1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF ILLINOIS
 2
    MANUEL ALVAREZ, SR.,                )
 3                                      )
           Plaintiff,                   )
 4                                      )
              -vs-                      )  No. 04-2162
 5                                      )
    CITY OF DANVILLE, OFFICER T. WASSON, )
 6  badge number 347, individually and as )
    employee of the Police Department of )
 7  the City of Danville, and OFFICER   )
    BLEW, individually and as employee  )
 8  of the Police Department of the City )
    of Danville,                        )
 9                                      )
           Defendants.                  )
10

11                        DEPOSITION

12       The Deposition of TROY WASSON, a citizen of the

13  State of Illinois, a witness of lawful age;

14  produced, sworn and examined upon his corporeal oath

15  on June 10, 2005 A.D., at the City of Danville

16  Police Department, 2 East South Street, Danville,

17  Illinois, before Janet E. Frederick, CSR, License

18  No. 084-003526, in and for the County of Champaign

19  and State of Illinois, as a witness in a certain

20  suit and matter now pending and undetermined in the

21  United States District Court, Central District of

22  Illinois.

23

24
```

2

```
 1       APPEARANCES:
```

```
 2          Ms. Jamie L. Bas
            GEORGE RIPPLINGER and ASSOCIATES
 3          2215 West Main Street
            Belleville, Illinois  62226-6692
 4          Appearing on behalf of the Plaintiff

 5          Mr. John F. Martin
            MEACHUM & MARTIN
 6          110 North Vermilion Street
            Danville, Illinois  61832
 7          Appearing on behalf of the Defendants

 8      ALSO PRESENT:

 9          Mr. Joseph Blew

10

11

12                  I N D E X

13   EXAMINATION BY:                    PAGE NO.

14       Ms. Bas...............................   3

15       Mr. Martin...........................  85

16       Ms. Bas..............................  87

17           (Exhibits retained by Ms. Bas.)

18

19

20

21

22

23

24
```

```
                                              3

 1                  TROY WASSON,

 2   the deponent herein, called as a witness, after

 3   having been first duly sworn, was examined and
```

4      testified as follows:

5                          EXAMINATION

6      BY MS. BAS:

7           Q.    Good morning, Officer Wasson.  How would

8      you prefer me to address you?

9           A.    That would be fine.

10          Q.    Okay.  Have you ever given a deposition

11     before?

12          A.    Yes, I have.

13          Q.    So you're familiar with the rules of us

14     not speaking over one another so the court reporter

15     can get us both down, correct?

16          A.    Yes.

17          Q.    And I'm going to assume today that if you

18     answer my question that you understood it.  Is that

19     okay?

20          A.    Yes.

21          Q.    And if at any point in time I need to

22     make myself more clear, please let me do so, okay?

23          A.    Yes.

24          Q.    Can you please tell me your educational

                                                          4

1      background?

2           A.    I graduated from Danville High School in

3      1988, and then I went to the United States Armed

4      Forces in the army.  And after that I completed two

5      years at DACC.

6           Q.    How long were you in the army?

7       A.    For four years.

8       Q.    And when did you get done with DACC?

9       A.    What year?

10      Q.    Yes.

11      A.    I don't recall the exact year of

12   graduation.

13      Q.    How long did it take you to complete the

14   DACC program?

15      A.    More than two years because I did it as I

16   worked.  I went to school full time and worked at

17   the same time, so probably a little over two years.

18      Q.    Okay.  Now, starting with high school as

19   a reference point, can you please tell me your work

20   background?

21      A.    After graduating high school, as I said I

22   went to the United States Army.  After the

23   United States Army, I worked at CCL Custom

24   Manufacturing as a chemical compounder.  After that

5

1   job I worked at the VA as a police officer here in

2   Danville.  After that job I was hired here for the

3   City of Danville as a police officer.

4       Q.    Okay.  I'm curious.  Is the VA place, is

5   that something different than the City of Danville?

6       A.    Yes.

7       Q.    Hired entirely separate?

8       A.    Completely different.

9       Q.    Okay.  I'm sorry.  Did you say yes?

10      A.    I said yes, they're completely different.

11      Q.    Okay.  And when did you start working for

12   the City of Danville?

13      A.    1996.

14      Q.    And what was your job title when you were

15   hired?

16      A.    Police officer.

17      Q.    Okay.  And have you had any commendations

18   since you've been a police officer here?

19      A.    Yes.

20      Q.    Can you estimate how many you've had?

21      A.    Well, starting for, I guess, the most

22   important is I received the medal of honor from the

23   City of Danville.  I've received -- this is just a

24   guess because I don't know exactly how many --

6

1    approximately ten departmental commendations and

2    four or five division commendations and several

3    letters of recommendation from my shift sergeants on

4    job performance.

5       Q.    Have you ever been promoted since you've

6    worked here?

7       A.    No.

8       Q.    Have you ever sought a promotion since

9    you worked here?

10      A.    I applied for sergeant, yes.

11      Q.    When did you apply for sergeant?

12          A.    Two years ago when the last test was --

13    let me think of the year.  Maybe 2004.  Early 2004,

14    late 2003.

15          Q.    Why weren't you promoted?

16          A.    I didn't score high enough.

17          Q.    What didn't you score high enough on?

18          A.    The written exam.

19          Q.    Was that the only reason you weren't

20    promoted to sergeant?

21          A.    I have no idea.

22          Q.    Okay.  Officer Wasson, I'm going to

23    direct my questioning straight to the events of

24    September 13th, 2003.  You were working that night,

                                                      7

1    correct?

2          A.    Yes.

3          Q.    And were you working alone that evening?

4          A.    I was.

5          Q.    Okay.  I'm going to say evening, but I

6    know that we're talking about the early morning

7    hours of after midnight.  Okay?

8          A.    Yes, ma'am.

9          Q.    Please tell me how it was that you came

10    to go to Manuel Alvarez's residence on September 13,

11    2003.

12          A.    I was dispatched there by Danville police

13    communications.

14        Q.    And at that time you were alone; is that

15    correct?

16        A.    Yes.

17        Q.    What were you told when you were

18    dispatched?

19        A.    I was dispatched to a fight in progress

20    and that the fight was continuing, and the caller

21    was on the phone with the dispatcher while I was en

22    route.

23        Q.    Okay.  When did you receive this dispatch

24    call?

8

1        A.    At what time?

2        Q.    Yes.

3        A.    It would have been approximately 0120 in

4    the morning.

5        Q.    I'm assuming that you're referring to the

6    police report now, correct?

7        A.    Yes, ma'am.

8        Q.    Okay.  I'm sorry.

9        A.    Would you like to see it?

10        Q.    No, I've got a copy.  Thank you.  Now, at

11    that particular point in time you said that you were

12    alone, correct?

13        A.    That's correct.

14        Q.    Okay.  Once you received the -- strike

15    that.

16        Were you told any other information during the

17     dispatch call?

18          A.     While I was en route to the address of

19     1101 Mabin, the dispatcher got back on the radio and

20     advised that they, "they" being the people involved,

21     were still fighting.

22          Q.     Okay.  And who was the dispatcher?

23          A.     I don't know.

24          Q.     Okay.  And were you told anything other

9

1     than they were still fighting?

2          A.     I don't recall.  I'd have to look at my

3     report, if you don't mind.

4          Q.     Go right ahead.

5          A.     It doesn't reflect whether or not they

6     said specifically who was fighting in the

7     background.

8          Q.     Did you know if it was -- if it were two

9     men or two women?

10          A.     I did not know.

11          Q.     Okay.  How long did it take you to get to

12     the scene?  And when I say scene, I mean

13     Mr. Alvarez's residence.

14          A.     I don't have that in front of me, but the

15     communications center logs the time of dispatch and

16     the time of arrival.  I would imagine it was just

17     within a few minutes.

18          Q.     Okay.  Did you speak with anyone other

19    than the dispatch officer between the time you

20    received the initial phone call and when you arrived

21    at Mr. Alvarez's residence?

22         A.    No.

23         Q.    What happened when you arrived at

24    Mr. Alvarez's residence on September 13th, 2003?


                                                     10

1          A.    As I turned into the driveway behind 1101

2    Mabin, I seen two people in the backyard, two men,

3    and then a third, which was a female, white.  At

4    that time I seen Mr. -- well, who was later

5    identified as Manuel Alvarez with a large pipe or

6    stick in his hand, and I watched him as he struck

7    the other subject who was later identified as Jeremy

8    Fleming in the head with that pipe.  Jeremy Fleming

9    then fell straight to the ground.

10         Q.    Okay.  Officer Wasson, what documents did

11    you review today before your deposition?

12         A.    My police report.

13         Q.    Have you reviewed any other documents

14    other than your police report in preparation of this

15    deposition today?

16         A.    Yes.

17         Q.    What documents did you review?

18         A.    I reviewed my personnel file.  I reviewed

19    complaints through the city of Danville, Sandra

20    Huston, which is the -- I don't know what her

21    official title is.  She works for the human resource

22    department.  She takes complaints against police

23    officers from citizens of Danville.  And I reviewed

24    my defensive tactics manual and the departmental

                                                              11

1    policy on defensive tactics.  I believe that's all

2    that I reviewed.

3         Q.    When you arrived at Mr. Alvarez's

4    residence, where specifically was the white female?

5         A.    As I was pulling into the back of the

6    house, I would be facing probably northeast

7    direction.  As I exited, she was on the south side

8    of the driveway closer to the house.  She was

9    probably five to ten yards away from the two men

10   fighting.

11        Q.    Okay.  And the two men are Mr. Alvarez

12   and Jeremy Fleming, correct?

13        A.    Yes.

14        Q.    Can you tell me specifically where

15   Mr. Alvarez was when you pulled up?

16        A.    He was just in the backyard.  As far as

17   exact location, I don't recall that.

18        Q.    Was he near the house or near the

19   driveway?

20        A.    He was closer to the driveway.

21        Q.    Okay.  Was he in the yard or actually in

22   the driveway?

23        A.    I believe that he was standing right next

24    to the driveway but probably in the grass.


                                                        12

1        Q.    What direction was he facing?

2        A.    He would have been facing west, southwest

3    direction.  So he would have been facing towards me

4    as I pulled in facing east.

5        Q.    And when you were pulling in and before

6    you got out of the car, what was he doing?

7        A.    What was who doing?

8        Q.    I'm sorry.  What was Mr. Alvarez doing as

9    you were still in the car?

10        A.    As I said, as I pulled up and I seen the

11    two men, which was Alvarez and Fleming, I seen

12    Mr. Alvarez with a pipe in his hand, and at that

13    point I observed Mr. Alvarez hit Fleming in the head

14    with a pipe.

15        Q.    And where were you when Mr. Alvarez hit

16    Mr. Fleming in the head with a pipe?

17        A.    I was in my police vehicle.

18        Q.    And was Mr. Alvarez standing when he

19    hit --

20        A.    Yes.

21        Q.    And where was Mr. Fleming when he was hit

22    by the pipe?

23        A.    He would have been directly in front of

24    Mr. Alvarez.

                                                        13

1        Q.    Was he standing?

2        A.    Yes.

3        Q.    And did he continue to stand after he was

4   hit by the pipe?

5        A.    No.

6        Q.    What did he do after he was hit by the

7   pipe?

8        A.    He fell to the ground in like a fetal

9   position.

10        Q.    Was Mr. Fleming facing you as you were

11   pulling up to the residence?

12        A.    No.

13        Q.    Was his back turned to you?

14        A.    Yes.

15        Q.    Once you saw Mr. Fleming fall to the

16   ground, what did you do next?

17        A.    After Mr. Fleming fell to the ground, I

18   got out.  I was exiting at the same time as I'm

19   pulling up to get out as quickly as possible.  I

20   yelled at Mr. Alvarez at least two times loudly to

21   drop the pipe.  He did not do so, so I advanced on

22   him.  Within probably ten feet, at that time I

23   removed my TASER, my X26 TASER, and activated it

24   which has a laser sight on it.  He still refused to

                                                          14

1   drop the pipe.

2        At that time I activated the TASER, which then

3    shoots a small set of two darts at Mr. Alvarez.  It

4    had little or no effect on him.  I again started

5    yelling at him to get on the ground.  He still did

6    not do so, so I activated the TASER again which

7    doesn't shoot another set of darts, it simply

8    reactivates the electricity from the stun gun, and

9    it again had no effect on Mr. Alvarez.

10        Q.    When you -- was your police car facing

11   the residence once you were out of it?

12        A.    No.  It was facing a northeast direction.

13   It was kind of at an angle.

14        Q.    Would the video inside of the police car

15   pick up any of the commotion in the backyard?

16        A.    I don't recall if it would have, if it

17   would have got the entire incident on tape or not.

18        Q.    Okay.  And that tape is no longer in

19   existence; is that correct?

20        A.    That's correct.

21        Q.    And when you saw Mr. Alvarez and you gave

22   him two commands, what did you tell him to do

23   specifically?

24        A.    Initially as I exited the car I told him

                                                     15

1    to drop the pipe twice, and he didn't do so.

2        Q.    Can you describe what he had in his hand

3    for me?

4        A.    I would describe it as probably three to

5    four foot long.  It was a round cylinder object, and

6   I would describe it as an aluminum tent pole.  And

7   maybe it didn't have any points or anything on the

8   end.  It was just a hollow, metal pipe.

9       Q.    Okay.  And did Mr. Alvarez recognize that

10  you were yelling at him?

11      A.    I don't know.  I only know that he

12  wasn't -- he wasn't -- I'm trying to think of the

13  right word.  He wasn't obeying the commands to drop

14  the pipe.

15      Q.    Did he look at you when you yelled at

16  him?

17      A.    I don't recall.

18      Q.    Did he put down the pipe when you told

19  him to?

20      A.    No.

21      Q.    And then that is when you activated the

22  TASER, correct?

23      A.    Yes.

24      Q.    And you said it was the X26; is that

16

1   correct?

2       A.    Yes.

3       Q.    Okay.  And after you TASER'd Mr. Alvarez,

4   what did he do?

5       A.    He did little or nothing.

6       Q.    Did he continue to hold the pipe?

7       A.    He did.

8        Q.     Okay.  And during the time that he

9    continued to hold the pipe, how exactly was he

10   holding it?

11       A.     At that point, he had already struck

12   Fleming.  He was on the ground.  He did not have it

13   over his head any longer, so I'm assuming, and I

14   don't recall exactly, but that he had it down in --

15   that he still had it in his hand.

16       Q.     Okay.  So at the time that you TASER'd

17   Mr. Alvarez, he was still holding the pipe, but it

18   was down at his side; is that right?

19       A.     He was still holding the pipe.  Whether

20   it was at his waist, above his head, or at the

21   ground, I'm not sure.

22       Q.     You don't know if it was above his head

23   or if he was holding it out to his side?

24       A.     I'm simply saying that I know he had it

                                                         17

1    in his hand.  I don't recall at this time the exact

2    positioning of the pipe.

3        Q.     Was he swinging the pipe when you TASER'd

4    him?

5        A.     No.

6        Q.     Was he making any violent movements when

7    you TASER'd him?

8        A.     No.

9        Q.     And you said after you TASER'd him he

10   continued to hold the pipe; is that correct?

11      A.    Yes.

12      Q.    Okay.  And how did he appear to you

13  physically after you TASER'd him?

14      A.    It had little or no effect on him.

15      Q.    Okay.  And what did you do after that?

16      A.    After which point?  After I TASER'd him?

17      Q.    After you TASER'd him the first time,

18  what did you do?

19      A.    I then yelled at him to start getting

20  down on the ground, and he again did nothing.

21      Q.    Did he continue to hold the pipe?

22      A.    At some point he dropped the pipe.

23      Q.    Okay.  Do you know if he dropped the pipe

24  because -- strike that.


                                            18

1       Did he drop the pipe before you TASER'd him the

2   second time?

3       A.    He dropped the pipe prior to activating

4   it the second time.

5       Q.    Okay.  And then what did you do after you

6   activated the TASER the second time?

7       A.    Once again it had little or no effect.

8       Q.    You deployed it, correct?

9       A.    Deploying it would be the first time

10  where the darts actually exit the blasting cartridge

11  and go out towards Mr. Alvarez.

12      Q.    Okay.  What happened the second time?

13      A.    The second time I just pulled the trigger

14   on it and it reactivated the electricity and the

15   small wires that are connected to the probes.

16      Q.    Okay.  Then what happened?  How did

17   Mr. Alvarez react after you activated the TASER the

18   second time?

19      A.    He did nothing.

20      Q.    When you say did nothing, did he move?

21      A.    Not during the time that the TASER was

22   going, which is why I say it had little or no

23   effect.

24      Q.    Did he look at you?

                                                    19

1      A.    I don't recall if he was looking at me.

2      Q.    Was he yelling?

3      A.    No.

4      Q.    Was he yelling at you before you

5   activated the TASER the second time?

6      A.    No.

7      Q.    Did he yell from the time that you

8   TASER'd him the first time until the second time?

9      A.    I don't recall.

10      Q.    And did he ever move his arms in a

11   violent manner between the first time you TASER'd

12   him and the second time?

13      A.    No, I don't believe he did.

14      Q.    Okay.  Where was Jeremy during the two

15   times that you TASER'd Mr. Alvarez?

16        A.    He was on the ground.

17        Q.    Was he still in front of Mr. Alvarez?

18        A.    I don't recall his exact location.  I was

19    focused on Mr. Alvarez at that point.

20        Q.    Okay.  And do you know where Tiffany Dill

21    was during the time that you were TASERing

22    Mr. Alvarez?

23        A.    Once again, I have no idea if he was

24    around me at that point.


                                                        20

1         Q.    Okay.  I know that Officer Blew at some

2     point came to the scene.  Was he present by this

3     time?

4         A.    Yes.

5         Q.    Okay.  When did Mr. -- I'm sorry.  When

6     did Officer Blew arrive?

7         A.    The exact time, I'm not sure.  Once

8     again, my attention was focused on the incident at

9     hand, but at some point Officer Blew had appeared in

10    my peripheral vision on my right side.  I think it

11    was after the first deployment and probably just

12    prior to the second deployment.  He was definitely

13    there as I approached Mr. Alvarez.

14        Q.    How close was he when he became in your

15    peripheral vision?

16        A.    He was probably five feet, five to ten

17    feet away from me.  He was just off my right side.

18          Q.    Okay.  Now, after you TASER'd Mr. Alvarez

19    the second time, you said it had little or no

20    effect; is that correct?

21          A.    Yes.

22          Q.    What did you do at that point?

23          A.    At that point I took the blasting cap or

24    the cartridge off the end of the TASER and I

                                                          21

1    discarded it onto the ground.

2          Q.    And what was Mr. Alvarez doing at this

3    particular point in time when you were discarding

4    the TASER?

5          A.    He was still standing in the same place.

6          Q.    Was he moving in any way?

7          A.    I don't recall.

8          Q.    Was he yelling in any way?

9          A.    No.

10          Q.    After you discarded the TASER, what did

11    you do?

12          A.    As I discarded the TASER, I was also

13    advancing towards Mr. Alvarez.

14          Q.    When you say you were advancing, describe

15    for me what you mean by advancing.

16          A.    I was just walking towards him because

17    the two deployments had just failed and at that

18    point he was still not doing anything, not obeying

19    the commands of me or if Joe was giving any

20    commands.  So at that point we have to move in close

21    enough to take him into custody.

22        So when I say advancing on him, I was moving

23    towards him and at the same time I'm taking the end

24    off the TASER and throwing it to the ground as I'm

                                                        22

1    walking.

2        Q.    Okay.  And you said that -- how would you

3    describe the pace that you were walking?

4        A.    It wasn't running and it probably wasn't

5    walking.  I don't know how to describe it.  In

6    between.  Given the conditions of the incident, I'm

7    sure I wasn't walking at a slow pace.

8        Q.    And how far did you have to walk from the

9    time that -- where you were standing when you

10    TASER'd Mr. Alvarez till when you got to him?

11        A.    I think I testified that I was about ten

12    or so feet away from him when I used the TASER, so

13    that distance.

14        Q.    Okay.  Now, during the point in time that

15    you are approaching Mr. Alvarez, do you remember

16    where Jeremy and Tiffany were at this point?

17        A.    No.

18        Q.    And Mr. Alvarez was in still the same

19    position, correct?

20        A.    Yes.

21        Q.    Okay.  Once you reached Mr. Alvarez, what

22    did you do?

23     A.     As I was approaching Mr. Alvarez, at that

24     point I recall that he was facing directly at me and

23

1     he took one step towards me.  At that point I was

2     within three to five feet, and at that point I had

3     my TASER in one hand, my left hand was empty, and I

4     used a front kick and kicked Mr. Alvarez in the

5     pelvis area.

6          And Joe was at that point probably as close as

7     I was on my right side.  He had an asp in his hand,

8     Officer Blew did, but it wasn't needed because at

9     that point Mr. Alvarez, I believe that he went down

10     to his knees at that point, rolled over onto his

11     stomach, and had both his hands underneath his

12     stomach or his chest area.  Kind of -- I don't know

13     how else to describe it.  Like a mummy position,

14     underneath his chest laying face down.

15     Q.     Okay.  And can you describe to me when

16     you kicked Mr. Alvarez, you said you kicked him in

17     the pelvic area; is that right?

18     A.     Yes.

19     Q.     Okay.  Did you kick him higher than where

20     his hip bones would sit?

21     A.     My point of aim is in the pelvis area.

22     Q.     And did you kick Mr. Alvarez only once?

23     A.     Yes.

24     Q.     And after you kicked him, he dropped to

24

1    the ground; is that correct?

2        A.    Yes.

3        Q.    And what did you do after Mr. Alvarez

4    landed on the ground?

5        A.    At that point, Officer Blew and I just

6    reached down, and we had to force his arms out from

7    under him, basically just pull his arms out from

8    under his body.  He was placed in the handcuffs.

9    Officer Blew and I lifted Mr. Alvarez to his feet

10    and noticed that he had a substantial or severe

11    wound to the face, and I immediately contacted Medix

12    for his injuries, which is the ambulance service.

13        Q.    Did you handcuff Mr. Alvarez?

14        A.    Yes, I did.

15        Q.    Did you handcuff him while he was still

16    on the ground?

17        A.    Yes.

18        Q.    And then you and Mr. Blew helped him --

19    Officer Blew, I'm sorry, helped him to his feet; is

20    that correct?

21        A.    Yes.

22        Q.    How did you help him to his feet?

23        A.    Ordinarily when a subject is laying on

24    the ground and handcuffed, I have them roll over on

25

1    their side, pull their knees up into their chest

2      area, kind of in a fetal position, and then with

3      their arms we rock them onto their knees and have

4      them stand up at that point.

5          Q.      Okay.  And is it your testimony today,

6      other than the two times that you TASER'd

7      Mr. Alvarez, the only time you came in contact with

8      him physically before you tried to handcuff him is

9      when you kicked him in the pelvis area; is that

10     correct?

11         A.      Yes.

12         Q.      Did Officer Blew ever physically come

13     into contact with Mr. Alvarez other than helping him

14     stand up?

15         A.      During the handcuffing process, and that

16     is by removing his arms under his body, that's the

17     only time Officer Blew had any contact with him.

18         Q.      And during -- once Mr. Alvarez fell to

19     the ground, the only manner in which you touched him

20     is when you took his arms from his chest and then

21     put them behind his back and handcuffed him; is that

22     correct?

23         A.      Yes, we pulled his arms from under his

24     chest and placed them behind his back.

                                                              26

1          Q.      Once you got handcuffs on Mr. Alvarez,

2      what did you do?

3          A.      Stood him up, seen his injuries, called

4      for Medix, and then escorted him over to the front

5    of my police car.  And we at that point could notice

6    that he was severely intoxicated, we could smell it,

7    and he was stumbling quite a bit so we leaned him up

8    against the front hood of the car, which is the

9    passenger side of vehicle 114.  And he was so

10    intoxicated at that point, he couldn't even stand on

11    his own so we stood there next to him momentarily

12    and he started -- he was so intoxicated that he was

13    sliding off the hood of the car.

14        So at that point we decided that we would sit

15    him on the ground.  So we had him sit down on the

16    ground next to the front tire of the police car so

17    that he wouldn't fall over.  And even then, if my

18    recollection is correct, that he was leaning over

19    and we had to have him sit up so that he wouldn't

20    lay over on himself.

21        At some point, while the medical people were en

22    route, we unhandcuffed Mr. Alvarez so that the

23    medics could take him because of his condition.  We

24    knew he was going to go to the emergency room, so we

27

1    took the handcuffs off of him so that they could

2    treat him.

3        Q.    Did Mr. Alvarez say anything to you

4    during the process of when you kicked him in the

5    pelvis?

6        A.    No.

7        Q.    Did he say anything once he fell to the

8    ground?

9        A.    No.

10       Q.    Did he make any violent movements when

11   you kicked him in the pelvis?

12       A.    No.

13       Q.    Did he make any violent movements after

14   he fell to the ground?

15       A.    Violent movements towards me or just

16   simply resisting arrest by holding his arms?  I'm

17   not quite sure what you're asking.

18       Q.    Did he make any movements toward you?

19       A.    No.

20       Q.    When you said that he was resisting

21   arrest, why do you say that?

22       A.    Because he was leaning on his chest and

23   refused to surrender his arms to be handcuffed.

24       Q.    And you said that Mr. Alvarez was

                                                        28

1    extremely intoxicated; is that correct?

2        A.    That's correct.

3        Q.    And he had just been kicked in the

4    pelvis, correct?

5        A.    Yes.

6        Q.    Did Mr. Alvarez appear to be in pain at

7    that point in time?

8        A.    I don't know.

9        Q.    Did you -- how would you describe the

10    kick?  Was it forceful?

11        A.    Describe your definition of forceful.

12        Q.    Well, describe for me how you would

13    describe the impact that you had upon Mr. Alvarez.

14        A.    As I was walking towards Mr. Alvarez, I

15    simply used my right leg and kicked him in the

16    pelvic area and pushed him backwards, which was my

17    intention.  I mean, I'm not trained in any skills as

18    far as Karate or anything like that, so it was just

19    to me normal.  It was a normal kick.  I'm not sure

20    exactly your definition of forceful, so I don't know

21    what you want.

22        Q.    Okay.  What portion of your foot came in

23    contact with Mr. Alvarez?

24        A.    I don't know.


                                                        29

1        Q.    The top?  The bottom part?

2        A.    It would be the sole of my foot, not the

3    top.

4        Q.    Okay.  Did you kick his stomach in any

5    way?

6        A.    I don't recall.  I aimed for the pelvic

7    area.

8        Q.    Where did you actually kick him if you

9    aimed for the pelvic area?

10        A.    I don't recall.  That was the aiming

11    point.  Please understand that the circumstances and

12     the incident happened within a few seconds.

13          Q.     I understand.  I'm just trying to get the

14     best of your memory that I can today.  Now, after

15     Mr. Alvarez was on the ground, did he say anything

16     to you during the process of trying to get him

17     handcuffed?

18          A.     No.

19          Q.     Did he say anything to Officer Blew

20     during this process?

21          A.     I don't know.  You'll have to ask Officer

22     Blew.

23          Q.     Once you handcuffed Mr. Alvarez, where

24     were Jeremy and Tiffany?

                                                        30

1          A.     During the handcuffing process, I don't

2     know where they were at.  After he was stood up and

3     was taken to the police car, Tiffany Dill was

4     still -- or she was standing on the steps on the

5     west side of the house, and at that point a third

6     officer and a fourth officer were on scene.

7          The third officer, Officer Phil Wilson, was

8     taking Jeremy Fleming.  He was picking him up at

9     that point.  I'm not sure if he was in custody or if

10     he was just lifting him up to check him.  I was with

11     Mr. Alvarez, and Fleming had still been on the

12     ground as I turned around.

13          Q.     And the only two officers at the scene

14     were yourself and Officer Blew; is that correct?

15      A.    When?  At what point?

16      Q.    During this whole time period.

17      A.    This whole time period lasted all of

18   about ten to fifteen seconds, and I knew that I was

19   there, Officer Blew was there.  Once Mr. Alvarez was

20   taken into custody, by the time we turned around,

21   there were two more officers on the scene.

22      Q.    Who were the two more officers that

23   arrived at the scene?

24      A.    Phil Wilson, badge number 366.


                                                          31

1       Q.    And who else?

2       A.    And the shift commander, Sergeant Jane

3    McFadden.

4       Q.    Did they witness any of the events of you

5    TASERing Mr. Alvarez and taking him to the ground?

6       A.    I don't know.

7       Q.    When did you realize that they were

8    there?

9       A.    After Mr. Alvarez was in custody.

10      Q.    When you say in custody, what do you

11   mean?

12      A.    Under arrest.

13      Q.    And when you say under arrest, what do

14   you mean?

15      A.    Handcuffed.

16      Q.    Did Mr. Alvarez say anything to you once

17    you got him off the ground and before the ambulance

18    arrived?

19        A.    I know that he was trying to talk, but he

20    was so highly intoxicated that, if I recall

21    correctly, both Officer Blew and I couldn't

22    understand what he was saying.

23        Q.    He was mumbling?

24        A.    Yes.

                                                            32

1         Q.    Was he yelling at you?

2         A.    No.

3         Q.    Did Mr. Alvarez ever yell at you during

4    this chain of events?

5         A.    No.

6         Q.    Did -- strike that.  You said that when

7    you were approaching Mr. Alvarez he took one step

8    toward you when you were three feet away from him;

9    am I correct?

10        A.    Yes.

11        Q.    Can you describe for me what exactly he

12    did?

13        A.    He was facing me at that time, and he

14    simply made his body language and turned towards me,

15    started towards me.  And by that I mean if his legs

16    start to come towards me as a step, that's a step.

17    That's what I see as him coming towards me as I'm

18    approaching him.

19        Q.    Okay.  Did he just make the -- he lifted

20     his leg and made one step; is that correct?

21          A.     I'm within three to five feet at this

22     point.  One step closes the gap to almost zero

23     between him and I, so I don't know if he took a step

24     or what.  He was in stride, I would say.

                                                                    33

1          Q.     Was he moving his arms when he took the

2     step?

3          A.     I don't recall.

4          Q.     Did he appear to be intoxicated when he

5     took the step to you?

6          A.     At that point, I didn't know what his

7     condition was.

8          Q.     Was he saying anything to you when he

9     took the step?

10          A.     No.

11          Q.     And why did you kick him when he took the

12     step toward you?

13          A.     At that point, my right hand was occupied

14     by a TASER gun, or an X26 TASER, which limited my

15     control of my hands.  I had no access to an asp or

16     any other control objects.  We were, like I said,

17     within three to five feet.  I had no reactionary

18     time at all.  At that point, my only option would

19     have been some other form of self-defense, which was

20     my foot, and my intention was to push him or kick

21     him away from me to keep him from being on top of

22    me.

23         Q.    Now, once the ambulance arrived, can you

24    please tell me what you did next?


                                                                34

1          A.    Once the ambulance arrived, they came

2     over and they looked at Mr. Alvarez and they

3     immediately started giving him his aid and he was

4     released to them.

5          Q.    Then what did you do?

6          A.    From there, I met with Phil Wilson,

7     Officer Blew, and Sergeant McFadden, and then went

8     to the hospital at Logan campus.

9          Q.    What did you do once you got to the

10    hospital?

11         A.    I went and met with medical staff.

12         Q.    Who did you meet with?

13         A.    I don't know.

14         Q.    Was it a doctor?

15         A.    Nurse, I believe.

16         Q.    Okay.  Male or female nurse?

17         A.    I don't know.

18         Q.    What did this nurse say to you?

19         A.    I went to check his condition to find out

20    whether or not he was going to be able to be

21    released.  They said because of the size of the

22    wound to the head and that they believed the bone

23    structure around the eye was damaged or broken, that

24    they were probably going to do a CAT scan and keep

35

1    him overnight.

2         Q.    Okay.  And this information was related

3    to you by a nurse; is that correct?

4         A.    I believe so, yes.

5         Q.    Okay.  Was anyone else present for this

6    conversation between you and the nurse?

7         A.    I don't recall who was around me.

8         Q.    Did the nurse say anything to you other

9    than what you have just told me?

10        A.    I had the nursing and that, I'm not

11   exactly sure which one it was, but check

12   Mr. Alvarez's body for the TASER dart or darts,

13   which there's two of them.  They looked over his

14   body for injuries, and they could find one small

15   puncture wound from the X26 dart that was shot.  So

16   that's what she reported to me.

17        Q.    Okay.  And you said that she reported

18   only one dot or mark; is that correct?

19        A.    Yes.

20        Q.    And what else was said between you and

21   the nurse?

22        A.    The nurse being Kim Desmond.

23        Q.    And you're getting that from your police

24   report, correct?

36

1        A.    Yes, ma'am, I am.  She just looked at the

2   dot, and her job at that point is to find out

3   whether or not the metal portion or the probe of the

4   X26 is actually in the skin.  She said it wasn't,

5   that it must have fallen out at some point, and that

6   she could only find one.

7        Q.    What did you do after you spoke with the

8   nurse?

9        A.    I left.

10        Q.    Did you ever speak with Mr. Alvarez when

11   you were at the hospital?

12        A.    I don't recall if we had a conversation.

13   He was getting -- had a pretty severe wound to his

14   face.

15        Q.    Okay.  Did you speak with anyone at the

16   hospital other than the nurse in the conversation

17   you just told me about?

18        A.    I don't recall.

19        Q.    Were any other officers at the hospital?

20        A.    Not that I can recall.

21        Q.    Is there anything that would refresh your

22   memory?

23        A.    Other than my police report, I don't

24   know.

37

1        Q.    So as you sit here today, the police

2   report is the only thing that you could rely on to

3   refresh your memory as to who else could have been

4      present at the hospital regarding this incident from

5      the police staff; is that correct?

6          A.    Are you asking me what other form of

7      documentations are out there?

8          Q.    Yes, if there's anything.  I want to know

9      if there are any other forms of documentation that

10     you could look at that would jog your memory, that

11     this information may be written down.

12         A.    Medical personnel have their

13     documentation, doctors have their documentation,

14     medical ambulance personnel have their

15     documentation.

16         Q.    Is there any documentation that you would

17     have written on that would jog your memory?

18         A.    No.

19         Q.    Is there any documentation within the

20     police department that would jog your memory?

21         A.    No.

22         Q.    Once you left the hospital, what did you

23     do?

24         A.    I got ahold of Officer Wilson because he

                                                            38

1      had transported Jeremy Fleming to book-in, and

2      Jeremy Fleming had been charged with battery.

3      Mr. Alvarez was also charged with battery at that

4      point but released from custody because of his

5      injuries.  And basically we just sent the police

6    report over to the state's attorney's office to file

7    a formal charge after he got out of the hospital.

8         Q.    Okay.

9         A.    So other than contacting Phil Wilson to

10   make sure that Jeremy Fleming was in custody, I

11   think I talked to Sergeant McFadden about what the

12   female, Tiffany Dill, had said because I hadn't

13   talked to her at the scene.

14        Q.    Okay.  What did you say to -- strike

15   that.

16        Where did this conversation occur between you

17   and Sergeant McFadden?

18        A.    I don't know the exact location.

19        Q.    Okay.  Was anyone else present for this

20   conversation?

21        A.    No.

22        Q.    Was it in person?

23        A.    Yes.

24        Q.    What did you say to her and what did she

                                                          39

1    say to you?

2         A.    I want to correct myself.  I'm not sure

3    if it was in person or over the telephone because

4    we're still working at this point.  I don't know if

5    we were in our cars meeting or by phone.

6         Q.    Okay.  What did she say to you and what

7    did you say to her?

8         A.    I simply asked her what Tiffany Dill had

9    said, and she told me that Tiffany Dill told her

10    that Manuel Alvarez and Jeremy Fleming are

11    father/son, that they had met earlier in the

12    evening, drank a couple cases of beer.  They got

13    into a pushing match.  The pushing match quickly led

14    to a fist fight that ended up in the backyard when

15    the police were called and that she called the

16    police.

17        Q.    Okay.  Was anything else said?

18        A.    Not that I can recall.

19        Q.    Is there anything that would help your

20    memory?

21        A.    No.

22        Q.    Okay.

23            MR. MARTIN:  I'll object.  There

24            might be something, but he doesn't know

                                                    40

1            what it is.

2        Q.    (by Ms. Bas)  Can you think of any

3    documents that would help your memory as to what

4    else was said between you and McFadden?

5        A.    There would be no documentation of a

6    personal conversation.

7        Q.    So as you sit here today, the only thing

8    you have is your memory; is that correct?

9        A.    Yes.

10        Q.    And there's nothing that you can look at

11    that would help your memory; is that correct?

12         A.    Yes.

13         Q.    After you spoke with -- strike that.

14         You said you also spoke with Officer Wilson; is

15    that correct?

16         A.    I did.

17         Q.    When did you speak with Mr. -- or Officer

18    Wilson?

19         A.    It was after I left the hospital.

20         Q.    Were you in your squad car at this time?

21         A.    Once again, I don't know if I was in the

22    car talking to him face to face or on the phone.

23         Q.    Okay.  If you had been speaking with him

24    face to face, where would you have been speaking


                                                        41

1    with him?

2         A.    In the city of Danville.

3         Q.    When you spoke with McFadden and Wilson,

4    was this sometime after he left the hospital, like

5    closer to after he left the hospital, or is it the

6    next day or two days later?

7         A.    It was the same night.

8         Q.    When you spoke with Officer Wilson, was

9    anyone else present for that conversation?

10        A.    No.

11        Q.    Tell me what you said to him and what he

12    said to you.

13        A.    I simply asked him if Jeremy Fleming had

14    any injuries and what was the charges he put on the

15    booking sheet for me.  He told me he put him down

16    for simple battery.  And I don't recall if he told

17    me if Jeremy Fleming had any physical injuries or

18    not.

19         Q.    Was Jeremy Fleming taken to the police

20    station?

21         A.    Yes.

22         Q.    And he was booked; is that correct?

23         A.    Yes.

24         Q.    And he was released, correct?

                                                    42

1          A.    Released?

2          Q.    On bail.  He was let out?

3          A.    I don't know.

4          Q.    Okay.  Did you ever speak with Jeremy

5     Fleming after you arrested Mr. Alvarez?

6          A.    No.

7          Q.    Did you read Mr. Alvarez his rights?

8          A.    I did not.

9          Q.    And why would you not or why did you not

10    do that?

11         A.    I didn't ask him any questions.

12         Q.    Okay.  And when you spoke with the

13    hospital staff, they told you that he would most

14    likely be there overnight; is that correct?

15         A.    They believed he would be held because he

16    had possibly had a concussion.  Whether that was

17    overnight or for the duration of the examination, we

18    were too busy to stay and baby-sit so we released

19    him to the hospital and I left.

20        Q.    Okay.  Did you have any intention of

21    going back to get Mr. Alvarez when he was going to

22    be released so you could book him?

23        A.    If he would have been released that

24    night, my intention, yes, was to take him into

                                                    43

1    custody for battery and process him in booking.

2        Q.    Okay.  And when did you work on -- strike

3    that.

4        When did you start your shift on September

5    12th, 2003?

6        A.    Was that the night --

7        Q.    That would have been before midnight.

8        A.    We start our shift at 10:20 p.m., I'm

9    sorry, 10:40 p.m.

10        Q.    And is that the time you started your

11    shift that particular evening?

12        A.    I believe it was.

13        Q.    And what time did your shift end on

14    September 13th, 2003?

15        A.    We normally end at 7:15 in the morning.

16        Q.    Okay.  Now, you testified that it was

17    your intention to go back and get Mr. Alvarez if he

18    were released that evening so you could take him to

19    the jail and book him; is that correct?

20        A.    Yes.

21        Q.    And why didn't you do that?

22        A.    He hadn't been released prior to the end

23    of my shift at 7:15.

24        Q.    Okay.  And if he had been released prior

                                                        44

1    to your shift at 7:15, you would have taken him to

2    the jail, correct?

3        A.    Yes.

4        Q.    How were you going to find out whether or

5    not Mr. Alvarez had been released from the hospital?

6        A.    I don't know who I spoke to, but I asked

7    them if he is ready for release to call the police

8    station and notify us and we'll come over and pick

9    him up.

10        Q.    Okay.  And did you call the hospital

11    before you ended your shift that morning at 7:15

12    a.m.?

13        A.    I don't recall if I called the hospital

14    or not.

15        Q.    Did you want to know whether or not he

16    had been released so you could book him?

17        A.    If he had been released, they would have

18    called, I assume.

19        Q.    Why do you assume that?

20        A.    Because that's what they normally do.

21        Q.    Can you tell me what the normal procedure

22    is on how to book someone if they require medical

23    treatment and you can't take them directly to the

24    jail?  What's the normal procedure?

                                                        45

1         A.    If they have to go to the hospital, we

2     don't book them at all.  I mean, our options are,

3     one, wait for him to be released by the doctor.

4     Once he's medically released, he can then be taken

5     into custody, transported to the jail, and

6     processed.  Or, two, simply notify the state's

7     attorney's office that you want either a warrant be

8     issued for his arrest and then we'll file formal

9     charges.

10        Q.    Now, earlier when you were speaking about

11    the hospital you said that's what they normally do

12    is that they call you when the person is ready to be

13    released.

14        A.    If we ask them to.

15        Q.    How many times have you done that and how

16    many times have they called you upon your request?

17        A.    More than ten.

18        Q.    And Jeremy Fleming was charged with

19    battery but Mr. Alvarez was not, correct?

20        A.    He was charged with battery.

21        Q.    He was, okay.  Did the state's attorney

22    prosecute the matter against Jeremy Fleming?

23        A.    I don't know.

24          Q.    Do you know if they prosecuted against

1    Mr. Alvarez?

2          A.    I don't know.

3          Q.    And you said you reported this incident

4    to the state's attorney; is that correct?

5          A.    I filed a police report.

6          Q.    Okay.  And the police report that you're

7    referring to, is that the same police report that

8    you are reviewing right now?

9          A.    Yes.

10          Q.    And who did you give that report to?

11          A.    We complete these reports and then submit

12    them to records, which is inside the Danville Police

13    Department.

14          Q.    Okay.  And then what happens once they

15    are submitted to records?

16          A.    They disseminate the reports to the

17    state's attorney's office through detectives, on

18    through the chief of police, and one goes in the

19    permanent file here at the station.

20          Q.    How are they disseminated?

21          A.    You'd have to check with records.

22          Q.    So all you know is that you filled out

23    this police report, you gave it to the records

24    department, they were supposed to disseminate it to

47

1    the state's attorney's office, correct?

2         A.    Yes, ma'am.

3         Q.    Do you know whether or not this report

4    was indeed disseminated to the state's attorney's

5    office?

6         A.    I don't.

7         Q.    Did you ever have any more contact with

8    Mr. Alvarez once you left the hospital?

9         A.    No.

10         Q.    In preparation of your deposition today,

11    other than your attorney, did you speak with anyone?

12         A.    Yes.

13         Q.    Who did you speak with?

14         A.    Officer Joe Blew.

15         Q.    Who else did you speak with?

16         A.    Officer Phil Wilson.

17         Q.    Who else did you speak with?

18         A.    Sergeant Jane McFadden.

19         Q.    Who else?

20         A.    Deputy Director Bob Richard.

21         Q.    Anyone else?

22         A.    Not that I can recall.

23         Q.    When did you speak with Officer Joe Blew?

24         A.    After I found out that I was being sued.

48

1         Q.    Okay.  What did you say to Officer Blew

2    and what did he say to you?

3          A.    We looked at the report, reviewed it,

4    talked about the incident.  Just the specifics that

5    are in the report.

6          Q.    Was anything else said that's not

7    contained in the report between yourself and Officer

8    Blew?

9          A.    No.

10         Q.    Have you ever spoken to Officer Blew

11   about the events that took place on September 13th,

12   2003, other than what's contained in the police

13   report?

14         A.    No.

15         Q.    When did you speak with Officer Wilson?

16         A.    I would imagine, and I don't know the

17   exact date, probably shortly thereafter receiving

18   the information that I was being sued.  I talked to

19   the officers that were there on scene.

20         Q.    Okay.  What specifically did you say to

21   Officer Wilson?

22         A.    I don't recall.

23         Q.    What did he say to you?

24         A.    I don't recall.

                                                    49

1          Q.    Is there anything that would refresh your

2    memory?

3          A.    No.

4          Q.    When did you speak with McFadden?

5      A.    Shortly thereafter receiving the

6    complaint.

7      Q.    Okay.  And what did you say to Jane

8    McFadden?

9      A.    I don't recall the specifics.

10     Q.    Do you remember what she said to you?

11     A.    No.

12     Q.    When did you speak with Deputy Bob

13   Richard?

14     A.    We're required to notify him as soon as

15   we receive a complaint or information that we're

16   being sued.  So as soon as I got the paperwork, as

17   soon as I possibly could I contacted him so he can

18   do whatever he does.

19     Q.    Okay.  What did you tell Deputy Bob

20   Richard once you were sued?

21     A.    I handed him the paperwork, and that was

22   about it.  He said he'd make notifications.

23     Q.    And he didn't say anything else to you

24   about this incident?

                                                    50

1      A.    No.

2      Q.    Did he ask you what happened?

3      A.    Later.

4      Q.    When did he ask you what happened?

5      A.    I don't recall the exact date.

6      Q.    What did you tell him?

7      A.    I told him the specifics that are in the

8   police report.

9       Q.    Did you relate any information to him

10  that's not contained in the police report?

11      A.    No.

12      Q.    Did you speak with Officer Wilson,

13  Sergeant McFadden, or Deputy Richard within the last

14  month about this incident?

15      A.    I spoke with Deputy Director Bob Richard

16  about this complaint within the last month.

17      Q.    What did you say -- or strike that.

18      How many conversations did you have with Deputy

19  Richard about this incident within the last month?

20      A.    When I got notified that they needed more

21  information.  Once to notify him that I had went to

22  see Jack Martin so that I could get paid for court.

23  A third time for this deposition here.

24      Q.    Okay.  The third time for this deposition

                                                        51

1   here, what specifically did you say to Deputy

2   Richard?

3       A.    I told him that I had to be here at 9:00

4   o'clock.

5       Q.    And what did he say to you?

6       A.    Okay.

7       Q.    Was anything else said during that

8   conversation?

9       A.    No.

10          Q.    What training -- strike that.

11          Can you explain to me how the X26 TASER works?

12          A.    If you ask me a specific question, I'll

13    try to answer that.  As far as the exact details on

14    how the machine itself works, I would imagine you

15    need a representative from the TASER company.

16          Q.    How do you know how it works?

17          A.    Through training.

18          Q.    What training did you receive regarding

19    the X26 TASER?

20          A.    I received training from a representative

21    from TASER International on how the TASER works.

22          Q.    When did you receive this training?

23          A.    I don't recall the exact date.

24          Q.    Was it before or after September 13th,

                                                          52

1    2003?

2          A.    Before.

3          Q.    How much before?

4          A.    I don't know the date that the department

5    began using TASERs.

6          Q.    Do you know the date when you started

7    using TASERs or an approximate time period?

8          A.    The day they started carrying TASERs was

9    the day that I started using TASERs.

10          Q.    Okay.  How many times did you receive

11    training on the X26 TASER before September 13th,

12    2003?

13          A.    I don't recall the number.

14          Q.    Is there anything that would refresh your

15    memory?

16          A.    No.

17          Q.    Is the X26 TASER the only TASER that

18    you've used at the Danville Police Department?

19          A.    No.

20          Q.    What other TASER did you use?

21          A.    The previous model to the X26.

22          Q.    What was that previous model?

23          A.    I don't recall the model.

24          Q.    Could it have been the M26?


                                                          53

1           A.    Could have been.  I'm not sure exactly.

2           Q.    Okay.  What's the difference between the

3     previous model and the X26?

4           A.    The biggest difference is size and

5     weight.  And other than that, I don't know the exact

6     differences.

7           Q.    At one point in time you were trained

8     to -- strike that.

9           Were you at one point in time trained to use

10    the prior model?

11          A.    Yes.

12          Q.    Okay.  And then at some point in time you

13    were given the X26 version; is that correct?

14          A.    That's correct.

15        Q.    Did you receive training on how to use

16   the X26 version?

17        A.    Yes, ma'am.

18        Q.    Okay.  So how did it differ from the

19   model that you had before?

20        A.    Once again, it was the size, and it has a

21   digital readout, and the M -- did you say the M29?

22        Q.    I don't know.  That's why I asked you

23   what the prior model was.

24        A.    Whatever the prior model was, I don't

                                                      54

1   recall what it is exactly, but it didn't have the

2   same functions as the X26.

3        Q.    What functions did it not have?

4        A.    I don't recall.  I'd have to have the

5   both of them in front of me to compare them.

6        Q.    Okay.  When -- strike that.  If you have

7   to -- strike that.

8             When you received your training for the X26

9   TASER, was it a -- how long did the training take

10   place, like what span of time?  Like a day?  Hours?

11   A week?

12        A.    It was not weeks.  It was more than

13   hours.  The exact number of days, I'm not sure.  I'm

14   sure it's in my training file.

15        Q.    Okay.  And what are you taught?  What

16   were you taught during the training session for the

17   X26 TASER?

18        A.    We were taught how to use it as far as

19    the functions.  We were taught how long the TASER

20    activates when you pull the trigger, how you can

21    turn it off to make it a shorter time, the distances

22    in deployment, the removal of the darts.  A basic

23    background on the history of TASER International,

24    background on the instructor.


                                                              55

1        We were all -- we all watched demonstrations of

2    people being shot with the TASER on video.  We all

3    participated in being shot with the TASER in the

4    classroom.  We were taught how to remove the

5    cartridges, put them back on, deploy the TASERs.

6    The basic functioning on how to use it.

7        Q.    Okay.  Were you taught what should happen

8    to a person when they are TASER'd?

9        A.    What the desired effect is?

10        Q.    Yes.

11        A.    Yes.

12        Q.    And were you taught any complications

13    that can arise by using a TASER?

14        A.    They went over whether it affects a pace

15    maker, what the long-term effects are, which they

16    said are none, versus like pepper spray or chemical

17    spray, OC spray, the effects of the TASER versus a

18    PR24 or an asp.  We covered that.  As far as

19    long-term complications, none.

20        Some complications would be a small puncture

21   wound, two of them if you get both darts in.

22   Possibly a small burn mark area on the skin because

23   it is a small amount of electricity that's being

24   used.  They said don't use the TASER if somebody is

56

1   standing on the corner of a building because they

2   could suffer injuries from that if they fell.  But

3   for the most part, they said there was very little

4   or few long-term complications from the TASER.

5        Q.    And have you been using the X26 laser --

6   or the X26 TASER since 2003?

7        A.    Yes, ma'am.

8        Q.    There isn't a newer model, correct?

9        A.    No, ma'am.

10        Q.    Now, you said that you were taught that

11   there were no long-term effects of using the TASER.

12   What are the short-term effects?

13        A.    The short-term effects, if you're asking

14   me what the effects are during the time that you're

15   being shot with the TASER --

16        Q.    Yes.

17        A.    What it does is it breaks up the

18   electrical muscle, whatever the brain sends out to

19   the muscles.  It disrupts that system so that its

20   desired effect is that by disrupting those

21   functions, whoever it is that you're shooting the

22   TASER can no longer do what they're doing.  So if

23    they're attacking you, they shouldn't be able to

24    attack you.  If they're grabbing a gun or a knife,

57

1    they shouldn't be able to do that.  That's the

2    desired effect.  It's not 100 percent.

3        Q.    Why do you say that?

4        A.    Because you have to have two contact

5    positions on the body for the electricity to have

6    the current to run through the body.  So if one dart

7    misses the body, you might have a small amount of --

8    I guess I can use the word jolt or vibration in the

9    body, but it's not going to disrupt the system that

10    it's desired for.

11        Q.    Were you TASER'd during the training?

12        A.    Yes, ma'am.

13        Q.    And did both darts hit you during that

14    training?

15        A.    I've been TASER'd five times, yes.

16        Q.    And what happens?  What happens to you

17    when you're TASER'd?

18        A.    At the time you're being TASER'd, you

19    can't speak, you can't -- or I could not speak, I

20    could not walk or move.  I dropped straight to my

21    knees until the point they turned them off.

22        Q.    And how long are you supposed to activate

23    a TASER?

24        A.    You can activate it from zero to five

58

1    seconds.

2        Q.    And what happens if you activate it

3    longer than five seconds?

4        A.    It doesn't activate longer than five

5    seconds.  It automatically shuts off after five

6    seconds and then you have to reactivate it by

7    pulling the trigger again.

8        Q.    Do you know what the voltage is on the

9    X26 TASER?

10       A.    I don't know the exact voltage.

11       Q.    Do you know approximately what the

12   voltage is?

13       A.    Fifty to a hundred thousand volts, .0036

14   amps.

15       Q.    And how many times can you activate --

16   how many times were you trained to activate a TASER

17   on someone if necessary?

18       A.    As many times as is necessary to take the

19   person into custody or to stop the actions of the

20   person that you shot with the TASER.

21       Q.    Okay.  And do you know -- strike that.

22       Were you trained in any side effects that can

23   happen if a person is TASER'd more than once?

24       A.    Not that I can recall.

59

1        Q.    Do you know of any side effects that

2    could occur if they're TASER'd more than twice?

3        A.    No.

4        Q.    Three times?

5        A.    No.

6        Q.    Four?

7        A.    We never covered more than four or five

8    times.

9        Q.    Okay.  But you could -- you were trained

10   that you could TASER somebody four or five times if

11   necessary, correct?

12       A.    They never gave a specific number.

13       Q.    So you were never instructed on how many

14   times you could activate a TASER on someone; is that

15   correct?

16       A.    Each time that the TASER is activated,

17   it's supposed to give you the desired effect.  If it

18   doesn't do it then you can reactivate it.  So they

19   didn't say you can't do this, a number, and they

20   didn't say you could do it so many numbers before it

21   has an effect.

22       Q.    Okay.  You would agree with me, though,

23   that you were never trained on how many times you

24   can TASER someone, correct?

                                                      60

1        A.    What I would agree with is that I don't

2    recall if they gave us a specific number or not.

3        Q.    Is there anything that would refresh your

4    memory as to how many times you were instructed that

5    you should or how many times -- strike that -- at

6    what point you should not TASER someone?

7        A.    I know there is a TASER manual, which I

8    think you're looking at.  But I don't know if it

9    says specifically whether or not you can TASER

10   somebody once, twice, five, ten, twenty times.

11       Q.    Okay.  And is there a manual on the X26

12   TASER?

13       A.    What type of manual are you speaking of?

14   We have like a pamphlet that has the nomenclature

15   which is basically the set-up, what all the

16   functions are on the TASER.  A specific manual for

17   each TASER for an officer to have, I don't recall if

18   they have one or not when they are given the TASER.

19       Q.    Were you ever given any handouts during

20   your training on the X26 TASER?

21       A.    Yes.

22       Q.    Are you sure that you were using the X26

23   TASER back on September 13, 2003?

24       A.    Yes.

                                                    61

1        Q.    And why are you sure of that?

2        A.    Because that's what I'm carrying right

3    now.

4        Q.    Counsel, I have been provided training on

5    the M26, not the X26 TASER.  I would like a copy of

6    the X26 pamphlet and training papers that Officer

7    Wasson was given during his training session on the

8    TASER gun he used on September 13, 2003.

9        Officer Wasson, are those papers here --

10       A.    What papers?

11       Q.    -- in the police station?  The training

12   papers for the X26 TASER.

13       A.    No.

14       Q.    Where are they kept?

15       A.    My copies?  Discarded.

16       Q.    Okay.  Does the police station keep

17   copies here?

18       A.    I don't know.

19       Q.    Who would know?

20       A.    Deputy Director Bob Richard.

21       Q.    Okay.  Is one of the side effects of

22   activating a TASER is that a person could become

23   frozen?

24       A.    Yes.


                                                    62

1        Q.    And if you TASER someone and they appear

2    frozen, what do you do?

3        A.    I don't know what it says specifically to

4    do at that point.

5        Q.    What were you trained to do if you TASER

6    someone and they appear frozen?

7        A.    I don't recall.

8        Q.    Were you trained on what to do if a

9      person appears frozen after they have been TASER'd?

10         A.    I remember the terminology frozen during

11     my training, but I don't recall the exact

12     instructions on what to do.

13         Q.    If a person -- were you trained on what

14     to do if a person appears intoxicated before you

15     TASER them?

16         A.    I don't know if they specifically talk

17     about if somebody appears intoxicated.  In this

18     instant, I didn't know if Mr. Alvarez was

19     intoxicated.

20         Q.    I'm asking you, though, what are you

21     trained to do if you come across an intoxicated

22     person, are you instructed that you can or cannot

23     use a TASER on that individual?

24         A.    You can use the TASER on any individual

                                                          63

1      that you need to.

2          Q.    Okay.  And whether or not they're

3      intoxicated doesn't make a difference; is that

4      correct?

5          A.    Yes, that's correct.

6          Q.    Do you know what effects, if any,

7      TASERing someone who is intoxicated would have on

8      their body?

9          A.    No.

10         Q.    Do you know if that person may appear

11     frozen after you TASER them?

12          A.      Once again, I don't know what they -- the

13    training was on being frozen.

14          Q.      Okay.  And how many times have you

15    TASER'd someone?

16          A.      I don't know.

17          Q.      Can you give me an approximation?

18          A.      Less than ten.

19          Q.      As of September 13, 2003, had you ever

20    TASER'd anyone before Mr. Alvarez?

21          A.      I don't recall.  An educated guess would

22    be yes.

23          Q.      Why do you say that?

24          A.      Because if we were using the X26 at that

                                                              64

1    time, which I'm sure I did, the older model I do

2    believe that I had used, the TASER before that, so

3    that's why I say yes.

4          Q.      Had you used the X26 TASER before on

5    anyone other than Mr. Alvarez?

6          A.      Have I ever used the X26?

7          Q.      I'll rephrase the question.  It was a

8    poorly phrased question.

9          Had you ever used the X26 TASER on anyone

10    before Mr. Alvarez on September 13th, 2003?

11          A.      I don't recall.

12          Q.      Is there anything that would refresh your

13    recollection?

14          A.     Nothing that I have in front of me.

15          Q.     Are there any documents anywhere else

16     that would refresh your recollection?

17          A.     We complete a TASER form at the

18     completion of the TASER incident.  It's called a

19     TASER Incident Form.  It's submitted with our police

20     report.

21          Q.     And why do you have to complete a TASER

22     Incident Form?

23          A.     It's policy.

24          Q.     What is the policy specifically?

                                                      65

1           A.     I don't know what the policy reads other

2      than they need to complete an incident report form

3      on the policy.

4           Q.     And when is that report supposed to be

5      completed?

6           A.     Following the incident.

7           Q.     And what is done with that report once it

8      is completed?

9           A.     Given to the shift commander.

10          Q.     Do you always fill out TASER reports when

11     you TASER someone?

12          A.     In accordance to policy, yes.

13          Q.     Did you fill out a TASER report

14     specifically regarding the incident involving

15     Mr. Alvarez on September 13, 2003?

16          A.     Yes, I believe I did.

17      Q.    Do you have a copy of that report?

18      A.    No, I don't.

19      Q.    Is that report in existence?

20      A.    I don't know what's done with it after I

21    complete them.

22      Q.    But you're sure you would have completed

23    one for Mr. Alvarez, correct?

24      A.    I should have, yes.


                                                        66

1      Q.    And you should have because that was

2    office policy, correct?

3      A.    Departmental policy, yes.

4      Q.    Thank you.  What information is contained

5    in the TASER report that you have to complete?

6      A.    Incident details, report number, where

7    the location of the dart was at -- darts, plural --

8    what the effects were on the person that had been

9    shot with the TASER, and it shows or it asks the

10    model number that you used, the serial number of the

11    X26 that you used.  I believe that's all that I can

12    recall at this time.  I haven't filled out an

13    incident report with a TASER for a while.

14      Q.    And once you fill out those incident

15    reports, who do those have to be given to?

16      A.    Hand them to the shift commander.

17      Q.    Would that have been Jane McFadden?

18      A.    I believe she was the shift commander

19        that night, yes.

20        Q.    After you fill out a report on the use of

21   the X26 TASER, is it complete at that point or does

22   somebody come and speak with you about the

23   deployment?

24        A.    No one comes to speak.


                                                           67

1         Q.    So it's just a matter of departmental

2    policy to make sure that there are reports for every

3    single time a TASER is activated; is that correct?

4         A.    Yes.

5         Q.    And do you know who wrote that policy?

6         A.    It would be Deputy Director Bob Richard.

7         Q.    You're trained on specifically the

8    force -- degree of force you can use on a person,

9    correct?

10        A.    Yes.

11        Q.    And am I correct that there are certain

12   levels that you are allowed to use according to the

13   appeared threat that person may project to you or to

14   someone else?

15        A.    Levels of use of force, is that what

16   you're asking me?

17        Q.    Yes, I am.

18        A.    Yes.

19        Q.    Can you explain the levels for me,

20   please, and when you can do what?  And I'm going to

21   ask you specifically what was the use of force you

22    were allowed to use as of September 13, 2003, going

23    from least to highest, to deadly.

24         A.    The least would be -- you have to excuse

                                                              68

1    me.  I've worked all night.  Would be -- a show of

2    force of simply arriving on the scene would probably

3    be the least amount of force that an officer can

4    use.  So simply showing up.

5         The next step would be verbal commands.  The

6    second step would probably be open or empty hand

7    control tactics.

8         Q.    Okay.  I'm going to interrupt you.  As

9    you're describing this, can you tell me why you are

10    allowed to go from verbal commands to empty hand

11    tactics?  Explain that difference to me as you're

12    going through these, please.

13         A.    What advances the levels?

14         Q.    Yes, thank you.

15         A.    Basically to cover it all in one is that

16    we just adjust our level of use of force based on

17    the suspect's actions, and it is our training and

18    been my experience that through training you always

19    go one level higher than the person that you're

20    encountering.  So if they're yelling and you have to

21    take them in custody, you are allowed through policy

22    to go one step above that in order to take that

23    person into custody.

24          So if -- if verbal control or communication

69

1    doesn't work with the subject, then you are

2    automatically allowed to move up to empty hand

3    controls or joint manipulation.  If that doesn't

4    work -- and, granted, you don't have to go step by

5    step by step.  You could go from just showing up to

6    deadly force if deemed necessary.  But the steps

7    being empty hand control, then closed hand control,

8    meaning hands closed, fists, knees, elbows.  Again,

9    I think it's joint manipulation, but I'm not sure at

10   this point.

11       Then you can go to your defensive weapons, such

12   as your baton and then, of course, from that is your

13   deadly force or your firearm, whatever necessary

14   deadly force you have to use.  TASER falls under

15   empty hand control.  It is in our level of force

16   before closed hand or hard hand use of force.  I

17   don't know the exact terminology.  I'm sorry.

18       Q.   No, that's fine.  You use terminology

19   that you're familiar with.  Would you agree that you

20   are allowed to use the -- and when I say my next

21   line of questioning, I'm speaking strictly the time

22   period of September 13th, 2003.  Would you agree

23   with me that you would be allowed to use the TASER

24   if someone were exhibiting resistive movements to

1  avoid arrest?

2      A.    Yes.

3      Q.    And you would also be allowed to use the

4  TASER if that person were making verbal remarks that

5  they were going to resist arrest?

6      A.    Yes.

7      Q.    And you would also be allowed to use the

8  TASER if the person were attempting to cause

9  physical injury to himself or someone else or even

10  another officer; is that correct?

11      A.    Yes.

12      Q.    And would you also agree with me during

13  2003, September 13th, that you would be allowed to

14  use punches or kicks or striking when a person

15  relayed a threat to themselves or another and

16  without intervention that threat would effectuate?

17      A.    Effectuate?

18      Q.    If the person appeared to be a threat to

19  themselves or another, you would be allowed to use,

20  I believe, what you described as closed fist or a

21  striking resist; is that correct?

22      A.    Yes.

23      Q.    Or if they acted in an aggressive manner,

24  correct, you would also be allowed to use a striking

71

1  or kicking; is that correct?

2      A.    It depends on the aggressive behavior

3     that you're talking about.  Just because they're

4     yelling doesn't give you the automatic right to use

5     a punch or a kick.

6          Q.    What gives you the right to use a punch

7     or a kick?

8          A.    Actively resisting arrest or they're

9     actively fighting you or you feel that at some point

10    you are in fear of being battered, fear of receiving

11    a battery.  That would automatically give you at

12    that point to use that or whatever force would be

13    necessary at that point to protect yourself and

14    effect the arrest.

15         Q.    And the police report that you used

16    earlier and that you made regarding this incident,

17    is that incident report accurate and complete?

18         A.    Yes.

19         Q.    Is there anything about the evening that

20    is not contained in your police report as far as the

21    actions of yourself or Mr. Alvarez?

22         A.    Yes.

23         Q.    What is that?

24         A.    It doesn't say that he had slurred speech

72

1     and that he slid off of the hood of my squad car.

2     It doesn't say he was sitting next to the tire and

3     falling over, that he needed that much medical

4     assistance because he was that drunk.  It doesn't

5     include whether he was facing me or facing away,

6    whether Jeremy Fleming was facing me or facing away

7    while he was lying on the ground after being hit in

8    the head.

9        Q.    Are you finished?

10       A.    I'm still reading.  It does not include

11   the specifics on me going forward and striking

12   Mr. Alvarez in the pelvic area.  It doesn't describe

13   his actions immediately thereafter.  I'm sure

14   there's probably small details like time and

15   temperature that's not in there also.

16       Q.    Anything else?

17       A.    No.

18       Q.    What's the purpose of the police report

19   that you filled out regarding Mr. Alvarez?

20       A.    To document the events that occurred on

21   September 13 of 2003, 0120 in the morning.

22       Q.    Why do you have to document the events

23   that occurred on September 13th, 2003?

24       A.    We're documenting the events because

                                                    73

1    there has been a criminal offense occur and we

2    document those for prosecution, for the protection

3    of the department, for the protection of witnesses

4    and victims and everyone involved.

5        Q.    And what training do you receive on how

6    to complete a report from the department?

7        A.    We receive training through the Police

8    Training Institute, and we also go through four

9    months of field training that you would write police

10   reports and a field training officer reviews them

11   and makes sure that you have the elements of the

12   offense in there.  And as long as they are written,

13   complete, and the time line is correct, then they're

14   good enough to turn in.

15        Q.    Okay.  What are the elements that you

16   referred to?

17        A.    Each offense -- each incident or crime

18   has a specific element that has to be met in order

19   to charge them.

20        Q.    You would agree with me it's important to

21   put absolutely everything that happens in a police

22   report, correct?

23        A.    As much as you can recall at the time

24   you're doing the report.

                                                        74

1         Q.    Well, you're trained to put -- strike

2    that.

3         You would agree with me that you are trained to

4    write down everything that is important to the

5    elements of an arrest, correct?

6              MR. MARTIN:  His testimony was

7              elements of the crime.

8              THE WITNESS:  Elements of the crime.

9         Q.    (by Ms. Bas)  You would agree with me

10   that you're supposed to put all the elements of the

11    crime in the police report; is that correct?

12        A.    Elements of the offense that the suspect

13    is being charged with.

14        Q.    Are you trained to put your actions into

15    the police report?

16        A.    The actions of -- yes.

17        Q.    And what specifically are you trained to

18    put in the police report regarding your own actions?

19        A.    You put in the report what takes place.

20        Q.    And why do you do that?

21        A.    To document what happened.

22        Q.    And is one of the purposes of the police

23    report so it can be reviewed whether or not your

24    actions are appropriate?

                                                         75

1        A.    I don't know the answer to that.

2        Q.    Would you agree that when concluding this

3    police report you had to write down all of your

4    actions, your physical actions toward Mr. Alvarez,

5    correct?

6        A.    Can you restate your question?

7        Q.    Would you agree with me that you had to

8    document in your police report all of your physical

9    actions directed toward Mr. Alvarez?

10        A.    Yes.

11        Q.    Would you agree with me in this police

12    report you had to write down all of Mr. Alvarez's

13    verbal and physical actions toward you?

14         A.    Yes.

15         Q.    And according to you, other than the

16    incident where you didn't document that he was

17    sliding down off the police car, that he was on the

18    ground, the only other thing other than that

19    incident and maybe some time, some temperature,

20    stuff like that, is that you didn't document in your

21    police report that you kicked him in the pelvis

22    area; is that correct?

23         A.    I didn't document the exact location of

24    the incident as far as grass or gravel.

                                                          76

1          Q.    Answer my question, please.  Did you

2     document in your police report that you kicked

3     Mr. Alvarez in the pelvis?

4          A.    No.

5          Q.    And did you document in your police

6     report that Mr. Alvarez took a step toward you?

7          A.    No.

8          Q.    And you would agree with me that those

9     are two important facts as to why you kicked him in

10    the -- strike that.

11         Would you agree with me that the fact that

12    Mr. Alvarez took a step toward you was the reason

13    why you kicked him; is that correct?

14         A.    Yes.

15         Q.    And that's something that should be

16    documented in your report, correct?

17        A.    He wasn't charged with resisting or

18    obstructing so that element of the offense wasn't

19    included.

20        Q.    That's something that should have been

21    contained in this report, correct?

22        A.    It's not an element of the offense that

23    he was charged with.

24        Q.    Earlier you agreed with me that you had

                                                        77

1    to write down all of your actions towards

2    Mr. Alvarez and all of Mr. Alvarez's actions towards

3    you, correct?

4        A.    I did.

5        Q.    But you did not do that in this case, did

6    you?

7        A.    No.

8        Q.    Why not?

9            MR. MARTIN:  He answered, it wasn't

10            one of the elements of the crime.

11        Q.    (by Ms. Bas)  You can answer my question.

12        A.    Not an element of the crime.

13        Q.    Earlier you said that you were supposed

14    to write down your actions toward Mr. Alvarez and

15    his actions towards you, but you did not do that in

16    this case.  I want to know why.

17            MR. MARTIN:  He just explained, it's

18          not an element of the crime.  It's been

19          asked and answered.

20     Q.    (by Ms. Bas)  Can you answer my question?

21     A.    Jack?

22          MR. MARTIN:  Well, go ahead.  I can

23          object but --

24          THE WITNESS:  Okay.  Ask me again.


                                                78

1          MS. BAS:  Can you read back my last

2          full question, please?

3          (Whereupon the requested portion of

4          the record was read by the court

5          reporter.)

6          THE WITNESS:  I don't know why.

7     Q.    (by Ms. Bas)  That's not what you were

8     trained to do, correct?

9     A.    I'm trained to complete a police report

10     that includes the elements of the offense that is

11     charged.

12     Q.    And you also agreed with me that you're

13     supposed to write down your actions toward another

14     individual and their actions toward you, correct?

15          MR. MARTIN:  Okay.  This has been

16          asked and answered.

17          MS. BAS:  It's the last time.  I just

18          want to make sure I'm correct.

19          MR. MARTIN:  I object because he's

20          answered the question three or four times

21              now.  The information is important, it's

22              put in the report because it's an element

23              of the crime, and he documented that.

24              He's answered your question three times.


79

1        Q.    (by Ms. Bas)  Officer Wasson, can you

2   please answer the question?

3        A.    Is it important?

4        Q.    No.  I said are you trained to write it

5   down.

6        A.    Am I trained to document?

7        Q.    Yes.

8        A.    I'm trained to document information

9   that's necessary in the police report.

10       Q.    Is that all you're trained?

11       A.    No.  I'm trained many things.

12       Q.    Fair enough.  Did the police -- did the

13  police department train you to write down your

14  actions toward an individual in a police report,

15  your physical actions?

16       A.    Yes.

17       Q.    And did they train you to write that

18  person's physical actions towards you in the police

19  report?

20       A.    Yes.

21       Q.    Officer Wasson, I believe -- strike that.

22              Have you ever been investigated by the

23    department?

24         A.    For what?

80

1              MR. MARTIN:  Object to the form of

2         the question.

3              THE WITNESS:  On what type of

4         investigation?

5         Q.    (by Ms. Bas)  Has the department ever

6    investigated any of your actions since your

7    employment here?

8         A.    Yes.

9         Q.    How many times?

10         A.    I don't know.

11         Q.    Have you ever been interviewed by anyone

12    regarding your actions?

13         A.    What actions?

14         Q.    During the investigation you said you'd

15    been investigated, so how many times have you been

16    interviewed regarding those investigations?

17         A.    I don't know.

18         Q.    Can you give me a rough estimate?

19         A.    No.

20         Q.    More than a hundred?  Less than a

21    hundred?

22         A.    Less than a hundred.

23         Q.    Less than fifty?

24         A.    Yes.

81

1      Q.    Less than twenty?

2      A.    Probably.

3      Q.    Less than ten?

4      A.    I don't recall exactly how many, but less

5    than twenty.

6      Q.    Okay.  Were you investigated regarding an

7    incident on September 30 of 2003 whether or not you

8    used excessive use of force?

9      A.    What happened on that date?

10     Q.    I believe you went to a residence, and

11   there's an incident involving whether or not you

12   kicked a door and kicked a person on the inside.  It

13   was you and a female officer.

14     A.    Yes.

15     Q.    Do you remember what I'm speaking of?

16     A.    I do.

17     Q.    Were you investigated regarding that

18   incident?

19     A.    I was asked what happened.

20     Q.    And what happened?  Strike that.

21         Were you disciplined in any way?

22     A.    No.

23     Q.    Have you ever been disciplined by the

24   department?

82

1      A.    Yes.

2       Q.    How many times?

3       A.    Do you want to include written

4    reprimands?

5       Q.    Yes.

6       A.    I don't know.

7       Q.    More or less than a hundred?

8       A.    Less.

9       Q.    Less than fifty?

10       A.    Less.

11       Q.    Less than twenty?

12       A.    Less.

13       Q.    Less than ten?

14       A.    Less.

15       Q.    Less than five?

16       A.    Yes.

17       Q.    Can you tell me the times that you were

18    reprimanded, please?

19       A.    I was reprimanded in 2001 for leaving a

20    piece of evidence in the evidence locker for more

21    than a day.  So I got warned by the sergeant to not

22    do that again.

23       I got suspended a day for calling in sick and

24    playing in a DARE golf tournament.  Let's see.  What

                                                              83

1    else have I been reprimanded for?  I don't think I

2    have any other written reprimands.

3       Then I was suspended for five days for -- I

4    don't have the official violations of the

5    departmental policy, but it wasn't use of force or

6    anything like that.  One was misuse of the MDT in

7    the squad car.

8        Q.    What's the MDT?

9        A.    Mobile data terminal.  You're talking the

10    entire ten years that I've been here, right?

11        Q.    Yes, I am.

12        A.    Violation of professional image.  All of

13    this included in one suspension.  They put four or

14    five different violations of departmental policy.

15    Violation of departmental image.

16        Q.    What was that?

17        A.    Because I was sitting in a parking lot

18    more than an hour.

19        Q.    Okay.

20        A.    Misuse of departmental vehicle.

21        Q.    What were you doing?

22        A.    We're assigned a specific area within the

23    town, and if you go from out of that area without

24    prior approval of your shift commander or sergeant,

                                                        84

1    it's a violation of policy.  So that was included.

2    Conduct unbecoming of an officer, which was included

3    in sitting in the parking lot for more than an hour

4    because it looked bad.  All of those are in one

5    disciplinary hearing.  I don't know if there's any

6    more than that or not.  I don't recall.

7        Q.    The only actions that Mr. Alvarez took

8    toward you before you kicked him was he took one

9    step; is that correct?

10       A.    No.

11       Q.    What else did he do?

12       A.    He was obstructing or resisting arrest by

13   not complying with the direct orders by me to drop

14   the pipe, then to get on the ground.

15       Q.    He had already dropped the pipe, correct,

16   when you kicked him?

17       A.    Yes, but he was not on the ground as

18   ordered.  He was still resisting arrest.

19       Q.    And he had been TASER'd twice at this

20   point, correct?

21       A.    Yes, ma'am.

22       Q.    And a person can appear frozen after

23   being TASER'd, correct?

24       A.    Or can be on some type of drugs.

                                                            85

1        Q.    And in this particular case we know

2    Mr. Alvarez was intoxicated, correct?

3        A.    But not at the time.

4        Q.    He wasn't intoxicated at the time you

5    TASER'd him?

6                  MR. MARTIN:  No, he didn't know at

7           the time.

8                  THE WITNESS:  I didn't know at the

9           time of the incident when he was resisting

10          arrest whether he was intoxicated, high on

11          drugs, or what.

12      Q.    (by Ms. Bas)  He wasn't yelling at you,

13  correct?

14      A.    Correct.

15      Q.    And he wasn't waving his arms at you,

16  correct?

17      A.    Correct.

18      Q.    The only thing he was doing was not

19  responding to your commands and he took one step

20  forward, correct?

21      A.    Yes.

22          MS. BAS:  That's all I have.  Thank

23          you.

24                  EXAMINATION

                                                    86

1   BY MR. MARTIN:

2       Q.    Troy, looking at your police report, in

3   one paragraph I think it mentions that you talked

4   with Tiffany Dill; is that correct?

5           MS. BAS:  I'm going to object.  I

6           believe it mischaracterizes his prior

7           testimony.

8           THE WITNESS:  Well, I did -- at one

9           point prior to leaving the scene, Tiffany

10          Dill was at the scene speaking with

11          Sergeant McFadden at the time.  So I

12          walked over there, and that would be at

13          the point where I was at the conversation.

14          As I previously said to Ms. Bas, that the

15          information that I received from Sergeant

16          McFadden was about what Tiffany Dill had

17          told her.

18     Q.   (by Mr. Martin)  Okay.  Thanks.  Looking

19  at the second page of your report, it indicates that

20  you -- am I correct it states you spoke with Alvarez

21  at the hospital?

22     A.   Where do you see that?  It does say that

23  he told me that he only remembered a pushing match,

24  but I don't recall a conversation at the time right

                                                          87

1   now.

2               MR. MARTIN:  Okay.  Thank you very

3          much.  That's all.

4                    EXAMINATION

5   BY MS. BAS:

6      Q.   You know, actually I do have a couple

7   more questions.  I'm sorry.  Where did you TASER

8   Mr. Alvarez physically on his person?

9      A.   It would have been on his front side,

10  probably the lower chest.

11     Q.   I'm going to mark Exhibit 1.  This is

12  Manuel Alvarez, correct?

13     A.   I don't recall what he looks like.  If

14  you say it is, it is.

15          Q.    I'm going to mark as Exhibit No. 2 -- I'm

16     going to show you a photo taken of Mr. Alvarez on

17     September 17th, 2003.  Can you look at the top of

18     what would be the lower part of his neck, upper part

19     of his back; is that a TASER mark?

20          A.    No, ma'am.

21          Q.    What do TASER marks look like?

22          A.    They look like a pin dot.

23          Q.    A pin dot?

24          A.    About as small as a needle head.


                                                            88


1          Q.    So it would be hard to see, is that what

2     you're saying?

3          A.    Yes.

4          Q.    There are two marks on Mr. Alvarez, the

5     one above which I was pointing is directly

6     underneath his hairline.  Is that the pin dot you

7     would be referring to?

8          A.    No, ma'am.  It's too round to be a TASER

9     dart.  That looks like a scratch or a scab of some

10    type.

11         Q.    I'm going to show you what I'm marking as

12    Exhibit No. 3, which is another picture of

13    Mr. Alvarez taken, I believe, on the same day.  This

14    is the opposite side, the mark on kind of the nape

15    of the back of his neck.  Is that the kind of dot?

16         A.    No, ma'am.

17        Q.    It is not.  I'm going to mark as Exhibit

18    No. 4 a photo of Mr. Alvarez's back taken on the

19    same day.  Are any of the marks on Mr. Alvarez's

20    back the type of marks caused by an X26 TASER?

21        A.    No, ma'am.

22        Q.    And you TASER'd Mr. Alvarez on his chest;

23    is that correct?

24        A.    Yes, ma'am.

                                                      89

1         Q.    And that's the only place you TASER'd

2     him, correct?

3         A.    That's correct.

4              MS. BAS:  I'm finished.

5              MR. MARTIN:  Okay.  We'll reserve

6         signature.

7              (Whereupon the deposition was

8         concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

90

1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF CHAMPAIGN )

3

4         I, JANET E. FREDERICK, CSR, License No.
     084-003526, in and for the County of Champaign,
5    State of Illinois, do hereby certify that TROY
     WASSON, the deponent herein, was by me first duly
6    sworn to tell the truth, the whole truth and nothing
     but the truth, in the aforementioned cause of
7    action, and the deposition is a true record of the
     testimony given by the deponent.
8         That the foregoing deposition was taken on
     behalf of the Plaintiff, on the 10th day of June
9    2005.
          That said deposition was taken down in
10   stenograph notes and afterwards reduced to
     typewriting under my instruction; and that it was
11   agreed by and between the witness and attorneys that
     said signature on said deposition would not be
12   waived.
          I do hereby certify that I am a disinterested
13   person in this cause of action; that I am not a
     relative of any party or any attorney of record in
14   this cause or an attorney for any party herein, or
     otherwise interested in the event of this action,
15   and am not in the employ of the attorneys for either
     party.
16        IN WITNESS WHEREOF, I have hereunto set my hand
     this 24th day of June 2005.

17

18

19

20        _____
                JANET E. FREDERICK, CSR.
21

22

23

24


91

1              IN THE UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF ILLINOIS
2
     MANUEL ALVAREZ, SR.,                    )
3         Plaintiff,                         )
                 -vs-                        ) No. 04-2162
4    CITY OF DANVILLE, OFFICER T. WASSON,    )
     badge number 347, individually and as  )
5    employee of the Police Department of    )
     the City of Danville, and OFFICER       )
6    BLEW, individually and as employee      )
     of the Police Department of the City    )
7    of Danville,                            )
          Defendants.                        )
8

9         This is to certify that I have read the

10   transcript of my deposition taken in the

11   above-entitled cause, and that the foregoing

12   transcript taken on June 10, 2005, accurately states

13   the questions asked and the answers given by me,

14   with the exception of the corrections noted, if any,

15   on the attached errata sheet(s).

16

17                          _____
                            TROY WASSON
18

19   Subscribed and Sworn before
     me this _____ day of
20
     _____ 2005
21
     _____
22   Notary Public

23
                   AREA WIDE REPORTING SERVICE
24     301 West White Street, Champaign, Illinois  61820