1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF ILLINOIS
 2
       MANUEL ALVAREZ, SR.,                    )
 3                                             )
            Plaintiff,                         )
 4                                             )
                   -vs-                        ) No. 04-2162
 5                                             )
       CITY OF DANVILLE, OFFICER T. WASSON,    )
 6     badge number 347, individually and as   )
       employee of the Police Department of    )
 7     the City of Danville, and OFFICER       )
       BLEW, individually and as employee      )
 8     of the Police Department of the City    )
       of Danville,                            )
 9                                             )
            Defendants.                        )
10

11                          DEPOSITION

12          The Deposition of MANUEL ALVAREZ, SR., a

13     citizen of the State of Illinois, a witness of

14     lawful age; produced, sworn and examined upon his

15     corporeal oath on June 9, 2005 A.D., at the Law

16     Offices of Meachum & Martin, 110 North Vermilion

17     Street, Danville, Illinois, before Janet E.

18     Frederick, CSR, License No. 084-003526, in and for

19     the County of Champaign and State of Illinois, as a

20     witness in a certain suit and matter now pending and

21     undetermined in the United States District Court,

22     Central District of Illinois.

23

24
```

2

```
 1          APPEARANCES:
```

```
2              Mr. John F. Martin
               MEACHUM & MARTIN
3              110 North Vermilion Street
               Danville, Illinois  61832
4              Appearing on behalf of the Defendants

5              Ms. Jamie L. Bas
               GEORGE RIPPLINGER and ASSOCIATES
6              2215 West Main Street
               Belleville, Illinois  62226-6692
7              Appearing on behalf of the Plaintiff

8        ALSO PRESENT:

9              Mr. Joseph Blew (as indicated)

10

11

12                    I N D E X

13    EXAMINATION BY:                      PAGE NO.

14        Mr. Martin............................    3

15        Ms. Bas..............................   46

16

17

18

19

20

21

22

23

24
```

```
1              MANUEL ALVAREZ, SR.,

2    the deponent herein, called as a witness, after

3    having been first duly sworn, was examined and
```

4    testified as follows:

5                         EXAMINATION

6    BY MR. MARTIN:

7         Q.    Would you state your name, please?

8         A.    Manuel Alvarez, Sr.

9         Q.    And, Mr. Alvarez, my name is Jack Martin.

10   I represent the defendants in this case.  I'm going

11   to ask you some questions today about it.  If you

12   don't understand a question or want me to repeat it,

13   just say so.  When you give your answers, make them

14   verbal as opposed to nodding or saying uh-huh and

15   huh-uh so she can get it down accurately.  Okay?

16        A.    Okay.

17        Q.    What's your address?

18        A.    1101 Mabin.

19        Q.    Is that in Danville, Illinois?

20        A.    Yes.

21        Q.    How long have you lived there?

22        A.    A little over fifteen years.

23        Q.    Okay.  What's your age?

24        A.    Forty-six.

                                                    4

1         Q.    Are you married?

2         A.    No.

3         Q.    Have you ever been?

4         A.    Yes.

5         Q.    And how long -- you've been divorced or

6    widowed?

```
7        A.    Six years about.

8        Q.    Divorced?

9        A.    Yes.

10       Q.    What is your ex-wife's name?

11       A.    Sylvia Perkins.

12       Q.    Do you know where she lives?

13       A.    Dixie Acres Road here in Danville.

14       Q.    Do you have any children?

15       A.    Yes.

16       Q.    And what are their names and ages?

17       A.    Manuel Alvarez, Jr., 22.  Ricardo and

18   Reynaldo -- they're twins -- they're 21.

19       Q.    Both Alvarez?

20       A.    Yes.

21       Q.    Any other children?

22       A.    Jessie Alvarez, he's 19; and

23   Michelangelo, he's 15.

24       Q.    Any others?
```

```
                                                5

1        A.    Two other sons from a previous marriage.

2        Q.    Okay.  What are their names?

3        A.    Jason Michael Ellis.

4        Q.    Ellis, E-L-L-I-S?

5        A.    Yes.  And Troy Ryan.

6        Q.    His last name is Ryan?

7        A.    No, middle name.

8        Q.    Okay.  What's his full name?
```

```
 9          A.     Troy Ryan Ellis.

10          Q.     Any other children?

11          A.     That's all.

12          Q.     Now, are you related to Jeremy Fleming?

13          A.     It was never proven that he was my son.

14          Q.     So it was -- paternity was never

15   established, you mean?

16          A.     Yes.

17          Q.     Do you ever pay child support for him or

18   anything like that?

19          A.     No.

20          Q.     Who is his mother?

21          A.     Candice.  It was Fleming.  She's married

22   now.  I don't know her last name now.

23          Q.     Now, at the 1101 Mabin Street address, do

24   you live there with someone?
```

                                                        6

```
 1          A.     My son.

 2          Q.     Which one?

 3          A.     Jessie.

 4          Q.     Back in September 13th, 2003, when the

 5   incident occurred, who was living there at that

 6   time?

 7          A.     At that time I was there by myself.

 8          Q.     How tall are you?

 9          A.     5-9.

10          Q.     And how much do you weigh?

11          A.     Two hundred.
```

12          Q.     And back in September of 1993, was your

13     weight about the same then?

14          A.     Yes.

15          Q.     What's your educational background?

16          A.     GED.

17          Q.     Where did you get that?

18          A.     At DACC.

19          Q.     When?

20          A.     1988.

21          Q.     How long have you lived in the Danville

22     area?

23          A.     Twenty-five, thirty years.

24          Q.     Do you have any education or training

                                                           7

1     beyond the GED?

2          A.     When I was employed at NAACO Materials, I

3     was a certified forklift operator, blueprint reading

4     certificate.

5          Q.     What years did you work at NAACO?

6          A.     '94 to 2001.

7          Q.     Was that the time when the plant left?

8          A.     Yes.

9          Q.     Before you worked at NAACO, started

10     working there in 1994, did you work somewhere else?

11          A.     Yes.  The longest job I held before that

12     was production services, sand blasting and painting.

13     I held that position for six years.

14        Q.    Are you employed now?

15        A.    No.

16        Q.    Do you have an occupation, a business?

17        A.    No.  I was a self-employed painter and

18  landscaper.

19        Q.    Over what period of time were you a

20  self-employed painter and landscaper?

21        A.    From the time that I lost my job at NAACO

22  and some periods between that, too, or between

23  production services and NAACO.

24        Q.    Okay.  Since 2001 when NAACO left, you

8

1  started up your self-employed painting and

2  landscaping business again?

3        A.    No.

4        Q.    No?

5        A.    No.

6        Q.    Did you work since NAACO?

7        A.    Yes.  I worked on my own landscaping and

8  my own painting.

9        Q.    Okay.  So that's what you were doing

10  between 2001?

11        A.    Yes, and the time of the injury.

12        Q.    The injury you're talking about, is that

13  when you hurt your back in July of 2003?

14        A.    Yes.

15        Q.    Up until the time that -- up until July

16  2003, did you have any employees?

17          A.    No.

18          Q.    Did you have an office, or did you run it

19     out of your house, the business?

20          A.    Out of my home.

21          Q.    Do you have any convictions, any criminal

22     convictions?

23                MS. BAS:  I'm going to object to the

24                relevance of this question, and also it's


                                                          9

1                 not limited to a time frame.  Go ahead and

2                 answer.

3                 THE WITNESS:  As a minor I had a

4                 burglary.

5          Q.    (by Mr. Martin)  How old were you at the

6     time?

7          A.    I can't recall the age.

8          Q.    Are you currently on any medication?

9          A.    Yes.

10          Q.    What are you on?

11          A.    Vicodin, Tricor, two different kinds of

12     muscle relaxers, Zantac.

13          Q.    Anything else?

14          A.    I can't recall all the prescriptions that

15     I have.

16          Q.    Is this for your back problem?

17          A.    Some of them.

18          Q.    Which are for your back problem?

19          A.     The Vicodin and the muscle relaxers.

20          Q.     What's the Tricor for?

21          A.     It's for cholesterol.

22          Q.     And what about Zantac?

23          A.     For stomach problems.

24          Q.     Do you have a family doctor?

                                                      10

1           A.     Yes.

2           Q.     Who is that?

3           A.     Dr. Ochoa.

4           Q.     How long has Dr. Ochoa been your family

5    doctor?

6           A.     I couldn't give you the years.

7           Q.     Ten years?  Five years?  Do you have any

8    kind of ball park?

9           A.     Over ten years.

10          Q.     I want to talk about prior injuries

11   requiring medical treatment.  I guess we could start

12   with the back injury.  That was in July 2003,

13   correct?

14          A.     Yes.

15          Q.     And what happened?  How did you get hurt?

16          A.     I was painting aluminum siding, and I got

17   up over a window, started reaching out a little bit,

18   and the ladder slid on the paint and fell over ten

19   feet on my back.

20                 (Joseph Blew enters.)

21          Q.     What treatment did you have for that?

22          A.    I went to the emergency room.  I can't

23     remember the date I went.

24          Q.    Okay.  In July of 2003, though, that's


                                                           11

1      the last time you worked?

2           A.    Yes.

3           Q.    And you're still under treatment for your

4      back problem?

5           A.    Yes.

6           Q.    And is Dr. Ochoa still treating you for

7      that?

8           A.    No.

9           Q.    Who is treating you for your back

10     problem?

11          A.    Dr. Sunkavally.

12          Q.    Is he the doctor that's prescribing the

13     medication for you?

14          A.    Yes.

15          Q.    Have you had any other injuries requiring

16     medical treatment besides this incident we're here

17     today about or the back problem?

18          A.    Back in -- when I was employed at NAACO

19     Materials, I hurt my shoulder out there.

20          Q.    When was that?

21          A.    I can't remember the exact year.

22          Q.    About when was it?

23          A.    I'd say '98.

24    Q.    Which shoulder?

12

1     A.    My left.

2     Q.    What was the injury?

3     A.    Partially -- it was like dislocated.

4     Q.    Have you worked anywhere since July 2003?

5            MS. BAS:  I'm going to object.  Asked

6        and answered.

7            THE WITNESS:  No.

8     Q.   (by Mr. Martin)  How do you support

9  yourself?

10    A.    My parents have been helping me.

11    Q.    Let's see.  Let's talk about the night

12  that this occurred, which I believe was early

13  morning of September 13, 2003.

14    A.    Yes.

15    Q.    What did you do the day before, on the

16  Friday the day before?  This happened in the early

17  morning hours of Saturday, right?

18    A.    Yes.

19    Q.    Okay.  Let's talk about what you did the

20  day before.  Do you remember when you got up that

21  day?

22    A.    Yes.  I got up, usual routine.  I do

23  things around the house.  Take walks.

24    Q.    What time did you get up?

```
1      A.    8:00, 9:00 o'clock.

2      Q.    What did you do then in the morning?

3            MS. BAS:  Object, asked and answered.

4         Go ahead.

5            THE WITNESS:  I eat breakfast, and I

6         walk over to my parents every morning,

7         drink a cup of coffee.

8      Q.    (by Mr. Martin)  What are your parents'

9  names?

10     A.    Domingo and Hermelinda.

11     Q.    How do you spell her name?

12     A.    H-E-R-M-E-L-I-N-D-A, Alvarez.

13     Q.    Where do they live?

14     A.    709 Plum Street.

15     Q.    Danville?

16     A.    Yes.

17     Q.    How far is that from your house?

18     A.    Across the street.

19     Q.    So after you visited your parents, what

20  did you do next?

21     A.    I sat around that afternoon.  I don't

22  recall everything I done that afternoon.  I was

23  mainly sitting around the house.

24     Q.    Sitting around your house?
```

```
                                               14

1      A.    Yes.

2      Q.    Were you on any medication at that time,
```

3     as of September 12, 2003?

4         A.    No.

5         Q.    So you went back to your house and just

6     sat around in the afternoon?

7         A.    Yes.

8         Q.    At some point in the day did you go out?

9               MS. BAS:  Object to the form of the

10              question.  Are we talking about any time

11              during the day or --

12        Q.    (by Mr. Martin)  Yes.

13        A.    Yes.

14        Q.    Okay.  When did you leave?

15        A.    That afternoon.  It was 6:00 o'clock.

16        Q.    Where did you go?

17        A.    I left with Jeremy.

18        Q.    Okay.  Now, Jeremy was not at your house

19    in the morning, correct?

20        A.    No.

21        Q.    That's correct, he wasn't there in the

22    morning?

23        A.    No, he wasn't there.

24        Q.    When did he show up?

                                                    15

1         A.    It was around that time, 6:00 o'clock.

2         Q.    What's Jeremy Fleming's address, if you

3     know?

4         A.    It's Geddings Street here in Danville.

5         Q.    Was he living on Geddings Street in

6     Danville as of September 2003?

7          A.    Yes.

8          Q.    Is Jeremy Fleming married?

9          A.    No.

10         Q.    Does he work?

11         A.    I have no idea.

12         Q.    Was he working back in September 2003?

13         A.    I think so.

14         Q.    How did you get to know Jeremy?

15              MS. BAS:  Object to the relevance of

16         this question.  Go ahead and answer.

17              THE WITNESS:  I would see him once in

18         a while here and there.

19         Q.    (by Mr. Martin)  Just a friend, you mean?

20         A.    Well, he had the impression I was his

21   dad, and he always came around once in a while.

22         Q.    Had you and he done things together in

23   the past?

24         A.    No.


                                                    16

1          Q.    Do you know -- how long had Jeremy

2    Fleming lived in Danville?

3          A.    Not long.  He lived somewhere in Indiana

4    before he came over here.

5          Q.    How long prior to September of 2003 did

6    he come to Danville from Indiana?

7          A.    I have no idea.

8          Q.     Now, on September 12th, did he just show

9     up spontaneously at your place, or had you made some

10    plans with him to come over?

11         A.     He just showed up.

12         Q.     Just rang the door bell, knocked on the

13    door, and there he was; is that right?

14         A.     Yes.

15         Q.     And was he alone?

16         A.     Yes.

17         Q.     This is about 6:00 p.m.?

18         A.     Yes.

19         Q.     Did you two decide to do something then?

20         A.     Yes.

21         Q.     What?  Tell me what it was.

22         A.     We went and got a twelve pack of beer.

23         Q.     Now, prior to the time you bought that

24    beer, had you had anything of an alcoholic nature to

                                                      17

1     drink on that Friday, September 12th, 2003?

2          A.     No.

3          Q.     Where did you buy the beer?

4          A.     Main Package.

5          Q.     Who paid for it?

6                 MS. BAS:  Object to the relevance of

7            the question, but go ahead and answer.

8                 THE WITNESS:  I think Jeremy did.

9          Q.     (by Mr. Martin)  How much beer did you

10    purchase?

11          A.     Twelve pack.

12          Q.     One twelve pack?

13          A.     We finished that, and then we went and

14  got another one.

15          Q.     Okay.  So let me get this straight.  Six

16  o'clock the two of you, do you drive down to the

17  Main Package store?

18          A.     Yes.

19          Q.     And he purchased a twelve pack, right?

20          A.     Yes.

21          Q.     Then did you come back to your house?

22          A.     Yes.

23          Q.     And then the two of you started drinking

24  beer then, right?


                                                      18

1           A.     Yes.

2           Q.     How long was it before you had -- the two

3   of you had drunk the whole twelve pack?

4           A.     I can't recall how long.

5           Q.     Had you had anything to eat that day on

6   September 12th, 2003?

7           A.     Yes.

8           Q.     And tell me what food you ate that day.

9           A.     I can't recall what I ate that afternoon.

10          Q.     Okay.  I mean, do you have any

11  recollection of anything you ate that day?

12          A.     I can't recall what I had that afternoon.

13      Q.    Okay.  So sometime during the course of

14  the evening, the twelve pack was gone, right?

15      A.    Yes.

16      Q.    And had you pretty much each drunk half

17  of it?

18      A.    Yes.

19      Q.    Six beers each?

20      A.    Yes.

21      Q.    And these are twelve ounce beers?

22      A.    Yes.

23      Q.    What kind of beer was it?

24      A.    Corona.


                                                    19

1       Q.    So sometime after 6:00 p.m. and after

2   you'd finished the beer, the initial twelve pack,

3   you decided to go back down and get another twelve

4   pack, correct?

5       A.    Yes.

6       Q.    And did you drive down there?

7       A.    Jeremy drove.

8       Q.    And what did you buy the second time?

9       A.    Twelve pack of Michelob.

10      Q.    Who paid for that?

11      A.    Jeremy.

12      Q.    And after you purchased it, where did you

13  go then?

14      A.    Back to my house.

15      Q.    And about what time did you get back to

16    your house with the second twelve pack?

17         A.    We drove to the liquor store and straight

18    back to my house.

19         Q.    Okay.  My question was, about what time

20    did you get back to your house with the second

21    twelve pack?

22         A.    I can't recall the time.

23         Q.    And then what did you and Jeremy do back

24    at your house, then?


                                                              20

1          A.    Sat outside and drank the other twelve.

2          Q.    And, again, did each of you drink about

3     six more beers each?

4          A.    Yes.

5          Q.    About what time was it that the second

6     twelve pack was gone?

7          A.    I can't recall what time we finished it.

8          Q.    At that point you were intoxicated?

9          A.    Yes.

10         Q.    Now, was anybody else at your house

11    during the evening up to the time of the dispute you

12    had with Jeremy?

13         A.    Jeremy's girlfriend.

14         Q.    Okay.  And that's Tiffany Dill?

15         A.    Yes.

16         Q.    And what time did she show up?

17         A.    I can't recall the time she came up.

18        Q.    Was it sometime after 6:00 p.m.?

19        A.    It was sometime after, after we finished

20    the first twelve pack.  So I can't recall.  I can't

21    recall the time she pulled in.

22        Q.    And was she alone?

23        A.    Yes.

24        Q.    So at the time you and Jeremy were


                                                    21

1    drinking the second twelve pack, there was just the

2    three of you there, correct?

3        A.    Yes.

4        Q.    Did Tiffany Dill have anything to drink

5    of an alcoholic nature that evening, to your

6    knowledge?

7        A.    No.

8        Q.    At some point, as I understand, a dispute

9    arose between you and Jeremy, right?

10        A.    Yes.

11        Q.    And tell me how that started.

12        A.    I don't recall a lot of what we argued

13    about.

14        Q.    Do you recall anything that you were

15    arguing about?

16        A.    No, I can't remember what we were arguing

17    about.

18        Q.    In any event, about what time of night

19    did you start having this dispute with him?

20        A.    I know it was after midnight because his

21    girlfriend called the police.

22        Q.    Was there a point where you were arguing

23    verbally for a period of time and then it started

24    getting physical?

                                                        22

1        A.    I think so.

2        Q.    How long were you arguing verbally before

3    the fight started?

4        A.    I can't recall.

5        Q.    Do you remember what was said back and

6    forth between the two of you?

7        A.    I can't recall that either.

8        Q.    Was that because at the time you were

9    intoxicated you can't remember?

10        A.    Yeah, some of it.

11        Q.    I believe the police were called sometime

12    after 1:00 in the morning, right?

13        A.    Yes.

14        Q.    And how did the fight start, the physical

15    part of the fight?

16        A.    I can't recall how we started fighting.

17    I remember standing over him.  I was holding a piece

18    of aluminum.

19        Q.    Anything else you remember about the

20    fight?

21        A.    That's all I can recall is standing over

22    him.

23    Q.    The police report indicates that Tiffany

24    Dill says that the arguing got to a pushing match


                                                                    23

1    and then at one point you struck Jeremy Fleming in

2    the face several times with a closed fist.  Did that

3    happen, or can you remember?

4        A.    I can't remember.

5        Q.    Do you remember who hit who first?

6            MS. BAS:  I'm going to object.  This

7            is asked and answered, but go ahead and

8            answer the question.

9            THE WITNESS:  I can't remember if I

10            hit him first or if he hit me.

11        Q.    (by Mr. Martin)  How long did the fist

12    fight, the physical fight, last?  How long did that

13    go on?

14        A.    I can't recall how long it lasted.

15        Q.    Do you remember hitting Jeremy?

16        A.    No, I cannot.

17        Q.    Do you remember Jeremy hitting you at

18    all?

19        A.    I remember when he struck me with a

20    bottle.

21        Q.    Okay.  Besides getting hit with a bottle,

22    do you remember any other times he struck you during

23    the fight?

24        A.    No.

24

1          Q.    And tell me about when he struck you with

2     the bottle, how did that occur?

3          A.    I think I was standing in front of him

4     and he just clocked me with the bottle.

5          Q.    It was a beer bottle?

6          A.    Yes.

7          Q.    And this was on the left side of your

8     face; is that right?

9          A.    Yes.

10         Q.    Cut your face; is that correct?

11         A.    Yes.

12         Q.    Did you also end up with a cut on your

13    nose also?

14         A.    Yes.  I had a cut right up here.

15         Q.    Was that from the beer bottle or was that

16    from some other --

17         A.    It was from the beer bottle.

18         Q.    At any time during the fight did the two

19    of you -- either one of you fall down?

20         A.    Not that I recall.

21         Q.    Jeremy Fleming was intoxicated at the

22    time of the fight, correct?

23         A.    Yes.

24         Q.    And you were intoxicated at the time of

25

1     the fight, correct?

2       A.      Yes.

3       Q.      How old is Jeremy?

4       A.      I have no idea.

5       Q.      Do you know about how tall he is?

6       A.      5-8, 5-9.

7       Q.      And do you know approximately how much he

8    weighed the night this incident occurred?

9       A.      I have no idea.

10      Q.      And generally are you a lot bigger than

11   he is in terms of weight, height?

12              MS. BAS:  I'm going to object to the

13              relevance of the question.  Go ahead and

14              answer.

15              THE WITNESS:  Maybe a little heavier

16              than him.

17      Q.      (by Mr. Martin)  Had you and he ever been

18   drinking alcohol together before?

19      A.      Never.

20      Q.      Have you and Jeremy ever drunk alcohol

21   together since this incident?

22      A.      No.

23      Q.      Did Jeremy ever tell you what the

24   argument was about?

                                                        26

1       A.      He reflected some of the things that

2    happened.  He said that we were arguing, I was

3    chasing him.  But as far as me recalling, I can't

4    remember.

5      Q.    Okay.  What did he tell you was the

6   reason for the fight?

7      A.    He said we were arguing about -- I can't

8   remember.

9      Q.    You don't remember what he told you?

10     A.    We were arguing about a car.  That's all

11  I can recall.

12     Q.    Where did the fight start, where at your

13  house there?

14     A.    In my driveway.

15     Q.    So up to that point -- you two had been

16  sitting on the porch drinking beer up to that point;

17  is that right?

18     A.    Yes.

19     Q.    Is this porch on the front of your house

20  or in the back of your house?

21     A.    In the back.

22     Q.    And so did the entire fight take place on

23  the porch or did it move outside?

24     A.    It was in the driveway.


                                                27

1      Q.    In the driveway?

2      A.    Yes.

3      Q.    Besides Tiffany Dill and Jeremy, was

4   anybody else present?

5      A.    No.

6      Q.    At some point do you remember the police

7    arriving?

8         A.    I remember standing over Jeremy.   And

9    then the TASERs hit me and it just -- it woke me up

10   a little bit and I seen what was happening.   But I

11   wasn't responding to the police's commands.

12        Q.    What were the police telling you to do?

13        A.    To get down.

14        Q.    And you were not doing that, correct?

15        A.    Yes.

16        Q.    That's correct?

17        A.    Yes.

18        Q.    Was Jeremy on the ground at this point

19   when the police arrived?

20        A.    I can't remember.

21        Q.    The police report indicates one of the

22   witnesses said you hit him over the head, Jeremy.

23   Did that happen?

24              MS. BAS:  I'm going to object to the

                                                          28

1              form of the question.  It's confusing.

2              THE WITNESS:  I can't remember.

3         Q.   (by Mr. Martin)  You may have, but you

4    don't remember, right?

5              MS. BAS:  I'm going to object.  It

6              mischaracterizes his testimony, and it's

7              asked and answered.

8              THE WITNESS:  I can't remember if I

9              hit him.

10        Q.     (by Mr. Martin)  Beg your pardon?

11        A.     I can't remember if I hit him.

12        Q.     Okay.  You mentioned you had something in

13   your hand, you said a piece of aluminum or

14   something?

15        A.     Yes.

16        Q.     Tell me what that is.  What was that?

17        A.     It's like the bottom kick panel off an

18   aluminum door.

19        Q.     How long was it?

20        A.     Two, three feet.

21        Q.     And how wide?

22        A.     It wasn't very wide.  I could hold it in

23   my hand.

24        Q.     So two inches?  Three inches?

                                                        29

1         A.     Three inches, maybe.

2         Q.     How did it happen you ended up with this

3    piece of panel off a door in your hand?

4         A.     I can't recall how I picked it up.

5         Q.     You do recall, you said, standing over

6    Jeremy with this piece of aluminum in your hand; is

7    that right?

8         A.     Yes.

9         Q.     And was Jeremy on the ground?

10        A.     Yes.

11        Q.     Do you know how he got on the ground?

12        A.    I can't recall how.

13        Q.    Was he conscious?

14        A.    Yes.

15        Q.    When were you first aware that the police

16    had arrived?

17        A.    After I was TASER'd.

18        Q.    And had you heard officers prior to that?

19        A.    I heard some of their commands.

20        Q.    Okay.  But you didn't comply with their

21    commands, correct?

22        A.    No.

23        Q.    That's correct?

24        A.    Yes.


                                                          30

1         Q.    Where were you struck by the TASER?

2         A.    Directly in the back of my neck, on my

3     back, on my front, lower part of my abdomen.

4         Q.    So you're saying it was four points where

5     you were hit by the TASER?

6         A.    It was more than four.

7         Q.    How many?

8         A.    My girlfriend counted seven.

9         Q.    Who's your girlfriend?

10        A.    Jeannine Ray.

11        Q.    Can you spell her first name?

12        A.    J-E-A-N-N-I-N-E, R-A-Y.

13        Q.    She was your girlfriend in September of

14    2003?

15        A.    Yes.

16        Q.    Is she still?

17        A.    Yes.

18        Q.    What's her address?

19        A.    704 Florida.

20        Q.    So you were hit by the TASER, and did you

21   feel the shock?

22        A.    Yes.

23        Q.    What happened next?

24        A.    I lost total -- I just collapsed to the

                                                         31

1    ground first time and dropped what I was holding.

2         Q.    Do you remember struggling at all with

3    the officers?

4         A.    No.

5         Q.    Do you remember being handcuffed?

6         A.    Yes.

7         Q.    After you were handcuffed, what happened?

8         A.    After I was TASER'd, I was taken to the

9    ground.  At the same time I was taken to the ground,

10   I can't recall what officer, but he rammed his knee

11   into my gut as I was being taken down.  Then I was

12   cuffed.

13        Q.    Okay.  So you're indicating that before

14   you were on the ground, they were trying to get you

15   to the ground, you were hit by an officer's knee; is

16   that right?

17          A.    As I was being taken down, his knee went

18   into my gut.

19          Q.    Okay.

20          A.    Abdomen.

21          Q.    Had you had any other blows to your

22   abdomen before this incident, before this officer

23   came up to you?

24          A.    No.


                                                         32

1          Q.    Do you know?

2          A.    I didn't have none.

3          Q.    How long did the fight go on?

4                MS. BAS:  I'm going to object to the

5                form of the question.  It's confusing.  Go

6                ahead and answer.

7                THE WITNESS:  I can't recall how long

8                the fight went on.

9          Q.    (by Mr. Martin)  And besides being hit in

10   the head with a beer bottle, you don't remember

11   where else you were hit during the fight?

12                MS. BAS:  Object to the form of the

13                question.  It's vague and confusing.

14                THE WITNESS:  That was the only time

15                I was hit.

16          Q.    (by Mr. Martin)  Your testimony is you

17   were hit once?

18          A.    By Jeremy, yes.

19          Q.    How many officers wrestled you to the

20    ground?

21        A.    One.

22        Q.    How many officers were present when this

23    was occurring?

24        A.    I seen two officers.


                                                              33

1         Q.    Where was Tiffany during this, when you

2     were being arrested?

3         A.    Standing right by my back door.

4         Q.    What happened after you were arrested?

5              MS. BAS:  I'm going to object.  It

6              mischaracterizes the facts and evidence.

7              I don't believe he was arrested.  Go ahead

8              and answer the question.

9              THE WITNESS:  I wasn't arrested.

10        Q.    (by Mr. Martin)  Well, you were taken

11    into custody, weren't you?

12        A.    I was taken to the hospital.

13        Q.    Okay.  You were handcuffed?

14        A.    Yes.

15        Q.    What did they do for you at the hospital?

16        A.    I went to the hospital.  They sewed my

17    eye, cleaned up my face.  They seen some of the

18    TASER marks, which one of the officers was present.

19        Q.    Had you ever had any other run-ins with

20    the police before this incident?

21        A.    No.

22      Q.    Had they ever been called to your house

23  before?

24      A.    No.

34

1       Q.    Were you admitted to the hospital or did

2   they send you home?

3       A.    They sent me home.

4             MS. BAS:  Can we take a break?

5             MR. MARTIN:  Sure.

6             (Whereupon a break was taken.)

7       Q.    You returned to the hospital the

8   following day with your abdominal problem, correct?

9       A.    Yes.

10      Q.    And did you talk to the hospital

11  personnel again about your situation?

12      A.    Yes.

13      Q.    Their notes indicate you told them that,

14  quote, I was involved in a fight two days ago with a

15  son and was struck in the face and other parts of

16  his body, end quote.  Did you tell them that?

17      A.    I can't recall telling them that.

18      Q.    It says also, quote, does not remember

19  the details, end quote.  Is that correct, did you

20  tell them that, too?

21      A.    I can't recall telling them that.

22      Q.    It says also, quote, he was inebriated,

23  end quote.  Do you recall telling them that?

24      A.    No, I don't.

35

1          Q.     Dr. Ochoa treated you at the hospital

2     when you went back; is that correct?

3          A.     Yes.

4          Q.     His notes indicate you told him, quote,

5     he was kicked in all parts of the body, including

6     the face, end quote.  Do you remember telling him

7     that?

8          A.     I don't recall telling him that.

9          Q.     Do you remember being kicked in all parts

10    of the body, including your face, during the fight?

11         A.     No.

12         Q.     Are there injuries that you blame the

13    officer for?

14         A.     Yes.

15         Q.     Tell me what that is.

16         A.     The ruptured bladder.

17         Q.     Anything else?

18         A.     All the injuries related to the ruptured

19    bladder, stomach problems.  A lot of it related just

20    to the ruptured bladder.

21         Q.     Do you blame your stomach problems on the

22    involvement with the officer?

23         A.     Yes.

24         Q.     And what's your stomach problem?

1          A.     My stomach problem is before I urinate --

2    or when my bladder fills, I have to urinate, I have

3    to go to the bathroom.  If not, I leak before and

4    after.

5          Q.     And when did that condition start?

6          A.     After they removed -- I can't think --

7    the catheter.

8          Q.     And this condition has been going on ever

9    since then; is that what you're saying?

10         A.     Yes.

11         Q.     What's your stomach problem, though, or

12   is that what you call the stomach problem what you

13   just described to me?

14         A.     Yes, that was some of it.

15         Q.     Is anybody treating you for this bladder

16   condition currently?

17         A.     I haven't seeked medical attention for it

18   because it's too embarrassing.

19         Q.     When was the last time you had any

20   treatment relative to your bladder?

21         A.     I seen Dr. Wolf in Carle in Champaign two

22   months ago, and they done a sonogram to look at my

23   bladder and done a complete stomach, and everything

24   turned out okay.

                                                        37

1          Q.     Does Dr. Wolf have a specialty?

2          A.     A urologist.

3          Q.     Do you know Dr. Wolf's first name?

4        A.    Not right off.  I have it at home.

5        Q.    The tests, they gave you a sonogram.

6   What other tests did they give you two months ago?

7        A.    A complete exam, rectal, everything.

8        Q.    And did you go back then and talk to

9   Dr. Wolf about the results of the test?

10       A.    Yes.

11       Q.    And what did Dr. Wolf tell you?

12       A.    They said everything in my bladder and

13  everything was fine.

14       Q.    You said before that you're taking Zantac

15  for your stomach?

16       A.    Yes.

17       Q.    And that's Dr. Ochoa -- strike that.

18       That was Dr. Sunkavally who prescribed that?

19       A.    No, Dr. Neeley.

20       Q.    When was the last time you saw

21  Dr. Neeley?

22       A.    Approximately -- I can't remember how

23  long ago.  It's been maybe a little over three

24  months.

                                                    38

1        Q.    Is Dr. Neeley only prescribing the

2   Zantac?

3              MS. BAS:  I'm going to object to the

4              form of the question.  Go ahead and

5              answer.

6                    THE WITNESS:  He had me on

7           Prednisone, too.

8           Q.    (by Mr. Martin)  Okay.  But now it's just

9      Zantac?

10          A.    Yes.

11          Q.    For Dr. Neeley?

12          A.    Yes.

13          Q.    What did Dr. Neeley tell you your medical

14     condition was as far as your stomach?

15          A.    I was having a lot of pain on my left

16     side.

17          Q.    Well, what was his diagnosis?  What did

18     he tell you was wrong?

19          A.    He thought it could have related to the

20     injury, but he wasn't sure until they done a CAT

21     scan.

22          Q.    And was that done?

23          A.    Yes.

24          Q.    And what did he tell you after the test?

                                                        39

1           A.    They found two cysts on my left kidney.

2           Q.    And so are you undergoing any treatment

3      for that?

4           A.    That's when Dr. Wolf came in.  He got the

5      results of the CT scans, and that was the reason for

6      his visit, too.

7           Q.    Okay.  So when you saw Dr. Wolf, he told

8      you everything was okay?

9       A.    Yes.

10      Q.    You don't blame the cyst on your kidney

11   from this incident with the officer, do you?

12      A.    Not the cyst.

13      Q.    You blame the bladder problem, right?

14      A.    Yes.

15      Q.    Currently you're seeing Dr. Sunkavally,

16   correct?

17      A.    Yes.

18      Q.    You're seeing Dr. Ochoa, correct?

19      A.    I haven't seen Dr. Ochoa in a while.

20      Q.    When was the last time?

21      A.    2004.

22      Q.    What was that for?

23      A.    Stomach related problems.

24      Q.    And you're seeing Dr. Neeley -- you saw

                                                    40

1    Dr. Neeley three months ago, correct?

2       A.    Give or take three months.  Maybe more.

3       Q.    You saw Dr. Wolf about two months ago,

4    right?

5       A.    Yes.

6       Q.    Have you seen any other doctors in the

7    past six months?

8       A.    Dr. Sunkavally last month.

9       Q.    Okay.  Besides him?

10      A.    No.

11        Q.    Did you know Tiffany Dill before the

12    evening of this fight?

13        A.    No.

14        Q.    So this was the first time you ever met

15    her, is that correct, the night the fight occurred?

16        A.    Yes.

17        Q.    Before the night that this fight

18    occurred, when was the last time prior to that that

19    you saw Jeremy Fleming?

20        A.    I can't remember how long it was.

21        Q.    Back in 2003, about how often would you

22    see Jeremy Fleming?

23        A.    Never.

24        Q.    Well, you certainly had seen him sometime

                                                            41

1    before the evening of the fight, didn't you?

2        A.    No.

3        Q.    How long was it before the fight was the

4    last time you saw him?

5        A.    I can't recall how long.  Maybe a year or

6    two years.  I can't remember.

7        Q.    Had you ever got in a fight with him

8    before?

9        A.    Never.

10        Q.    Now, you mentioned Jeannine Ray saw the

11    marks on you from the TASER; is that right?

12        A.    Yes.

13        Q.    What else does she know about this case,

14    if anything?

15              MS. BAS:  I'm going to object to the

16              form of the question.  Go ahead and

17              answer.

18              THE WITNESS:  Immediately after I was

19              released from the hospital -- I take that

20              back.  She came and picked me up at the

21              emergency room and took me home.

22    Q.    (by Mr. Martin)  This is when you were

23    released the night of the fight?

24    A.    On the 13th, yes.


                                                    42

1     Q.    All right.  She wasn't present at all

2     during any of the fight or when the police came,

3     correct?

4     A.    Correct.

5     Q.    And I think you list your mother as a

6     witness.  What knowledge does she have of the facts

7     of this case?

8     A.    The morning of September 14th, she came

9     over with my brother and found me almost ready to

10    collapse.

11    Q.    This would be the Sunday; is that

12    correct?

13    A.    Yes, the 14th.

14    Q.    What's your brother's name?

15    A.    Joel Alvarez.

16        Q.    He lives at 706 Martin Street?

17        A.    Yes.

18        Q.    Did he live there back in September of

19    2003?

20        A.    Yes.

21        Q.    They took you to the hospital then; is

22    that right?

23        A.    Yes.

24        Q.    Have you ever had back surgery?


                                              43

1         A.    No.

2         Q.    Do you remember signing these answers to

3     interrogatories in this case?

4         A.    Yes.

5         Q.    In one of them you were asked about other

6     injury or illness.  You mentioned that you went to

7     the emergency room on April 1st, 2004.  Do you

8     recall going then?

9         A.    Yes.

10        Q.    Your complaints were stomach pains,

11    hives, and trouble breathing?

12        A.    Wheezing, yes.

13        Q.    Wheezing?

14        A.    Yes.

15        Q.    What did the doctors tell you was wrong

16    with you?

17        A.    They couldn't relate what it was -- they

18    couldn't say what it was related to, but it was --

19    the hives were severe and it was cutting off my

20    breathing.

21        Q.    When you say the hives, what did you

22    notice about yourself?

23        A.    My top lip swelled up like a balloon, and

24    I was wheezing when I breathed and I felt something


                                                    44

1    up in my throat where I couldn't breathe.

2        Q.    Had that ever happened to you before?

3        A.    Never.

4        Q.    Did they ever tell you what they thought

5    it was, what the cause was?

6              MS. BAS:  Object to the form of the

7              question.  Go ahead and answer.

8              THE WITNESS:  They couldn't relate it

9              to the injury.

10        Q.    (by Mr. Martin)  Did they relate it to

11    anything else?  Did they tell you what caused it?

12        A.    The emergency room physician thought

13    maybe it was some allergic reaction to something,

14    but they couldn't say it was.

15        Q.    The cut you had on your head from the

16    fight, that was on the left side of your left eye;

17    is that right?

18        A.    Yes.

19        Q.    And about how long was it?

20        A.    It was thirteen inches and straight

21     across, down.

22          Q.     Approximately how long was the cut?

23          A.     I can't recall how long it was.  It was

24     thirteen stitches long.


                                                            45

1          Q.     Do you still have a scar from it?

2          A.     Yes.

3                 MS. BAS:  And you can see it.

4          Q.     (by Mr. Martin)  You're indicating by

5     your left eye is a scar that runs back toward your

6     ear?

7          A.     Yes.  No, it runs straight up and down.

8          Q.     Oh, okay.  Did you have any broken bone

9     in your face from being hit by the bottle?

10         A.     No.

11         Q.     And do you have a scar on your nose from

12     the fight, too?

13         A.     I think when he hit me, it cut me a

14     little bit here.

15         Q.     And you're indicating --

16                MS. BAS:  The bridge?

17         Q.     (by Mr. Martin)  Bridge of your nose?

18         A.     Yes.

19         Q.     Have any other scars from this fight?

20         A.     Just the surgery to my -- no.

21         Q.     Have you ever discussed with anybody from

22     the City of Danville about this incident?

23         A.     No.

24                    MR. MARTIN:  Let's take a break for a

                                                        46

1          second.

2                    (Whereupon a break was taken.)

3                    MR. MARTIN:  That's all we have.

4          Thank you.

5                         EXAMINATION

6    BY MS. BAS:

7          Q.    Actually, I have just one more question.

8    Mr. Alvarez, earlier you said something about a scar

9    and you stopped in the middle.

10         A.    Yes.

11         Q.    Can you tell me what other scar you were

12   referring to?

13         A.    The scar is from the ruptured bladder,

14   the emergency surgery.  It's approximately seven

15   inches long.  It starts from the top of my belly

16   button all the way down.

17                    MS. BAS:  Okay.  That's all I have.

18         We'll reserve signature.

19                    (Whereupon the deposition was

20         concluded.)

21

22

23

24

47

```
1    STATE OF ILLINOIS    )
                          )  SS
2    COUNTY OF CHAMPAIGN )

3

4         I, JANET E. FREDERICK, CSR, License No.
     084-003526, in and for the County of Champaign,
5    State of Illinois, do hereby certify that MANUEL
     ALVAREZ, SR., the deponent herein, was by me first
6    duly sworn to tell the truth, the whole truth and
     nothing but the truth, in the aforementioned cause
7    of action, and the deposition is a true record of
     the testimony given by the deponent.
8         That the foregoing deposition was taken on
     behalf of the Defendants, on the 9th day of June
9    2005.
          That said deposition was taken down in
10   stenograph notes and afterwards reduced to
     typewriting under my instruction; and that it was
11   agreed by and between the witness and attorneys that
     said signature on said deposition would be waived.
12        I do hereby certify that I am a disinterested
     person in this cause of action; that I am not a
13   relative of any party or any attorney of record in
     this cause or an attorney for any party herein, or
14   otherwise interested in the event of this action,
     and am not in the employ of the attorneys for either
15   party.
          IN WITNESS WHEREOF, I have hereunto set my hand
16   this 24th day of June 2005.

17

18

19

20                     _____
                       JANET E. FREDERICK, CSR.
21

22

23

24
```

48

```
1        IN THE UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
2
```

```
       MANUEL ALVAREZ, SR.,            )
 3         Plaintiff,                   )
              -vs-                      ) No. 04-2162
 4     CITY OF DANVILLE, OFFICER T. WASSON, )
       badge number 347, individually and as )
 5     employee of the Police Department of  )
       the City of Danville, and OFFICER )
 6     BLEW, individually and as employee )
       of the Police Department of the City )
 7     of Danville,                    )
           Defendants.                  )
 8

 9         This is to certify that I have read the

10     transcript of my deposition taken in the

11     above-entitled cause, and that the foregoing

12     transcript taken on June 9, 2005, accurately states

13     the questions asked and the answers given by me,

14     with the exception of the corrections noted, if any,

15     on the attached errata sheet(s).

16

17                           _____
                             MANUEL ALVAREZ, SR.
18

19     Subscribed and Sworn before
       me this _____ day of
20
       _____ 2005
21
       _____
22     Notary Public

23

                   AREA WIDE REPORTING SERVICE
24      301 West White Street, Champaign, Illinois  61820
```