1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 CENTRAL DISTRICT OF ILLINOIS
 2
     MANUEL ALVAREZ, SR.,                      )
 3                                             )
            Plaintiff,                         )
 4                                             )
              -vs-                             ) No. 04-2162
 5                                             )
     CITY OF DANVILLE, OFFICER T. WASSON,      )
 6   badge number 347, individually and as    )
     employee of the Police Department of     )
 7   the City of Danville, and OFFICER        )
     BLEW, individually and as employee       )
 8   of the Police Department of the City     )
     of Danville,                             )
 9                                             )
            Defendants.                        )
10
```

11                          DEPOSITION

12          The Deposition of JOSEPH BLEW, a citizen of the

13     State of Illinois, a witness of lawful age;

14     produced, sworn and examined upon his corporeal oath

15     on June 10, 2005 A.D., at the City of Danville

16     Police Department, 2 East South Street, Danville,

17     Illinois, before Janet E. Frederick, CSR, License

18     No. 084-003526, in and for the County of Champaign

19     and State of Illinois, as a witness in a certain

20     suit and matter now pending and undetermined in the

21     United States District Court, Central District of

22     Illinois.

23

24

2

 1          APPEARANCES:

```
 2              Ms. Jamie L. Bas
                GEORGE RIPPLINGER and ASSOCIATES
 3              2215 West Main Street
                Belleville, Illinois  62226-6692
 4              Appearing on behalf of the Plaintiff

 5              Mr. John F. Martin
                MEACHUM & MARTIN
 6              110 North Vermilion Street
                Danville, Illinois  61832
 7              Appearing on behalf of the Defendants

 8         ALSO PRESENT:

 9              Mr. Troy Wasson

10

11

12                     I N D E X

13    EXAMINATION BY:                      PAGE NO.

14        Ms. Bas..............................    3

15

16

17

18

19

20

21

22

23

24
```

```
 1                     JOSEPH BLEW,

 2    the deponent herein, called as a witness, after

 3    having been first duly sworn, was examined and
```

4    testified as follows:

5                    EXAMINATION

6    BY MS. BAS:

7         Q.    Officer Blew, how would you prefer I

8    address you?

9         A.    That's fine.

10        Q.    Have you ever given a deposition before?

11        A.    No, ma'am.

12        Q.    I'm sure your attorney has gone over with

13   you several things, but I'll repeat probably what

14   he's told you.  Because the court reporter is here,

15   she can only take down one of us speaking at a time.

16   So if you could please wait to let me finish my

17   question before you start to answer and vice versa,

18   it will make her job a lot easier.  Okay?

19        A.    Okay.

20        Q.    If you don't understand any of my

21   questions at any particular time, please ask me to

22   rephrase or be more specific and I'll be happy to do

23   so.  Okay?

24        A.    Okay.


                                                      4

1         Q.    If at any time you answer my question,

2    I'm going to assume that you understood it; is that

3    fair?

4         A.    Sure.

5         Q.    And if at any point in time you need to

6    take a break or drink water or whatever, you're free

7  to do so.

8       A.    Okay.

9       Q.    Officer Blew, can you tell me your

10  educational background, please, starting from high

11  school on?

12       A.    I graduated from Oakwood High School in

13  1987.  I went to college for a year here in Danville

14  at DACC.  I finished a two year program in

15  respiratory therapy at Parkland College in Urbana.

16  After that, I worked for a short time as an ICU

17  respiratory therapist on ventilator patients.  Due

18  to cutbacks, loss of job, I went to paramedic

19  school.  After that I worked as a paramedic here in

20  the city about eight years.

21       Q.    I'm sorry?

22       A.    About eight years.  After that I got

23  hired by the police department, by the City of

24  Danville, and subsequently went to the police

                                                    5

1  academy.

2       Q.    How long was the training that you

3  received at the police academy?

4       A.    Twelve weeks.

5       Q.    And when did you become employed with the

6  Danville Police Department?

7       A.    June of 2001.

8       Q.    And what is your rank?

9          A.    I'm a police officer.

10         Q.    Have you ever been promoted since you've

11   worked here?

12         A.    No, ma'am.

13         Q.    I'm going to ask you questions directly

14   for September 13th, 2003.  Can you tell me what time

15   you started your shift on that particular day, or on

16   the 12th?

17         A.    Would have been 10:40 in the evening.

18         Q.    On September 12th, 2003, correct?

19         A.    Yes, ma'am.

20         Q.    When did your shift end on September 13,

21   2003?

22         A.    7:15 in the morning.

23         Q.    And is it, to the best of your

24   recollection, that you did work the full shift that

6

1    day?

2          A.    Yes, it is.

3          Q.    At some point in time you were directed

4    to go to Manuel Alvarez's house in Danville,

5    correct?

6          A.    Yes.

7          Q.    Can you tell me how it was that you were

8    directed to go to Mr. Alvarez's residence on

9    September 13th, 2003?

10         A.    Officer Wasson was dispatched to

11   Mr. Alvarez's house for a fight in progress.  And

12    with calls of that nature they generally send two

13    officers, one as a primary, one as a back-up.  So

14    when Officer Wasson was dispatched to that, I was

15    the back-up officer that was sent with him.

16        Q.    And how long did it take you to get to

17    the residence, if you know, once you received the

18    call?

19        A.    I was probably a block, maybe a block and

20    a half away when Officer Wasson arrived.  So I'm

21    just guessing maybe fifteen, twenty seconds.  Just a

22    matter of being around the corner.

23        Q.    Other than getting the dispatch call, did

24    you speak with anyone other than the dispatcher on

                                                            7

1    that one particular occasion before you got to the

2    residence?

3        A.    No, I did not.

4        Q.    Where was your police car parked when you

5    got to the residence?

6        A.    I was parked on Plum Street.  The house

7    sits on a corner.  Sits on the corner of Plum and

8    Mabin.  My car was parked on Plum facing north.

9        Q.    Was your car -- I'm bad with directions,

10    especially when I'm not familiar with the

11    neighborhood.  Was your car toward the back yard or

12    the front?  Where does Plum intersect, I guess?  Is

13    Plum the front of the house or the rear?

14          A.    Plum is the front of the house, what

15    looks like the front of the house.  The house sits

16    sideways.  It has a Mabin Street address, but the

17    front of the house sits towards Plum Street.

18          Q.    Okay.

19          A.    So I guess it would be in front of the

20    house just facing north.  I never pulled into the

21    driveway.

22          Q.    Okay.  So you had to get out of your

23    squad car and then go around the house; is that

24    correct?

8

1           A.    I had to get out of the squad car.  The

2    house, if this is the house, the house sits here.

3    This is Plum Street, and then the yard is up in

4    here.  So you don't actually have to go like you're

5    going around the house to go to the backyard or

6    something.

7           Q.    Okay.  Now, what happened when you

8    arrived at Mr. Alvarez's residence on September

9    13th, 2003?

10          A.    When I arrived at the residence, Officer

11    Wasson was already there.  He was already out of the

12    car.  I got out of my squad car.  There was a male,

13    white, that was laying on the ground that later was

14    identified as Jeremy Fleming.  I started to go over

15    towards him.  At that time I heard Officer Wasson

16    yelling for Mr. Alvarez to drop the pipe he had in

17    his hand and get on the ground.  He had already --

18    by that point he had already deployed his TASER once

19    because I could see the cords from it.  He wasn't

20    complying, and Officer Wasson had hollered at him

21    again to get on the ground.

22        At that point I started to -- at that point I

23    started to approach Mr. Alvarez.  Officer Wasson

24    deployed the TASER again in an attempt to see if he

9

1    would go down, but still had little or no effect on

2    him.  I did have my nightstick out, or my asp, and

3    Mr. Alvarez, I guess, at some point had dropped the

4    pipe.  I didn't see him drop the pipe, but at some

5    point I guess he had.

6        He took a step towards Officer Wasson.  I do

7    remember -- I remember his fists being clenched.

8    We're taught at the academy -- and I hadn't been out

9    of the academy but a couple years at that point --

10   you always watch the hands.  I remember his hands

11   being in a fist.  Officer Wasson kicked him and

12   pushed him backwards.  He went to the ground.

13   Rolled up, I guess you call it, in a fetal position

14   like this.  Still wouldn't give up his hands.  We

15   had a brief struggle with him.  Got his hands pulled

16   out and behind his back and cuffed Mr. Alvarez.

17        Q.    Now, when you said he had his arms like

18   this, you crossed them over your chest?

19      A.    Yes, ma'am.

20      Q.    That's just for the record.

21      A.    Sure.

22      Q.    Officer Blew, when you first got out of

23   your car and you said that once you could see what

24   was going on you could tell that Officer Wasson had

                                                           10

1    already deployed the TASER; is that correct?

2       A.    Yes.

3       Q.    How far from you -- how far away from

4    Officer Wasson were you when you could tell that he

5    had deployed the TASER, in feet?

6       A.    I don't know.  Maybe fifteen feet.

7       Q.    And you could see the cords; is that

8    correct?

9       A.    Yes, ma'am.

10      Q.    And you said Jeremy Fleming was on the

11   ground; is that correct?

12      A.    Yes, ma'am.

13      Q.    Where was Tiffany Dill?

14      A.    I never -- I don't recall ever seeing

15   Tiffany Dill when I arrived there.

16      Q.    Were there any other officers there other

17   than Officer Wasson when you arrived?

18      A.    No.

19      Q.    Are you sure?

20      A.    Well, myself and Officer Wasson, and then

21   shortly after the incident with Mr. Alvarez, when we

22    were walking back to the car, Sergeant McFadden and

23    Officer Wilson were there.  At what point when they

24    arrived, they arrived during the struggle.

                                                        11

1         Q.    Okay.  Now, once you arrived and you saw

2    that Officer Wasson had deployed his TASER, you said

3    that Mr. Alvarez was holding something in his hand;

4    is that correct?

5         A.    Yes.

6         Q.    What was he holding?

7         A.    What looked to be a small pipe.

8         Q.    Describe it for me physically.

9         A.    Maybe a couple feet in length, maybe a

10   silver and aluminum color.  I don't know.  It didn't

11   look to have a very big diameter, but I don't know

12   what it was made of.

13        Q.    How was he holding the pipe?

14        A.    I believe he had it down at his side or

15   kind of off to the side in his hand.

16        Q.    He wasn't swinging it, correct?

17        A.    Not that I recall, no.

18        Q.    Was he yelling?

19        A.    He said something to Officer Wasson, and

20   I don't recall what it was because he was hard to

21   understand.  And I think he called him something in

22   Spanish, but I'm not sure.  There was a lot of

23   commotion.  I believe he said something to him.  I

24      wouldn't call it yelling.  I don't know what he was

                                                        12

1      saying to him, though.

2          Q.    When do you recall him saying something

3      to Mr. Wasson during the chronology of events that

4      happened on September 13th, 2003?

5          A.    Probably before he got TASER'd the second

6      time.

7          Q.    When he -- was Mr. Alvarez moving in any

8      way when you first arrived on the scene?

9          A.    He was squared off on Officer Wasson with

10     the pipe in his hand down at his side, not complying

11     with Officer Wasson telling him to get on the

12     ground.

13         Q.    Was he moving?

14         A.    Not that I recall at that point.

15         Q.    Is there anything that would help you

16     recall?

17         A.    No, ma'am.

18         Q.    I'm sorry?

19         A.    No, ma'am.

20         Q.    You didn't fill out a report regarding

21     this incident on September 13, 2003, did you?

22         A.    No, ma'am.

23         Q.    And you didn't do any written

24     documentation anywhere on anything regarding the

1    events of September 13, 2003, correct?

2         A.    No, I did not.

3         Q.    What documents did you review today

4    before your deposition?

5         A.    Police report that Officer Wasson

6    completed.

7         Q.    Did you review anything else today in

8    preparation for your deposition other than the

9    police report?

10         A.    My personnel file that Jack had that he

11    obtained from the department.

12         Q.    Anything else?

13         A.    I don't believe so, no.

14         Q.    Now, when Officer Wasson deployed -- or

15    strike that.

16         When Officer Wasson activated the TASER the

17    second time, how did Mr. Alvarez respond?

18         A.    He just stood there.

19         Q.    Did he move?

20         A.    No.  He just stood there.  Stood in

21    place.

22         Q.    Did he say anything?

23         A.    No.

24         Q.    Then what happened?  I'm sorry.  At the

                                                        14

1    point in time that Officer Wasson activated the

2    TASER for the second time, where were you in

3    proximity to Officer Wasson?

4        A.    I was just a matter of a few feet from

5    him.  I was coming up alongside Mr. Alvarez and,

6    like I said, I had my nightstick in my hand.  I was

7    coming up alongside of him, approximately maybe

8    five, six feet.

9        Q.    And when you say him, you're referring to

10   Mr. Alvarez?

11       A.    Mr. Alvarez.  Just five or six feet from

12   Mr. Alvarez.

13       Q.    So at the time that Officer Wasson

14   activated the TASER for the second time, you were

15   actually closer to Mr. Alvarez than Officer Wasson;

16   is that correct?

17       A.    Yes.

18       Q.    Then what happened?

19       A.    The TASER had little or no effect.

20   Didn't get any response out of him.  He still didn't

21   comply with any orders.  Officer Wasson started to

22   approach Mr. Alvarez.  At that time, Mr. Alvarez

23   took a step forward at him.  I noticed his hands

24   were in a fist.  They were still down.  His hands

                                                    15

1    were in a fist.  He took a step at Officer Wasson.

2    Officer Wasson used a front thrusting kick striking

3    Mr. Alvarez.  Mr. Alvarez went to the ground and

4    immediately rolled over with his hands underneath of

5    him.

6        Q.    What were you doing during the time

7    period that Officer Wasson activated the TASER for

8    the second time?

9        A.    I was standing alongside Mr. Alvarez

10    because I was waiting to see if the second

11    activation would have any effect on him.

12        Q.    Did you say anything to Mr. Alvarez?

13        A.    I was hollering at him to get on the

14    ground.

15        Q.    Did Mr. Alvarez look at you?

16        A.    No.

17        Q.    Did it appear to you that Mr. Alvarez

18    understood what you said?

19        A.    I don't know if he understood what I was

20    saying or not.

21        Q.    You couldn't tell?

22        A.    I couldn't tell.

23        Q.    And did Mr. Alvarez say anything to you

24    during this time period?  And I'm talking about the

                                                          16

1    second time that the TASER was activated.

2        A.    To me, myself?

3        Q.    Yes.

4        A.    No, ma'am.

5        Q.    During the time period that Officer

6    Wasson started to approach Mr. Alvarez, what were

7    you doing?

8          A.     I was still standing alongside

9    Mr. Alvarez.

10         Q.     And how far were you away from him at

11   this particular point in time?

12         A.     Probably the same distance I was before,

13   just a matter of a few feet.

14         Q.     Okay.  And where was Jeremy Fleming

15   during this particular point in time?  And I'm

16   talking about as Officer Wasson is approaching

17   Mr. Alvarez.

18         A.     To the best of my knowledge, Jeremy

19   Fleming was still laying on the ground in the yard.

20         Q.     In front of Mr. Alvarez?

21         A.     No.  He was laying off to the side.  He

22   was like off where the edge of the driveway and the

23   edge of the grass meet, right around that area.

24         Q.     And how many feet away from the house is

                                                      17

1    this that you're referring?

2          A.     Where Jeremy was or --

3          Q.     Well, okay.  How far was Jeremy from

4    Mr. Alvarez at this point?

5          A.     To be exact, I don't know.  Maybe twenty,

6    thirty feet.

7          Q.     Okay.  And how far was Mr. Alvarez from

8    the house at this particular point in time?

9          A.     He was -- to be exact, I don't really

10   know.

11      Q.    Did you ever watch Jeremy move away from

12  Mr. Alvarez?

13      A.    Watch Jeremy move away from Mr. Alvarez?

14  When I arrived, Jeremy was just laying on the

15  ground.

16      Q.    So he hadn't moved once you got there?

17      A.    No.  He was still laying on the ground.

18      Q.    Okay.  Where was Tiffany Dill?

19      A.    I was told she was standing over by the

20  house.  I never saw Tiffany Dill.

21      Q.    Okay.  During the time period that

22  Officer Wasson was approaching Mr. Alvarez, what was

23  Mr. Alvarez doing?

24      A.    Officer Wasson approached Mr. Alvarez.


                                                    18

1  As he approached, Mr. Alvarez took a step towards

2  him and at that time Officer Wasson kicked

3  Mr. Alvarez.

4      Q.    Was Mr. Alvarez saying anything to

5  Officer Wasson?

6      A.    No, not that I recall at that point.

7      Q.    Was Mr. Alvarez saying anything to you at

8  this particular point in time?

9      A.    No.

10      Q.    And what were you doing during this time

11  period?

12      A.    At that point, I was standing there,

13    still had my asp.  I mean, this all took place in

14    just a matter of seconds.  So Mr. Alvarez went down.

15    We immediately grabbed ahold of him, tried to pull

16    his arms out to cuff Mr. Alvarez.  I'm not sure what

17    you're after.

18         Q.    When was the first time that you

19    physically came in contact with Mr. Alvarez?

20         A.    When we were struggling on the ground to

21    pull his hands out from underneath of him.

22         Q.    Can you describe the struggle for me?

23         A.    Mr. Alvarez was laying -- he laid down on

24    his stomach or the front part of his body down, had


                                                        19

1     his hands up underneath of him, almost in like a

2     fetal position.  I yelled at him to give up his

3     hands, put his hands behind his back.  He wouldn't

4     do it.  We actually physically pulled his arms out

5     from underneath of him, put them behind his back and

6     cuffed him.

7          Q.    What part of his body did you touch to

8     get his arms out from underneath him?

9          A.    Just wrapped my arms in and pulled on his

10    arms.  Which arm, I don't recall exactly.

11         Q.    What did you use of your body to get his

12    arms out from underneath him?

13         A.    My hands and arms.

14         Q.    Did any other part of your body other

15    than your hands and arms ever come in contact with

16    Mr. Alvarez?

17         A.    No.

18         Q.    Did -- what part of Officer Wasson's body

19    came in contact with Mr. Alvarez during this

20    struggle?

21         A.    The same as mine.  He had ahold of -- I

22    was pulling on one arm.  He pulled on the other arm

23    to bring them behind his back.  So hands and arms.

24         Q.    Did you ever strike Mr. Alvarez during

                                                          20

1     this struggle on the ground?

2          A.    No.

3          Q.    Did you ever kick Mr. Alvarez during this

4     struggle on the ground?

5          A.    No.

6          Q.    Did Officer Wasson strike Mr. Alvarez

7     during this struggle on the ground?

8          A.    No.

9          Q.    Did Officer Wasson kick Mr. Alvarez

10    during the struggle on the ground?

11         A.    No.

12         Q.    Was Mr. Alvarez struck, hit, kicked,

13    punched in any way other than the time when Officer

14    Wasson kicked Mr. Alvarez in the pelvic area?

15         A.    No, he was not.

16         Q.    That's the only forceful contact

17    Mr. Alvarez received from Officer Wasson; is that

18    correct?

19        A.    Yes.

20            MR. MARTIN:   Pulling on the arms,

21        that can be characterized as forceful,

22        too, I suppose.

23        Q.    (by Ms. Bas)  And pulling the arms out,

24    correct?


                                                    21

1        A.    Yes.

2        Q.    Now, although you were closer to

3    Mr. Alvarez, you allowed Officer Wasson to approach

4    him; is that correct?

5        A.    Yes.

6        Q.    Why?

7        A.    I don't know.  It just happened that way.

8    I mean, I don't know.  It all happened in a matter

9    of seconds when Officer Wasson approached him.  When

10   he, Mr. Alvarez, took a step towards him, he kicked

11   him.  We both grabbed ahold of him to pull his hands

12   out when he went to the ground.  I don't know why.

13   It just happened to work out that way.

14       Q.    Did you have a TASER gun on you that

15   particular early morning?

16       A.    No, I did not.

17       Q.    Why not?

18       A.    Because it was in the car.

19       Q.    Are you trained to keep your TASER gun on

20   you?

21        A.    The new ones that we carry now, yes.

22        Q.    What new ones do you carry now?

23        A.    The X26.

24        Q.    X26?


                                                        22

1        A.    Yes.

2        Q.    How long have you carried those?

3        A.    I don't remember exactly.  I'm just

4    guessing.  I'm going to say maybe a year, year and a

5    half, right around in there.

6        Q.    Did you have the X26 TASER gun on

7    September 13, 2003?

8        A.    I didn't.  My car had one of the old ones

9    in it, the M --

10        Q.    The M26?

11        A.    Yeah.  That's what my car had in it.

12        Q.    Why did you have an M26 instead of an

13    X26?

14        A.    At some point the department was in the

15    process of changing them over.  That just happened

16    to be what was in the car that I took that night.

17        Q.    How does -- strike that.

18        After Mr. Alvarez was handcuffed, what did you

19    do?

20        A.    I helped Officer Wasson get Mr. Alvarez

21    on his feet.  We walked him over to Officer Wasson's

22    squad car.  He was bleeding from a pretty good

23     laceration down the side of his eye.  As we were

24     walking, he had a very heavy odor of alcohol.  We

23

1      laid him over the hood of the car.  He was having a

2      hard time even leaning up against the car, leaning

3      over it.  He was sliding off to the side of the car,

4      so we ended up sitting him down on the ground while

5      we were waiting on paramedics to arrive.

6          Q.    And when was the first time that you

7      could smell alcohol on Mr. Alvarez?

8          A.    As soon as we stood him up, because I

9      looked at him.  I looked at him to see where the

10     blood was coming from, and I could smell it on him.

11         Q.    Just so I got this correct, at the time

12     that Officer Wasson activated the TASER for the

13     second time before he approached Mr. Alvarez, he was

14     standing, he wasn't moving, he may have been saying

15     something but you're not sure, he had a cut on his

16     eye and was bleeding; is that correct?

17         A.    Other than the cut on his eye.  He had

18     blood on him, but at that point when we were at that

19     situation or at that time during the incident, I

20     didn't know where the blood was coming from.  I

21     didn't realize that it was coming from the

22     laceration of the eye until after we got him up and

23     started walking him to the car.

24         Q.    And Mr. Alvarez wasn't responding to

24

1    Officer Wasson, correct?

2        A.   Correct.

3        Q.   And he wasn't responding to you, correct?

4        A.   Correct.

5        Q.   And you couldn't tell if he understood

6    what was going on; is that correct?

7        A.   He was facing Officer Wasson.  I don't

8    know if Mr. Alvarez heard me or if he was just

9    ignoring me or if he understood what was going on.

10       Q.   You were closer to Mr. Alvarez, correct?

11       A.   Yes.

12       Q.   You were half the distance that Officer

13   Wasson was at the time Officer Wasson started to

14   approach Mr. Alvarez, correct?

15       A.   Yes.

16       Q.   So you had a better viewpoint of

17   Mr. Alvarez, correct?

18       A.   Uh-huh, yes.

19       Q.   And when did Mr. Alvarez take this step

20   toward Officer Wasson?

21       A.   As Officer Wasson approached him.

22       Q.   How far away was Officer Wasson when

23   Mr. Alvarez took the step?

24       A.   Officer Wasson was, by the time he took


25

1    the step, maybe three feet from him.  Officer Wasson

2    was approaching him to grab ahold of him to take him

3    to the ground.  So by the time, yeah, by the time

4    Mr. Alvarez took a step, Officer Wasson was a matter

5    of a few feet.

6        Q.    And at that point in time that Officer

7    Wasson was approaching Mr. Alvarez, you said that he

8    had dropped the object that he had in his hand,

9    correct?

10        A.    Yes, he had dropped it at some point.

11        Q.    Did you see whether or not Mr. Alvarez

12    had the object in his hand at the point in time

13    Officer Wasson was approaching him?

14        A.    I don't believe that he did.

15        Q.    And he wasn't moving his arms; is that

16    correct?  And I'm talking about the point in time

17    where Officer Wasson was approaching Mr. Alvarez.

18        A.    Other than having them clenched in a

19    fist, no.

20        Q.    And all he did was take a step forward;

21    is that correct?

22        A.    He took a step at Officer Wasson.

23        Q.    And he wasn't responding to either of

24    your commands; is that correct?

26

1        A.    No, ma'am.

2        Q.    And you knew that he had been TASER'd now

3    twice; is that correct?

4        A.    Yes, ma'am.

5        Q.    Did Mr. Alvarez appear to be a threat

6    when he took the step toward Officer Wasson?

7        A.    I don't know what Mr. Alvarez's

8    intentions were when he took a step towards Officer

9    Wasson.

10        Q.    Did he appear to be a threat to you?

11        A.    Yes.

12        Q.    Why?

13        A.    Because I didn't know what Mr. Alvarez

14    was going to do.  He took a step towards Officer

15    Wasson.  His hands, even though they were down, they

16    were clenched in a fist.  I didn't know if

17    Mr. Alvarez was going to wrestle with Officer

18    Wasson, strike Officer Wasson, kick him.  I didn't

19    know what Mr. Alvarez was going to do.

20        Q.    And because you saw this going on and you

21    didn't know what Mr. Alvarez was going to do next,

22    what did you do?

23        A.    I kept hollering for Mr. Alvarez to get

24    on the ground.  As Officer Wasson approached him, he


                                                      27

1    took a step.  Officer Wasson kicked him, and he went

2    to the ground.

3        Q.    So all you did in this time period was

4    just watch and yell at Mr. Alvarez; is that correct?

5        A.    Yes.

6        Q.    Once Mr. Alvarez was placed into

7    handcuffs, what did you do next?

8         A.    We helped Mr. Alvarez up, realized that

9    he had the laceration to the side of his head,

10    called for paramedics.  Walked him over to the car,

11    leaned him over the car, Officer Wasson's squad.  He

12    was having a hard time even leaning over the car

13    standing up, so we sat him on the ground so he

14    didn't fall.  While he was on the ground, he had a

15    hard time sitting up even just sitting on the

16    ground.

17         Q.    Then what did you do?

18         A.    Paramedics arrived.  He was released to

19    the EMTs for treatment.  After that, Officer Wasson

20    went to complete whatever his part of his

21    investigation he was doing with it.  I went back in

22    service to answer calls.

23         Q.    Did you speak with Jeremy Fleming?

24         A.    No.


                                                    28

1         Q.    Did you speak with Tiffany Dill?

2         A.    No.

3         Q.    Why not?

4         A.    By that point, Jeremy Fleming was already

5    in the back of Officer Wilson's squad car and I had

6    no clue where the female, other than at the house

7    somewhere, I had no clue where the female even was.

8         Q.    And during this whole time that

9    Mr. Alvarez was being TASER'd and then kicked by

10    Officer Wasson, you never saw Tiffany; is that

11    correct?

12         A.    That's right, I never saw where Tiffany

13    was.

14         Q.    And after you and Officer Wasson

15    handcuffed Mr. Alvarez and took him over to the

16    squad car, you just got in your squad car and left;

17    is that right?

18         A.    I stood there for a couple minutes,

19    didn't talk to anybody.  Kept an eye on him to make

20    sure that he wasn't going to give the EMTs any

21    problem, which at that point he wasn't.  To my

22    knowledge, Sergeant McFadden was speaking with

23    Tiffany.  Jeremy was already in the back of Officer

24    Wilson's squad car.  Once Medix left with him, Medix

                                                        29

1    left with him and Officer Wilson left with Jeremy --

2    we work six officers on a shift, you know -- I went

3    back in service to answer calls.

4         Q.    Did you speak with Officer Wilson during

5    the events before you left to go back and answer

6    calls?

7         A.    No.

8         Q.    Did you speak with McFadden before you

9    went to go and answer calls?

10         A.    No.

11         Q.    Did you speak with Officer Wasson before

12    you left to go answer calls?

13        A.    I believe we had just a brief

14    conversation, but I don't recall what it was about

15    other than basically are you all right, are you all

16    right, kind of along that line.

17        Q.    Did you ever speak with Mr. Alvarez?

18        A.    No, I never spoke with Mr. Alvarez.

19        Q.    Did Mr. Alvarez ever say anything to you?

20        A.    When we had him by the car, his speech

21    was slurred.  He was mumbling something, but I don't

22    know if he was actually speaking in general or if he

23    was trying to talk.  We couldn't understand him.

24        Q.    Was Mr. Alvarez in pain?


                                                        30

1        A.    I would assume he was.

2        Q.    Was he complaining of being in pain?

3        A.    I couldn't tell if he was complaining or

4    not.

5        Q.    Was he holding his stomach?

6        A.    He was handcuffed.

7        Q.    Once he had his handcuffs taken off of

8    him, did he hold his stomach?

9        A.    Not that I recall, no.

10        Q.    Did Officer Wasson speak with anyone

11    while you were present?  And when I say anyone,

12    Tiffany, Jeremy, Officer Wilson, or Officer

13    McFadden.

14        A.    Maybe Officer Wilson and Officer

15    McFadden.  I'm not sure.  I don't believe that he

16    ever spoke with Jeremy Fleming.

17         Q.    And you never filled out any

18    documentation regarding this evening?

19         A.    No, I did not.

20         Q.    Why not?

21         A.    Basically, as far as my part of it, my

22    part of it was, you know, I helped him get his hands

23    out and get him handcuffed.  I didn't do any part of

24    the investigative end of it.


                                                          31

1          Q.    Why not?

2          A.    Basically because it wasn't my call.  I

3     mean, not to sound like I'm dumping it on him, I

4     mean, it wasn't my call.  We have a primary officer

5     and a back-up officer.  Generally the primary

6     officer is the one who takes charge on the calls,

7     beside the sergeant, and conducts whatever

8     investigation that they need for whatever the

9     incident is they're called on.

10         Q.    What's your role as the back-up officer?

11         A.    Make sure that he's not --

12         Q.    "He," you mean Officer Wasson?

13         A.    Officer Wasson, yes.  It's basically

14    watching out for each other, you know.  Especially

15    with a fight.  You don't know what's going on when

16    you arrive on a fight, so they don't send officers

17    to fights by themselves.

18         Q.    During the year 2003, was your role

19    primarily as the back-up officer?

20         A.    I was the back-up officer on that call.

21    We have assigned areas, like Officer Wasson stated,

22    and if that's your assigned area, whoever the area

23    is in, the officer assigned to that area is the

24    primary and then what they do is they pull one from

                                                          32

1     another area to back them up.

2          Q.    Have you ever been -- were you ever the

3     primary officer on call during 2003?

4          A.    Sure.

5          Q.    How often?

6          A.    Whenever I'd get a call in the area that

7     I was responsible for.

8          Q.    Like 50 percent?  Sixty?  Seventy?

9          A.    No, probably more like 90.  If there was

10    a call in my area, it was my responsibility to be

11    the report call or whatever, handle the call.

12         Q.    Where is the division of the area because

13    you said at the time you got the call you were only

14    a block away.

15              MR. MARTIN:  I think he said that

16              Officer Wasson was there when he was a

17              block away, but you can clarify.

18              THE WITNESS:  Officer Wasson was

19              already there.  I just -- that was just a

20              coincidence I happened to be a block away

21              from there when they put it out.

22      Q.      (by Ms. Bas)  Did you go to the hospital?

23      A.      No, I did not.

24      Q.      And you didn't speak with anyone at the

                                                        33

1    hospital; is that correct?

2       A.      That is correct.

3       Q.      Have you ever used the TASER X26?

4       A.      Yes, I have.

5       Q.      How many times?

6       A.      I'm going to say three, maybe four times.

7       Q.      When was the first time you ever used

8    the -- when was the first time you had to use the

9    X26 TASER?

10      A.      I don't remember exactly when.

11      Q.      This year?  Last year?  Two years ago?

12      A.      Probably last year sometime.

13      Q.      Had you ever used any other TASER before,

14   meaning actually activated it?

15      A.      No.

16      Q.      So as of September 13, 2003, you had

17   never used a TASER; is that correct?

18      A.      No.

19      Q.      That's not correct?

20      A.      No, I had never -- up to that point, I'd

21   never got into an incident where I had to use it.

22        Q.    Okay.  And what training did you

23    receive -- strike that.

24        You started at the Danville Police Department

                                                        34

1    in June of 2001, correct?

2        A.    Yes, I did.

3        Q.    And this incident occurred on September

4    13, 2003.  Did you receive any training on how to

5    use a TASER gun prior to September 13th, 2003?

6        A.    Yes.

7        Q.    When did you receive that training?

8        A.    When I got out of PTI.  When I got back

9    to the department here, just the first or second day

10   of my field training.

11        Q.    What did that training consist of that

12   you received here?  And when I say here, I mean

13   Danville PD.

14        A.    I was -- my field training officer went

15   over it with me, just briefly explained how the

16   device worked, where to aim ideally, what kind of a

17   dart spread that you would want to get an effect,

18   explained how to put the cartridge on, take the

19   cartridge off, how to reactivate it if you needed to

20   reactivate it, explained that the activation itself

21   lasted five seconds.  If you need to reactivate

22   again, explained how to reactivate it again.

23   Actually shot one into a specialized target

24   downstairs in the armory, and then I had it used on

35

1    me to see what it was like.

2        Q.    How many times have you had it used on

3    you?

4        A.    Just once.

5        Q.    What happened?

6        A.    I collapsed on the floor in a ball.

7        Q.    Could you move?

8        A.    No.

9        Q.    I interrupted you.  What other training

10   did you get?

11       A.    I believe that was it.

12       Q.    Okay.  Was this just one person who went

13   over these things with you?

14       A.    No.  There was me, there was another

15   officer that had gotten out of the academy that

16   started at the same time as I did, and his training

17   officer was down there also.  So there was four of

18   us all together.

19       Q.    Who was your training officer?

20       A.    Officer Beth Damilano.

21       Q.    Can you spell her last name for me?

22       A.    D-A-M-I-L-A-N-O?

23       Q.    We won't tell.  Okay.  So other than your

24   training, how it worked, where to aim, how to change

1    the cartridges, how to reactivate, the duration of

2    the activation and you shot it once and you were

3    actually shot at with the TASER, did you receive any

4    other training regarding the TASER at the Danville

5    Police Department when you first arrived here?

6        A.    Other than just the desired effect, which

7    is obviously the desired effect.

8        Q.    What's the desired effect?

9        A.    Is to stop whatever aggressive behavior

10    and usually collapse to the ground.  Other than

11    that, they went over as far as an intoxicated person

12    or somebody with a pace maker, that it's not that,

13    you know, it doesn't hurt the pace maker.  Other

14    than that, they never got into the engineering or

15    the mechanicals of how it works.

16        Q.    Okay.  You said you were trained on it

17    regarding an intoxicated person.  What did they tell

18    you?

19        A.    Just that ideally that whether they're

20    intoxicated or whether they are under the influence

21    of some type of drugs that it's supposed to still --

22    supposed to still obtain the desired effect.  But

23    they also told us that it doesn't always.

24        Q.    What are you supposed to do if it doesn't

                                                      37

1    obtain the desired effect?

2        A.    Reactivate it.

3        Q.    How many times can you do that?

4        A.    They never said a specific number.

5        Q.    Were you ever trained that a person could

6   be TASER'd and appear frozen as if they weren't

7   reacting when, in fact, they were?

8        A.    I was told that.

9        Q.    What were you told to do in that

10   situation?

11       A.    I was told that if they're freezing, that

12   the freezing effect is usually while the TASER is

13   cycling or while they're getting the electrical

14   charge.  And that once the electrical charge is

15   stopped or has discontinued, then they have full

16   motion or full muscle control, however you want to

17   describe it, to do whatever you're wanting them to

18   do.

19       Q.    You said you were TASER'd once, right?

20       A.    Yes.

21       Q.    Were you able to move right after you

22   were TASER'd?

23       A.    As soon as he cut it off, I got right

24   back up off the floor.

                                                    38

1        Q.    Within seconds?

2        A.    Right after he cut off the electrical

3   current, I got right back up.

4        Q.    Even though it had knocked you to the

5   ground, the effect only lasted during the time

6    period that you were actually being TASER'd and

7    after that you were fine; is that correct?

8        A.    Yes, other than a little bit of a

9    tingling feeling where the darts were.  That was it.

10       Q.    So what did they tell you was the purpose

11   of the TASER if as soon as you activate it the

12   person can move again?  What's the desired effect

13   that you were trained to achieve if the person can

14   still move after you're done?

15       A.    The idea, the way that I understand it's

16   supposed to be, that when the TASER is activated,

17   the majority of people will collapse to the ground

18   because it disrupts their muscular function which is

19   supposed to give you the opportunity to grab ahold

20   of them in order to effect the arrest or effect

21   whatever you need to effect.  That's basically

22   supposed to stop them or stun them, or however you

23   want to describe it, but while the current is going.

24   Then hopefully by the time the five seconds is up,

                                                        39

1    you've got ahold of them so you can get them cuffed.

2        Q.    When Officer Wasson TASER'd Mr. Alvarez

3    the second time, did he fall to the ground?

4        A.    No.

5        Q.    Did the academy ever -- or strike that.

6        Did the Danville Police Department ever tell

7    you what to do in a situation where if you TASER

8    someone a couple times and they don't appear to

9    respond, what to do?

10        A.    If they didn't respond initially,

11    reactivate the TASER.  If you still didn't get any

12    kind of response out of them, then you are going to

13    have to use some other means to effect the arrest,

14    whether it was hands on, whether it was a chemical

15    munition like OC.  You're going to have to, I mean,

16    if it didn't work, you're going to have to do

17    something else.

18        Q.    And in this particular instance if

19    something else was done by Officer Wasson as he

20    approached Mr. Alvarez and he kicked him once

21    Mr. Alvarez took a step forward; is that correct?

22        A.    Say it one more time.  I'm sorry.

23        Q.    It was a poorly phrased question.  It's

24    my fault.  After Mr. Alvarez was TASER'd for the

                                                        40

1    second time, he didn't yell at anyone, correct?

2        A.    No.

3        Q.    And he didn't swing at anyone with his

4    arms, correct?

5        A.    No.

6        Q.    And he had dropped the pipe, correct?

7        A.    That's correct.

8        Q.    And the only movement that he made was he

9    took one step forward, correct?

10        A.    Yes, towards Officer Wasson.

11        Q.    How are you instructed to take someone to

12   the ground?

13        A.    Try using some type of joint

14   manipulation, do basically what you would call a

15   sweep.  Basically if you get ahold of them, kick a

16   leg out from under them to get them to the ground.

17   When I say kick, I don't mean actually kick them as

18   a strike but basically off balance them by sweeping

19   a leg up, taking them to the ground.

20        Q.    Are you instructed to kick someone in the

21   pelvis area?

22        A.    PPCP book demonstrates front thrusting

23   kicks.  So yeah.  I mean --

24        Q.    Can you kick a person anywhere, according

                                                           41

1    to the book?

2         A.    I don't know what your definition of

3    anywhere is.

4         Q.    Anywhere on the body.

5         A.    You can kick to the legs, too, but --

6         Q.    What are you trained to do in a situation

7    where a person is not voicing any verbal threats, is

8    not speaking, has his hands down to his side and

9    takes one step forward, what are you instructed to

10   do in that situation?

11             MR. MARTIN:  I'll object to the

12             question.  Leaves out details of this case

13             which includes he was in a fight, making

14          an aggressive move toward the officer,

15          he's not obeying police commands.

16      Q.     (by Ms. Bas)  Officer, can you answer my

17  question?

18      A.     Yeah.  You have to ask it one more time.

19  I'm sorry.

20          MS. BAS:  Can you read it back for

21          me, please?

22          (Whereupon the requested portion of

23          the record was read by the court

24          reporter.)


                                                        42

1       A.     If I deem him taking a step forward at me

2   as a threat, then I'm going to take him to the

3   ground.

4       Q.     How would you do that?  In this scenario,

5   let's say that Mr. Alvarez had made the step towards

6   you instead of Officer Wasson, what would you have

7   done?

8       A.     If I had, given the situation and a TASER

9   in one of my hands --

10      Q.     You didn't have a TASER.

11      A.     You just -- I thought you just -- this is

12  hypothetical.

13      Q.     Let's say in this situation, if you're

14  standing there and you've got your stick but you

15  don't have a TASER and let's pretend that

16    Mr. Alvarez had made the step towards you, what

17    would you have done?

18        A.    If Mr. Alvarez had made the step towards

19    me and I perceived or felt threatened that he was

20    going to either hit me or kick me, then I probably

21    would have kicked him to get him back off of me.

22        Q.    How would you have kicked him?

23        A.    Probably the same way Officer Wasson did,

24    a kick to the, you know, the pelvis area or

                                                              43

1    basically where the bones are.

2        Q.    Why would you kick where the bones are?

3        A.    I was just -- ideally, that's where, you

4    know, ideally that's where you want to kick.

5    Depending on the circumstance, if they turn or

6    they're coming at you, you don't know where it's

7    going to wind up.

8        Q.    Why are the bones the ideal spot that you

9    want to kick someone?

10        A.    To diminish injury.

11        Q.    Have you ever heard of anyone being

12    injured by a TASER gun?

13        A.    Injured as in how?

14        Q.    Physically injured.

15        A.    No.

16        Q.    Have you ever heard of anyone dying

17    because of a TASER gun?

18        A.    The only thing I've ever heard in

19    relation to or in regards to TASER related deaths

20    was that usually the deaths that had happened, that

21    there was usually some other underlying factor and

22    it was usually some type of stimulant drug.

23        Q.    Do they go over that here at the Danville

24    Police Department?

                                                        44

1        A.    Yes, I believe it was brought up.  It's

2    been a while ago but, yeah, I believe it was brought

3    up about the incidence of deaths.

4        Q.    Did Mr. Alvarez appear to be a threat to

5    you or to Mr. Wasson when Mr. Wasson kicked him?

6            MR. MARTIN:  I'm going to object.

7            That's been asked and answered.

8        Q.    (by Ms. Bas)  You can answer.

9        A.    Yes, I perceived Mr. Alvarez as a threat

10   to Officer Wasson.

11       Q.    Why did you perceive him to be a threat?

12            MR. MARTIN:  I object.  It's been

13            asked and answered.

14            THE WITNESS:  Mr. Alvarez had already

15            been involved in a fight.  He was not

16            obeying either Officer Wasson's orders or

17            my orders to get down.  He was not

18            complying with anything we were asking him

19            to do.  And as Officer Wasson approached

20            him when the TASER didn't work, he took a

21          step towards Officer Wasson, I perceived

22          that he was either going to kick him, hit

23          him, or grab ahold of him and they were

24          going to end up in a struggling match.


                                                    45

1       Q.    (by Ms. Bas)  What shift do you work?

2       A.    I work seconds now.

3       Q.    When did you start working second shift?

4       A.    Would have been October of --

5       Q.    2003?

6       A.    Yeah, probably about October, towards the

7    end of October of 2003, and then I ended up going

8    back to nights for about three months due to a

9    manpower shortage.  And then I came back -- in the

10   summer of 2004, I came back to second shift.

11      Q.    Did you ever seek to work second shift

12   prior to when you were assigned to do so in October

13   of 2003?

14      A.    Did I ever -- what do you mean?

15      Q.    Apply to work second shift.

16      A.    To work second shift?  Yeah.

17      Q.    When was that?

18      A.    We do shift picks once a year, and then

19   everybody is assigned to pick according to

20   seniority.  And at the time when they came out I

21   didn't have enough seniority, so I got stuck on

22   third shift.

23      Q.    Are you aware of any concerns the

24    department had regarding your training in January of

46

1    2003?

2        A.    Yes, I am.

3        Q.    What were their concerns?

4        A.    Number one was that they didn't feel that

5    I took charge on calls to the point of what they

6    thought it should have been and that usually once a

7    command officer would show up I'd kind of back off

8    and let them deal with whatever the problem was.

9        And there was -- they were concerned over doing

10   building searches because I was taught a way to do

11   it over at the police academy, which they teach more

12   of a SWAT tactical way of doing it and they do it

13   different here a little bit, I mean.  And there

14   was -- there was one other concern, and without

15   looking at it, to be honest with you, I can't recall

16   off the top of my head what it involved.

17       Q.    Did it have anything to do with the

18   reason you were denied to work second shift?

19       A.    No, ma'am.

20           MS. BAS:  That's all I have.

21           MR. MARTIN:  Reserve signature.

22           (Whereupon the deposition was

23           concluded.)

24

47

```
 1    STATE OF ILLINOIS    )
                           )  SS
 2    COUNTY OF CHAMPAIGN )

 3

 4         I, JANET E. FREDERICK, CSR, License No.
      084-003526, in and for the County of Champaign,
 5    State of Illinois, do hereby certify that JOSEPH
      BLEW, the deponent herein, was by me first duly
 6    sworn to tell the truth, the whole truth and nothing
      but the truth, in the aforementioned cause of
 7    action, and the deposition is a true record of the
      testimony given by the deponent.
 8         That the foregoing deposition was taken on
      behalf of the Plaintiff, on the 10th day of June
 9    2005.
           That said deposition was taken down in
10    stenograph notes and afterwards reduced to
      typewriting under my instruction; and that it was
11    agreed by and between the witness and attorneys that
      said signature on said deposition would not be
12    waived.
           I do hereby certify that I am a disinterested
13    person in this cause of action; that I am not a
      relative of any party or any attorney of record in
14    this cause or an attorney for any party herein, or
      otherwise interested in the event of this action,
15    and am not in the employ of the attorneys for either
      party.
16         IN WITNESS WHEREOF, I have hereunto set my hand
      this 24th day of June 2005.
17

18

19

20                        _____
                          JANET E. FREDERICK, CSR.
21

22

23

24
```

48

```
 1         IN THE UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF ILLINOIS
 2
```

```
        MANUEL ALVAREZ, SR.,              )
 3          Plaintiff,                     )
               -vs-                        ) No. 04-2162
 4      CITY OF DANVILLE, OFFICER T. WASSON, )
        badge number 347, individually and as )
 5      employee of the Police Department of  )
        the City of Danville, and OFFICER     )
 6      BLEW, individually and as employee    )
        of the Police Department of the City  )
 7      of Danville,                          )
            Defendants.                       )
 8
```

9       This is to certify that I have read the

10     transcript of my deposition taken in the

11     above-entitled cause, and that the foregoing

12     transcript taken on June 10, 2005, accurately states

13     the questions asked and the answers given by me,

14     with the exception of the corrections noted, if any,

15     on the attached errata sheet(s).

16

17                              _____
                                JOSEPH BLEW
18

19     Subscribed and Sworn before
       me this _____ day of
20     _____ 2005

21     _____
22     Notary Public

23
                        AREA WIDE REPORTING SERVICE
24      301 West White Street, Champaign, Illinois  61820