IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MANUEL ALVAREZ, SR.,                )
                                    )
        Plaintiff,                  )
                                    )
        -vs-                        )  No. 04-2162
                                    )
CITY OF DANVILLE, OFFICER T. WASSON, )
badge number 347, individually and as )
employee of the Police Department of )
the City of Danville, and OFFICER    )
BLEW, individually and as employee   )
of the Police Department of the City )
of Danville,                         )
                                    )
        Defendants.                 )

DEPOSITION

The Deposition of TROY WASSON, a citizen of the State of Illinois, a witness of lawful age; produced, sworn and examined upon his corporeal oath on June 10, 2005 A.D., at the City of Danville Police Department, 2 East South Street, Danville, Illinois, before Janet E. Frederick, CSR, License No. 084-003526, in and for the County of Champaign and State of Illinois, as a witness in a certain suit and matter now pending and undetermined in the United States District Court, Central District of Illinois.

ORIGINAL

PLAINTIFF'S EXHIBIT C

AREA WIDE REPORTER (800)747-6789

Page 14

1  drop the pipe.
2      At that time I activated the TASER, which then
3  shoots a small set of two darts at Mr. Alvarez. It
4  had little or no effect on him. I again started
5  yelling at him to get on the ground. He still did
6  not do so, so I activated the TASER again which
7  doesn't shoot another set of darts, it simply
8  reactivates the electricity from the stun gun, and
9  it again had no effect on Mr. Alvarez.
10     Q. When you -- was your police car facing
11 the residence once you were out of it?
12     A. No. It was facing a northeast direction.
13 It was kind of at an angle.
14     Q. Would the video inside of the police car
15 pick up any of the commotion in the backyard?
16     A. I don't recall if it would have, if it
17 would have got the entire incident on tape or not.
18     Q. Okay. And that tape is no longer in
19 existence; is that correct?
20     A. That's correct.
21     Q. And when you saw Mr. Alvarez and you gave
22 him two commands, what did you tell him to do
23 specifically?
24     A. Initially as I exited the car I told him

Page 15

1  to drop the pipe twice, and he didn't do so.
2     Q. Can you describe what he had in his hand
3  for me?
4     A. I would describe it as probably three to
5  four foot long. It was a round cylinder object, and
6  I would describe it as an aluminum tent pole. And
7  maybe it didn't have any points or anything on the
8  end. It was just a hollow, metal pipe.
9     Q. Okay. And did Mr. Alvarez recognize that
10 you were yelling at him?
11    A. I don't know. I only know that he
12 wasn't -- he wasn't -- I'm trying to think of the
13 right word. He wasn't obeying the commands to drop
14 the pipe.
15    Q. Did he look at you when you yelled at
16 him?
17    A. I don't recall.
18    Q. Did he put down the pipe when you told
19 him to?
20    A. No.
21    Q. And then that is when you activated the
22 TASER, correct?
23    A. Yes.
24    Q. And you said it was the X26; is that

Page 16

1  correct?
2     A. Yes.
3     Q. Okay. And after you TASER'd Mr. Alvarez,
4  what did he do?
5     A. He did little or nothing.
6     Q. Did he continue to hold the pipe?
7     A. He did.
8     Q. Okay. And during the time that he
9  continued to hold the pipe, how exactly was he
10 holding it?
11    A. At that point, he had already struck
12 Fleming. He was on the ground. He did not have it
13 over his head any longer, so I'm assuming, and I
14 don't recall exactly, but that he had it down in --
15 that he still had it in his hand.
16    Q. Okay. So at the time that you TASER'd
17 Mr. Alvarez, he was still holding the pipe, but it
18 was down at his side; is that right?
19    A. He was still holding the pipe. Whether
20 it was at his waist, above his head, or at the
21 ground, I'm not sure.
22    Q. You don't know if it was above his head
23 or if he was holding it out to his side?
24    A. I'm simply saying that I know he had it

Page 17

1  in his hand. I don't recall at this time the exact
2  positioning of the pipe.
3     Q. Was he swinging the pipe when you TASER'd
4  him?
5     A. No.
6     Q. Was he making any violent movements when
7  you TASER'd him?
8     A. No.
9     Q. And you said after you TASER'd him he
10 continued to hold the pipe; is that correct?
11    A. Yes.
12    Q. Okay. And how did he appear to you
13 physically after you TASER'd him?
14    A. It had little or no effect on him.
15    Q. Okay. And what did you do after that?
16    A. After which point? After I TASER'd him?
17    Q. After you TASER'd him the first time,
18 what did you do?
19    A. I then yelled at him to start getting
20 down on the ground, and he again did nothing.
21    Q. Did he continue to hold the pipe?
22    A. At some point he dropped the pipe.
23    Q. Okay. Do you know if he dropped the pipe
24 because -- strike that.

Page 18

1  Did he drop the pipe before you TASER'd him the
2  second time?
3  A. He dropped the pipe prior to activating
4  it the second time.
5  Q. Okay. And then what did you do after you
6  activated the TASER the second time?
7  A. Once again it had little or no effect.
8  Q. You deployed it, correct?
9  A. Deploying it would be the first time
10 where the darts actually exit the blasting cartridge
11 and go out towards Mr. Alvarez.
12 Q. Okay. What happened the second time?
13 A. The second time I just pulled the trigger
14 on it and it reactivated the electricity and the
15 small wires that are connected to the probes.
16 Q. Okay. Then what happened? How did
17 Mr. Alvarez react after you activated the TASER the
18 second time?
19 A. He did nothing.
20 Q. When you say did nothing, did he move?
21 A. Not during the time that the TASER was
22 going, which is why I say it had little or no
23 effect.
24 Q. Did he look at you?

Page 19

1  A. I don't recall if he was looking at me.
2  Q. Was he yelling?
3  A. No.
4  Q. Was he yelling at you before you
5  activated the TASER the second time?
6  A. No.
7  Q. Did he yell from the time that you
8  TASER'd him the first time until the second time?
9  A. I don't recall.
10 Q. And did he ever move his arms in a
11 violent manner between the first time you TASER'd
12 him and the second time?
13 A. No, I don't believe he did.
14 Q. Okay. Where was Jeremy during the two
15 times that you TASER'd Mr. Alvarez?
16 A. He was on the ground.
17 Q. Was he still in front of Mr. Alvarez?
18 A. I don't recall his exact location. I was
19 focused on Mr. Alvarez at that point.
20 Q. Okay. And do you know where Tiffany Dill
21 was during the time that you were TASERing
22 Mr. Alvarez?
23 A. Once again, I have no idea if he was
24 around me at that point.

Page 20

1  Q. Okay. I know that Officer Blew at some
2  point came to the scene. Was he present by this
3  time?
4  A. Yes.
5  Q. Okay. When did Mr. -- I'm sorry. When
6  did Officer Blew arrive?
7  A. The exact time, I'm not sure. Once
8  again, my attention was focused on the incident at
9  hand, but at some point Officer Blew had appeared in
10 my peripheral vision on my right side. I think it
11 was after the first deployment and probably just
12 prior to the second deployment. He was definitely
13 there as I approached Mr. Alvarez.
14 Q. How close was he when he became in your
15 peripheral vision?
16 A. He was probably five feet, five to ten
17 feet away from me. He was just off my right side.
18 Q. Okay. Now, after you TASER'd Mr. Alvarez
19 the second time, you said it had little or no
20 effect; is that correct?
21 A. Yes.
22 Q. What did you do at that point?
23 A. At that point I took the blasting cap or
24 the cartridge off the end of the TASER and I

Page 21

1  discarded it onto the ground.
2  Q. And what was Mr. Alvarez doing at this
3  particular point in time when you were discarding
4  the TASER?
5  A. He was still standing in the same place.
6  Q. Was he moving in any way?
7  A. I don't recall.
8  Q. Was he yelling in any way?
9  A. No.
10 Q. After you discarded the TASER, what did
11 you do?
12 A. As I discarded the TASER, I was also
13 advancing towards Mr. Alvarez.
14 Q. When you say you were advancing, describe
15 for me what you mean by advancing.
16 A. I was just walking towards him because
17 the two deployments had just failed and at that
18 point he was still not doing anything, not obeying
19 the commands of me or if Joe was giving any
20 commands. So at that point we have to move in close
21 enough to take him into custody.
22   So when I say advancing on him, I was moving
23 towards him and at the same time I'm taking the end
24 off the TASER and throwing it to the ground as I'm

Page 22

1 walking.
2  Q. Okay. And you said that -- how would you
3 describe the pace that you were walking?
4  A. It wasn't running and it probably wasn't
5 walking. I don't know how to describe it. In
6 between. Given the conditions of the incident, I'm
7 sure I wasn't walking at a slow pace.
8  Q. And how far did you have to walk from the
9 time that -- where you were standing when you
10 TASER'd Mr. Alvarez till when you got to him?
11  A. I think I testified that I was about ten
12 or so feet away from him when I used the TASER, so
13 that distance.
14  Q. Okay. Now, during the point in time that
15 you are approaching Mr. Alvarez, do you remember
16 where Jeremy and Tiffany were at this point?
17  A. No.
18  Q. And Mr. Alvarez was in still the same
19 position, correct?
20  A. Yes.
21  Q. Okay. Once you reached Mr. Alvarez, what
22 did you do?
23  A. As I was approaching Mr. Alvarez, at that
24 point I recall that he was facing directly at me and

Page 23

1 he took one step towards me. At that point I was
2 within three to five feet, and at that point I had
3 my TASER in one hand, my left hand was empty, and I
4 used a front kick and kicked Mr. Alvarez in the
5 pelvis area.
6  And Joe was at that point probably as close as
7 I was on my right side. He had an asp in his hand,
8 Officer Blew did, but it wasn't needed because at
9 that point Mr. Alvarez, I believe that he went down
10 to his knees at that point, rolled over onto his
11 stomach, and had both his hands underneath his
12 stomach or his chest area. Kind of -- I don't know
13 how else to describe it. Like a mummy position,
14 underneath his chest laying face down.
15  Q. Okay. And can you describe to me when
16 you kicked Mr. Alvarez, you said you kicked him in
17 the pelvic area; is that right?
18  A. Yes.
19  Q. Okay. Did you kick him higher than where
20 his hip bones would sit?
21  A. My point of aim is in the pelvis area.
22  Q. And did you kick Mr. Alvarez only once?
23  A. Yes.
24  Q. And after you kicked him, he dropped to

Page 24

1 the ground; is that correct?
2  A. Yes.
3  Q. And what did you do after Mr. Alvarez
4 landed on the ground?
5  A. At that point, Officer Blew and I just
6 reached down, and we had to force his arms out from
7 under him, basically just pull his arms out from
8 under his body. He was placed in the handcuffs.
9 Officer Blew and I lifted Mr. Alvarez to his feet
10 and noticed that he had a substantial or severe
11 wound to the face, and I immediately contacted Medix
12 for his injuries, which is the ambulance service.
13  Q. Did you handcuff Mr. Alvarez?
14  A. Yes, I did.
15  Q. Did you handcuff him while he was still
16 on the ground?
17  A. Yes.
18  Q. And then you and Mr. Blew helped him --
19 Officer Blew, I'm sorry, helped him to his feet; is
20 that correct?
21  A. Yes.
22  Q. How did you help him to his feet?
23  A. Ordinarily when a subject is laying on
24 the ground and handcuffed, I have them roll over on

Page 25

1 their side, pull their knees up into their chest
2 area, kind of in a fetal position, and then with
3 their arms we rock them onto their knees and have
4 them stand up at that point.
5  Q. Okay. And is it your testimony today,
6 other than the two times that you TASER'd
7 Mr. Alvarez, the only time you came in contact with
8 him physically before you tried to handcuff him is
9 when you kicked him in the pelvis area; is that
10 correct?
11  A. Yes.
12  Q. Did Officer Blew ever physically come
13 into contact with Mr. Alvarez other than helping him
14 stand up?
15  A. During the handcuffing process, and that
16 is by removing his arms under his body, that's the
17 only time Officer Blew had any contact with him.
18  Q. And during -- once Mr. Alvarez fell to
19 the ground, the only manner in which you touched him
20 is when you took his arms from his chest and then
21 put them behind his back and handcuffed him; is that
22 correct?
23  A. Yes, we pulled his arms from under his
24 chest and placed them behind his back.

Page 26

1  Q. Once you got handcuffs on Mr. Alvarez,
2 what did you do?
3    A. Stood him up, seen his injuries, called
4 for Medix, and then escorted him over to the front
5 of my police car. And we at that point could notice
6 that he was severely intoxicated, we could smell it,
7 and he was stumbling quite a bit so we leaned him up
8 against the front hood of the car, which is the
9 passenger side of vehicle 114. And he was so
10 intoxicated at that point, he couldn't even stand on
11 his own so we stood there next to him momentarily
12 and he started -- he was so intoxicated that he was
13 sliding off the hood of the car.
14    So at that point we decided that we would sit
15 him on the ground. So we had him sit down on the
16 ground next to the front tire of the police car so
17 that he wouldn't fall over. And even then, if my
18 recollection is correct, that he was leaning over
19 and we had to have him sit up so that he wouldn't
20 lay over on himself.
21    At some point, while the medical people were en
22 route, we unhandcuffed Mr. Alvarez so that the
23 medics could take him because of his condition. We
24 knew he was going to go to the emergency room, so we

Page 27

1 took the handcuffs off of him so that they could
2 treat him.
3    Q. Did Mr. Alvarez say anything to you
4 during the process of when you kicked him in the
5 pelvis?
6    A. No.
7    Q. Did he say anything once he fell to the
8 ground?
9    A. No.
10   Q. Did he make any violent movements when
11 you kicked him in the pelvis?
12   A. No.
13   Q. Did he make any violent movements after
14 he fell to the ground?
15   A. Violent movements towards me or just
16 simply resisting arrest by holding his arms? I'm
17 not quite sure what you're asking.
18   Q. Did he make any movements toward you?
19   A. No.
20   Q. When you said that he was resisting
21 arrest, why do you say that?
22   A. Because he was leaning on his chest and
23 refused to surrender his arms to be handcuffed.
24   Q. And you said that Mr. Alvarez was

Page 28

1 extremely intoxicated; is that correct?
2    A. That's correct.
3    Q. And he had just been kicked in the
4 pelvis, correct?
5    A. Yes.
6    Q. Did Mr. Alvarez appear to be in pain at
7 that point in time?
8    A. I don't know.
9    Q. Did you -- how would you describe the
10 kick? Was it forceful?
11   A. Describe your definition of forceful.
12   Q. Well, describe for me how you would
13 describe the impact that you had upon Mr. Alvarez.
14   A. As I was walking towards Mr. Alvarez, I
15 simply used my right leg and kicked him in the
16 pelvic area and pushed him backwards, which was my
17 intention. I mean, I'm not trained in any skills as
18 far as Karate or anything like that, so it was just
19 to me normal. It was a normal kick. I'm not sure
20 exactly your definition of forceful, so I don't know
21 what you want.
22   Q. Okay. What portion of your foot came in
23 contact with Mr. Alvarez?
24   A. I don't know.

Page 29

1    Q. The top? The bottom part?
2    A. It would be the sole of my foot, not the
3 top.
4    Q. Okay. Did you kick his stomach in any
5 way?
6    A. I don't recall. I aimed for the pelvic
7 area.
8    Q. Where did you actually kick him if you
9 aimed for the pelvic area?
10   A. I don't recall. That was the aiming
11 point. Please understand that the circumstances and
12 the incident happened within a few seconds.
13   Q. I understand. I'm just trying to get the
14 best of your memory that I can today. Now, after
15 Mr. Alvarez was on the ground, did he say anything
16 to you during the process of trying to get him
17 handcuffed?
18   A. No.
19   Q. Did he say anything to Officer Blew
20 during this process?
21   A. I don't know. You'll have to ask Officer
22 Blew.
23   Q. Once you handcuffed Mr. Alvarez, where
24 were Jeremy and Tiffany?

Page 38

1  had transported Jeremy Fleming to book-in, and
2  Jeremy Fleming had been charged with battery.
3  Mr. Alvarez was also charged with battery at that
4  point but released from custody because of his
5  injuries. And basically we just sent the police
6  report over to the state's attorney's office to file
7  a formal charge after he got out of the hospital.
8      Q. Okay.
9      A. So other than contacting Phil Wilson to
10 make sure that Jeremy Fleming was in custody, I
11 think I talked to Sergeant McFadden about what the
12 female, Tiffany Dill, had said because I hadn't
13 talked to her at the scene.
14     Q. Okay. What did you say to -- strike
15 that.
16     Where did this conversation occur between you
17 and Sergeant McFadden?
18     A. I don't know the exact location.
19     Q. Okay. Was anyone else present for this
20 conversation?
21     A. No.
22     Q. Was it in person?
23     A. Yes.
24     Q. What did you say to her and what did she

Page 39

1  say to you?
2      A. I want to correct myself. I'm not sure
3  if it was in person or over the telephone because
4  we're still working at this point. I don't know if
5  we were in our cars meeting or by phone.
6      Q. Okay. What did she say to you and what
7  did you say to her?
8      A. I simply asked her what Tiffany Dill had
9  said, and she told me that Tiffany Dill told her
10 that Manuel Alvarez and Jeremy Fleming are
11 father/son, that they had met earlier in the
12 evening, drank a couple cases of beer. They got
13 into a pushing match. The pushing match quickly led
14 to a fist fight that ended up in the backyard when
15 the police were called and that she called the
16 police.
17     Q. Okay. Was anything else said?
18     A. Not that I can recall.
19     Q. Is there anything that would help your
20 memory?
21     A. No.
22     Q. Okay.
23         MR. MARTIN: I'll object. There
24     might be something, but he doesn't know

Page 40

1  what it is.
2      Q. (by Ms. Bas) Can you think of any
3  documents that would help your memory as to what
4  else was said between you and McFadden?
5      A. There would be no documentation of a
6  personal conversation.
7      Q. So as you sit here today, the only thing
8  you have is your memory; is that correct?
9      A. Yes.
10     Q. And there's nothing that you can look at
11 that would help your memory; is that correct?
12     A. Yes.
13     Q. After you spoke with -- strike that.
14     You said you also spoke with Officer Wilson; is
15 that correct?
16     A. I did.
17     Q. When did you speak with Mr. -- or Officer
18 Wilson?
19     A. It was after I left the hospital.
20     Q. Were you in your squad car at this time?
21     A. Once again, I don't know if I was in the
22 car talking to him face to face or on the phone.
23     Q. Okay. If you had been speaking with him
24 face to face, where would you have been speaking

Page 41

1  with him?
2      A. In the city of Danville.
3      Q. When you spoke with McFadden and Wilson,
4  was this sometime after he left the hospital, like
5  closer to after he left the hospital, or is it the
6  next day or two days later?
7      A. It was the same night.
8      Q. When you spoke with Officer Wilson, was
9  anyone else present for that conversation?
10     A. No.
11     Q. Tell me what you said to him and what he
12 said to you.
13     A. I simply asked him if Jeremy Fleming had
14 any injuries and what was the charges he put on the
15 booking sheet for me. He told me he put him down
16 for simple battery. And I don't recall if he told
17 me if Jeremy Fleming had any physical injuries or
18 not.
19     Q. Was Jeremy Fleming taken to the police
20 station?
21     A. Yes.
22     Q. And he was booked; is that correct?
23     A. Yes.
24     Q. And he was released, correct?

Page 42

1   A. Released?
2   Q. On bail. He was let out?
3   A. I don't know.
4   Q. Okay. Did you ever speak with Jeremy
5   Fleming after you arrested Mr. Alvarez?
6   A. No.
7   Q. Did you read Mr. Alvarez his rights?
8   A. I did not.
9   Q. And why would you not or why did you not
10  do that?
11  A. I didn't ask him any questions.
12  Q. Okay. And when you spoke with the
13  hospital staff, they told you that he would most
14  likely be there overnight; is that correct?
15  A. They believed he would be held because he
16  had possibly had a concussion. Whether that was
17  overnight or for the duration of the examination, we
18  were too busy to stay and baby-sit so we released
19  him to the hospital and I left.
20  Q. Okay. Did you have any intention of
21  going back to get Mr. Alvarez when he was going to
22  be released so you could book him?
23  A. If he would have been released that
24  night, my intention, yes, was to take him into

Page 43

1   custody for battery and process him in booking.
2   Q. Okay. And when did you work on -- strike
3   that.
4       When did you start your shift on September
5   12th, 2003?
6   A. Was that the night --
7   Q. That would have been before midnight.
8   A. We start our shift at 10:20 p.m., I'm
9   sorry, 10:40 p.m.
10  Q. And is that the time you started your
11  shift that particular evening?
12  A. I believe it was.
13  Q. And what time did your shift end on
14  September 13th, 2003?
15  A. We normally end at 7:15 in the morning.
16  Q. Okay. Now, you testified that it was
17  your intention to go back and get Mr. Alvarez if he
18  were released that evening so you could take him to
19  the jail and book him; is that correct?
20  A. Yes.
21  Q. And why didn't you do that?
22  A. He hadn't been released prior to the end
23  of my shift at 7:15.
24  Q. Okay. And if he had been released prior

Page 44

1   to your shift at 7:15, you would have taken him to
2   the jail, correct?
3   A. Yes.
4   Q. How were you going to find out whether or
5   not Mr. Alvarez had been released from the hospital?
6   A. I don't know who I spoke to, but I asked
7   them if he is ready for release to call the police
8   station and notify us and we'll come over and pick
9   him up.
10  Q. Okay. And did you call the hospital
11  before you ended your shift that morning at 7:15
12  a.m.?
13  A. I don't recall if I called the hospital
14  or not.
15  Q. Did you want to know whether or not he
16  had been released so you could book him?
17  A. If he had been released, they would have
18  called, I assume.
19  Q. Why do you assume that?
20  A. Because that's what they normally do.
21  Q. Can you tell me what the normal procedure
22  is on how to book someone if they require medical
23  treatment and you can't take them directly to the
24  jail? What's the normal procedure?

Page 45

1   A. If they have to go to the hospital, we
2   don't book them at all. I mean, our options are,
3   one, wait for him to be released by the doctor.
4   Once he's medically released, he can then be taken
5   into custody, transported to the jail, and
6   processed. Or, two, simply notify the state's
7   attorney's office that you want either a warrant be
8   issued for his arrest and then we'll file formal
9   charges.
10  Q. Now, earlier when you were speaking about
11  the hospital you said that's what they normally do
12  is that they call you when the person is ready to be
13  released.
14  A. If we ask them to.
15  Q. How many times have you done that and how
16  many times have they called you upon your request?
17  A. More than ten.
18  Q. And Jeremy Fleming was charged with
19  battery but Mr. Alvarez was not, correct?
20  A. He was charged with battery.
21  Q. He was, okay. Did the state's attorney
22  prosecute the matter against Jeremy Fleming?
23  A. I don't know.
24  Q. Do you know if they prosecuted against

Page 58

1 seconds.
2  Q. And what happens if you activate it
3 longer than five seconds?
4  A. It doesn't activate longer than five
5 seconds. It automatically shuts off after five
6 seconds and then you have to reactivate it by
7 pulling the trigger again.
8  Q. Do you know what the voltage is on the
9 X26 TASER?
10  A. I don't know the exact voltage.
11  Q. Do you know approximately what the
12 voltage is?
13  A. Fifty to a hundred thousand volts, .0036
14 amps.
15  Q. And how many times can you activate --
16 how many times were you trained to activate a TASER
17 on someone if necessary?
18  A. As many times as is necessary to take the
19 person into custody or to stop the actions of the
20 person that you shot with the TASER.
21  Q. Okay. And do you know -- strike that.
22  Were you trained in any side effects that can
23 happen if a person is TASER'd more than once?
24  A. Not that I can recall.

Page 59

1  Q. Do you know of any side effects that
2 could occur if they're TASER'd more than twice?
3  A. No.
4  Q. Three times?
5  A. No.
6  Q. Four?
7  A. We never covered more than four or five
8 times.
9  Q. Okay. But you could -- you were trained
10 that you could TASER somebody four or five times if
11 necessary, correct?
12  A. They never gave a specific number.
13  Q. So you were never instructed on how many
14 times you could activate a TASER on someone; is that
15 correct?
16  A. Each time that the TASER is activated,
17 it's supposed to give you the desired effect. If it
18 doesn't do it then you can reactivate it. So they
19 didn't say you can't do this, a number, and they
20 didn't say you could do it so many numbers before it
21 has an effect.
22  Q. Okay. You would agree with me, though,
23 that you were never trained on how many times you
24 can TASER someone, correct?

Page 60

1  A. What I would agree with is that I don't
2 recall if they gave us a specific number or not.
3  Q. Is there anything that would refresh your
4 memory as to how many times you were instructed that
5 you should or how many times -- strike that -- at
6 what point you should not TASER someone?
7  A. I know there is a TASER manual, which I
8 think you're looking at. But I don't know if it
9 says specifically whether or not you can TASER
10 somebody once, twice, five, ten, twenty times.
11  Q. Okay. And is there a manual on the X26
12 TASER?
13  A. What type of manual are you speaking of?
14 We have like a pamphlet that has the nomenclature
15 which is basically the set-up, what all the
16 functions are on the TASER. A specific manual for
17 each TASER for an officer to have, I don't recall if
18 they have one or not when they are given the TASER.
19  Q. Were you ever given any handouts during
20 your training on the X26 TASER?
21  A. Yes.
22  Q. Are you sure that you were using the X26
23 TASER back on September 13, 2003?
24  A. Yes.

Page 61

1  Q. And why are you sure of that?
2  A. Because that's what I'm carrying right
3 now.
4  Q. Counsel, I have been provided training on
5 the M26, not the X26 TASER. I would like a copy of
6 the X26 pamphlet and training papers that Officer
7 Wasson was given during his training session on the
8 TASER gun he used on September 13, 2003.
9  Officer Wasson, are those papers here --
10  A. What papers?
11  Q. -- in the police station? The training
12 papers for the X26 TASER.
13  A. No.
14  Q. Where are they kept?
15  A. My copies? Discarded.
16  Q. Okay. Does the police station keep
17 copies here?
18  A. I don't know.
19  Q. Who would know?
20  A. Deputy Director Bob Richard.
21  Q. Okay. Is one of the side effects of
22 activating a TASER is that a person could become
23 frozen?
24  A. Yes.

Page 70

1  avoid arrest?
2     A. Yes.
3     Q. And you would also be allowed to use the
4  TASER if that person were making verbal remarks that
5  they were going to resist arrest?
6     A. Yes.
7     Q. And you would also be allowed to use the
8  TASER if the person were attempting to cause
9  physical injury to himself or someone else or even
10 another officer; is that correct?
11    A. Yes.
12    Q. And would you also agree with me during
13 2003, September 13th, that you would be allowed to
14 use punches or kicks or striking when a person
15 relayed a threat to themselves or another and
16 without intervention that threat would effectuate?
17    A. Effectuate?
18    Q. If the person appeared to be a threat to
19 themselves or another, you would be allowed to use,
20 I believe, what you described as closed fist or a
21 striking resist; is that correct?
22    A. Yes.
23    Q. Or if they acted in an aggressive manner,
24 correct, you would also be allowed to use a striking

Page 71

1  or kicking; is that correct?
2     A. It depends on the aggressive behavior
3  that you're talking about. Just because they're
4  yelling doesn't give you the automatic right to use
5  a punch or a kick.
6     Q. What gives you the right to use a punch
7  or a kick?
8     A. Actively resisting arrest or they're
9  actively fighting you or you feel that at some point
10 you are in fear of being battered, fear of receiving
11 a battery. That would automatically give you at
12 that point to use that or whatever force would be
13 necessary at that point to protect yourself and
14 effect the arrest.
15    Q. And the police report that you used
16 earlier and that you made regarding this incident,
17 is that incident report accurate and complete?
18    A. Yes.
19    Q. Is there anything about the evening that
20 is not contained in your police report as far as the
21 actions of yourself or Mr. Alvarez?
22    A. Yes.
23    Q. What is that?
24    A. It doesn't say that he had slurred speech

Page 72

1  and that he slid off of the hood of my squad car.
2  It doesn't say he was sitting next to the tire and
3  falling over, that he needed that much medical
4  assistance because he was that drunk. It doesn't
5  include whether he was facing me or facing away,
6  whether Jeremy Fleming was facing me or facing away
7  while he was lying on the ground after being hit in
8  the head.
9     Q. Are you finished?
10    A. I'm still reading. It does not include
11 the specifics on me going forward and striking
12 Mr. Alvarez in the pelvic area. It doesn't describe
13 his actions immediately thereafter. I'm sure
14 there's probably small details like time and
15 temperature that's not in there also.
16    Q. Anything else?
17    A. No.
18    Q. What's the purpose of the police report
19 that you filled out regarding Mr. Alvarez?
20    A. To document the events that occurred on
21 September 13 of 2003, 0120 in the morning.
22    Q. Why do you have to document the events
23 that occurred on September 13th, 2003?
24    A. We're documenting the events because

Page 73

1  there has been a criminal offense occur and we
2  document those for prosecution, for the protection
3  of the department, for the protection of witnesses
4  and victims and everyone involved.
5     Q. And what training do you receive on how
6  to complete a report from the department?
7     A. We receive training through the Police
8  Training Institute, and we also go through four
9  months of field training that you would write police
10 reports and a field training officer reviews them
11 and makes sure that you have the elements of the
12 offense in there. And as long as they are written,
13 complete, and the time line is correct, then they're
14 good enough to turn in.
15    Q. Okay. What are the elements that you
16 referred to?
17    A. Each offense -- each incident or crime
18 has a specific element that has to be met in order
19 to charge them.
20    Q. You would agree with me it's important to
21 put absolutely everything that happens in a police
22 report, correct?
23    A. As much as you can recall at the time
24 you're doing the report.

### Page 74

1  Q. Well, you're trained to put -- strike
2  that.
3      You would agree with me that you are trained to
4  write down everything that is important to the
5  elements of an arrest, correct?
6          MR. MARTIN: His testimony was
7      elements of the crime.
8          THE WITNESS: Elements of the crime.
9  Q. (by Ms. Bas) You would agree with me
10 that you're supposed to put all the elements of the
11 crime in the police report; is that correct?
12 A. Elements of the offense that the suspect
13 is being charged with.
14 Q. Are you trained to put your actions into
15 the police report?
16 A. The actions of -- yes.
17 Q. And what specifically are you trained to
18 put in the police report regarding your own actions?
19 A. You put in the report what takes place.
20 Q. And why do you do that?
21 A. To document what happened.
22 Q. And is one of the purposes of the police
23 report so it can be reviewed whether or not your
24 actions are appropriate?

### Page 75

1  A. I don't know the answer to that.
2  Q. Would you agree that when concluding this
3  police report you had to write down all of your
4  actions, your physical actions toward Mr. Alvarez,
5  correct?
6  A. Can you restate your question?
7  Q. Would you agree with me that you had to
8  document in your police report all of your physical
9  actions directed toward Mr. Alvarez?
10 A. Yes.
11 Q. Would you agree with me in this police
12 report you had to write down all of Mr. Alvarez's
13 verbal and physical actions toward you?
14 A. Yes.
15 Q. And according to you, other than the
16 incident where you didn't document that he was
17 sliding down off the police car, that he was on the
18 ground, the only other thing other than that
19 incident and maybe some time, some temperature,
20 stuff like that, is that you didn't document in your
21 police report that you kicked him in the pelvis
22 area; is that correct?
23 A. I didn't document the exact location of
24 the incident as far as grass or gravel.

### Page 76

1  Q. Answer my question, please. Did you
2  document in your police report that you kicked
3  Mr. Alvarez in the pelvis?
4  A. No.
5  Q. And did you document in your police
6  report that Mr. Alvarez took a step toward you?
7  A. No.
8  Q. And you would agree with me that those
9  are two important facts as to why you kicked him in
10 the -- strike that.
11     Would you agree with me that the fact that
12 Mr. Alvarez took a step toward you was the reason
13 why you kicked him; is that correct?
14 A. Yes.
15 Q. And that's something that should be
16 documented in your report, correct?
17 A. He wasn't charged with resisting or
18 obstructing so that element of the offense wasn't
19 included.
20 Q. That's something that should have been
21 contained in this report, correct?
22 A. It's not an element of the offense that
23 he was charged with.
24 Q. Earlier you agreed with me that you had

### Page 77

1  to write down all of your actions towards
2  Mr. Alvarez and all of Mr. Alvarez's actions towards
3  you, correct?
4  A. I did.
5  Q. But you did not do that in this case, did
6  you?
7  A. No.
8  Q. Why not?
9          MR. MARTIN: He answered, it wasn't
10     one of the elements of the crime.
11 Q. (by Ms. Bas) You can answer my question.
12 A. Not an element of the crime.
13 Q. Earlier you said that you were supposed
14 to write down your actions toward Mr. Alvarez and
15 his actions towards you, but you did not do that in
16 this case. I want to know why.
17         MR. MARTIN: He just explained, it's
18     not an element of the crime. It's been
19     asked and answered.
20 Q. (by Ms. Bas) Can you answer my question?
21 A. Jack?
22         MR. MARTIN: Well, go ahead. I can
23     object but --
24         THE WITNESS: Okay. Ask me again.

Page 82

1   A. Yes.
2   Q. How many times?
3   A. Do you want to include written
4   reprimands?
5   Q. Yes.
6   A. I don't know.
7   Q. More or less than a hundred?
8   A. Less.
9   Q. Less than fifty?
10  A. Less.
11  Q. Less than twenty?
12  A. Less.
13  Q. Less than ten?
14  A. Less.
15  Q. Less than five?
16  A. Yes.
17  Q. Can you tell me the times that you were
18  reprimanded, please?
19  A. I was reprimanded in 2001 for leaving a
20  piece of evidence in the evidence locker for more
21  than a day. So I got warned by the sergeant to not
22  do that again.
23       I got suspended a day for calling in sick and
24  playing in a DARE golf tournament. Let's see. What

Page 83

1   else have I been reprimanded for? I don't think I
2   have any other written reprimands.
3        Then I was suspended for five days for -- I
4   don't have the official violations of the
5   departmental policy, but it wasn't use of force or
6   anything like that. One was misuse of the MDT in
7   the squad car.
8   Q. What's the MDT?
9   A. Mobile data terminal. You're talking the
10  entire ten years that I've been here, right?
11  Q. Yes, I am.
12  A. Violation of professional image. All of
13  this included in one suspension. They put four or
14  five different violations of departmental policy.
15  Violation of departmental image.
16  Q. What was that?
17  A. Because I was sitting in a parking lot
18  more than an hour.
19  Q. Okay.
20  A. Misuse of departmental vehicle.
21  Q. What were you doing?
22  A. We're assigned a specific area within the
23  town, and if you go from out of that area without
24  prior approval of your shift commander or sergeant,

Page 84

1   it's a violation of policy. So that was included.
2   Conduct unbecoming of an officer, which was included
3   in sitting in the parking lot for more than an hour
4   because it looked bad. All of those are in one
5   disciplinary hearing. I don't know if there's any
6   more than that or not. I don't recall.
7   Q. The only actions that Mr. Alvarez took
8   toward you before you kicked him was he took one
9   step; is that correct?
10  A. No.
11  Q. What else did he do?
12  A. He was obstructing or resisting arrest by
13  not complying with the direct orders by me to drop
14  the pipe, then to get on the ground.
15  Q. He had already dropped the pipe, correct,
16  when you kicked him?
17  A. Yes, but he was not on the ground as
18  ordered. He was still resisting arrest.
19  Q. And he had been TASER'd twice at this
20  point, correct?
21  A. Yes, ma'am.
22  Q. And a person can appear frozen after
23  being TASER'd, correct?
24  A. Or can be on some type of drugs.

Page 85

1   Q. And in this particular case we know
2   Mr. Alvarez was intoxicated, correct?
3   A. But not at the time.
4   Q. He wasn't intoxicated at the time you
5   TASER'd him?
6        MR. MARTIN: No, he didn't know at
7        the time.
8        THE WITNESS: I didn't know at the
9        time of the incident when he was resisting
10       arrest whether he was intoxicated, high on
11       drugs, or what.
12  Q. (by Ms. Bas) He wasn't yelling at you,
13  correct?
14  A. Correct.
15  Q. And he wasn't waving his arms at you,
16  correct?
17  A. Correct.
18  Q. The only thing he was doing was not
19  responding to your commands and he took one step
20  forward, correct?
21  A. Yes.
22       MS. BAS: That's all I have. Thank
23       you.
24       EXAMINATION